Mark Johnson (SBN 135288)
Mark.johnson@offitkurman.com
Offit Kurman, P.A.
445 S. Figueroa Street
18th Floor
Los Angeles, CA 90071
Office: (213) 629-5700

Ari Karen (*pro hac vice forthcoming*)
akaren@mitchellsandler.com
Lucas Markowitz (*pro hac vice forthcoming*)
lmarkowitz@mitchellsandler.com
Alexander Rogosa (*pro hac vice forthcoming*)
arogosa@mitchellsandler.com
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, DC 20036
Office: (202) 886-5265

Attorneys for Plaintiff
LUMINATE HOME LOANS, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUMINATE HOME LOANS, INC., | Case No.: **'24CV2251 BAS MSB** |
| Plaintiff, | **LUMINATE HOME LOANS, INC.'S VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| BETTER MORTGAGE CO., DANIEL HORANYI, JEANETTE LEE, & LAUREN HAVINS, | |
| Defendants. | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND FOR DAMAGES

Plaintiff Luminate Home Loans, Inc., by and through its undersigned counsel, hereby files this Verified Complaint, seeking injunctive relief, monetary relief, and such other relief as the Court deems appropriate, and in support thereof, avers as follows:

**The Parties**

1.  Plaintiff Luminate Home Loans, Inc. ("Luminate" or "the Company") is a Minesota corporation with a principal place of business at 2523 Wayzata, Suite 200, Minneapolis, MN 55405.

2.  Defendant Better Mortgage, Co. ("Better") is a corporation organized under the laws of the State of California with a principal place of business at 175 Greenwich Street, 57th Floor, New York, NY 10007.

3.  Defendant Daniel Horanyi is an individual who currently resides at 1119 Vega Way, San Marcos, CA 92078.

4.  Defendant Jeanette Lee is an individual who currently resides at 17 Cuervo Drive, Aliso Viejo, CA 92656.

5.  Defendant Lauren Havins is an individual who currently resides at 1721 Dayton Drive, Lemon Grove, CA 91945.

**Jurisdiction and Venue**

6.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

7.  This Court further has diversity jurisdiction over this matter pursuant to 28 U. S. C. § 1332 as there is complete diversity between the Parties, since Plaintiff is a citizen of Minnesota under the statute, Defendants are all citizens of California under the statute, and the amount in controversy exceeds $75,000.

8.  The Court has personal jurisdiction over Better as set forth in Cal. Code Civ. Proc. § 410.10 because it is incorporated in California and because of the intentional tortious activity it engaged in targeting California as the location where Luminate's employees were located and from where it extracted Luminate's trade secrets.

9.  This Court has personal jurisdiction over Defendant Horanyi, Defendant Jeanette Lee, and Defendant Lauren Havins ("Individual Defendants") because they

are residents of California and because of the intentional tortious activity they engaged in from California.

10.    Better engaged high-ranking Luminate employees, including but not limited to the Individual Defendants, in a conspiracy and tortiously interfered with Luminate employment contracts to induce the Individual Defendants and others to breach the terms of their employment, breach their fiduciary duties to their employer, solicit coworkers, and collectively misappropriated Luminate trade secrets, computer files and data, and other confidential and proprietary information in an effort to copy Luminate's business model for Better.

11.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as Defendant Horanyi and Defendant Havins reside in this district, a substantial part of the events giving rise to the claims asserted herein occurred in this District, and all Defendants are residents of the state and subject to jurisdiction in this District.

**Factual Background**

12.    Luminate began as the entity AMEC Home Loans in 1998 and rebranded to Luminate Home Loans, Inc. in 2020. It operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products.

13.    The company began with only six employees and has expanded to over 500 loan originators, with additional operations staff, providing mortgage services across the country.

14.    In the fall of 2021, Luminate investigated an opportunity to purchase a unique mortgage division known as NEO Home Loans ("NEO") from a struggling competitor, Celebrity Home Loans LLC.

15.    The purchase was finalized and announced in December 2022, with Luminate quickly taking steps to onboard existing NEO employees from Celebrity Home Loans LLC into their company.

16.    Daniel Horanyi was identified to serve as a Division President for NEO within Luminate after making the transition from Celebrity Home Loans LLC.

3

17.    Luminate ultimately hired and onboarded approximately 350 people in this acquisition, investing significant resources to integrate these employees into Luminate and sharing Luminate's infrastructure to provide support for this new division.

18.    Luminate made significant developments to its NEO division over the next three years to refine its business strategies and make it a successful division, providing extensive support to the division through marketing, hiring, cost-sharing, experience and communication, product support and data analytics, human resources, and other areas.

19.    NEO functioned within Luminate's larger structure as one source of its mortgage operations and fulfillment offerings, with other branches of Luminate's business handling manufacturing processes for those NEO loans, such as appraisals, disclosures, and other aspects.

20.    One notable development Luminate made with its NEO division was through creating a mortgage option that enabled borrowers to present "cash offers" on their home purchases, a major factor in having a bid accepted in today's competitive environment.

21.    Luminate's advancements as a company, including through its development of the NEO division, led to its recognition as the third fastest-growing nonbank mortgage originator in the nation in September 2024.

22.    Luminate continued to support and expand its NEO division, devoting months of work in 2024 to set up NEO as its own wholly owned subsidiary of Luminate's parent company, Luminate Bank, and giving NEO division managers further access and information on Luminate to prepare for this.

23.    In October of 2024, Luminate became aware that the NEO division leadership, led by Defendant Horanyi, were meeting collectively with other mortgage lenders about leaving Luminate.

24.    Luminate sought to remedy any dissatisfaction its employees had so the

Company's CEO, as well as the Company director, each met with the NEO division's managers, but they denied any dissatisfaction or interest in other companies rather than working to address any concerns together.

25.    The suspicious and evasive conduct of these individuals led Luminate to exercise its right to review and monitor its employees' work devices, reviewing emails and data access for some key individuals within the NEO division.

26.    This process revealed NEO leadership were meeting extensively with another lender, Better, and sharing Luminate confidential information and trade secrets.  By this time, each of the Individual Defendants already received offer letters from Better and had evidently agreed to join the company with an intent to surreptitiously bring the NEO division with them.

27.    Better was founded in 2003 and is a competitor in the mortgage industry to Luminate.  However, upon information and belief, Better has never had a retail lending division like Luminate does, of which NEO is a part.  Acquiring Luminate's confidential information and trade secrets about how Luminate operated NEO were paramount to making this a successful expansion of Better's operations.

28.    On October 25, 2024, Luminate terminated the Individual Defendants and six other employees from its NEO division that Luminate identified as engaging in this misconduct.

29.    Having been forced to terminate nearly the entire leadership structure of its NEO division as a result of this illicit conduct, Luminate announced on October 25, 2024, that it would be shutting down its NEO division and would need to transition its more than 200 employees that worked in that division to other areas of its business.

**Individual Defendant's Employment and Contractual Obligations**

a.  Defendant Horanyi

30.    Defendant Horanyi began his employment with Luminate on January

5

12, 2021, as a Division President, a nonproducing position.

31.    Defendant Horanyi was responsible for running the NEO division within Luminate.  The nature of that employment meant Luminate entrusted him with confidential and proprietary information regarding Luminate's operations, strategies, and employees.

32.    As a material term and consideration for his employment with Luminate, and in exchange for fair salary compensation, Defendant Horanyi reviewed and signed Luminate's Employee Handbook on December 11, 2022.  *See* Horanyi Employee Handbook Excerpt attached as Exhibit 1.

33.    The employee handbook confirmed that Mr. Horanyi was an at-will employee.  In signing the handbook, he expressly agreed not to engage in outside employment which impacted the performance of his job duties at Luminate or presented a conflict of interest.  *Id.* at § 5.5.  He further agreed in his employment with Luminate to abide by "the principles of fair dealing and ethical conduct" and to demonstrate "the highest standards of conduct and personal integrity."  *Id.* at § 5.2. Violations of Luminate's standard of conduct were specifically noted to include disclosure "of Company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company or its customers, contractors, suppliers, or vendors." *Id.* at § 5.1.

34.    Luminate's policy on the use of company technology is also clearly articulated in the handbook, which Defendant Horanyi agreed to abide by. This included that "all content maintained in company IT resources and communications systems are the property of the company" and are to be used for business purposes for the benefit of Luminate.  *Id.* at § 6.5.  The policy confirms that there is no expectation of privacy for employees when using these systems and employees agree

that the company may "monitor, intercept, and/or review all data transmitted, received, or downloaded over Company IT resources and communications systems." *Id.*

35.    Luminate maintains a detailed section regarding its confidential business information and trade secrets to ensure employees such as Defendant Horanyi who are entrusted with access to them, protect that closely guarded information for the benefit of Luminate.

36.    Defendant Horanyi agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans. Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *Id.* at § 9.1.  Defendant Horanyi was clearly advised that he was "not permitted to use confidential information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains." *Id.*

37.    Luminate advised employees such as Defendant Horanyi that they "may not illegally duplicate any licensed software or related documentation … [they] may not duplicate, copy, or give software to any outsiders including clients, contractors, customers, and others." *Id.* at § 9.3.

38.    On or about December 9, 2022, as a material term and consideration for Defendant Horanyi's employment with Luminate, and in exchange for fair salary compensation, he signed Luminate's policy prohibiting any dual employment that could create a conflict of interest with Luminate.  *See* Horanyi Dual Employment Agreement attached as Exhibit 2.

39.    On or about February 16, 2023, Luminate further formalized the terms of Defendant Horanyi's at-will employment through an employment agreement as a material term and consideration for his continued employment with Luminate, and in

exchange for fair salary compensation. *See* Horanyi Employee Agreement attached as Exhibit 3.

40.    Defendant Horanyi agreed that "employee shall not directly or indirectly render any related services of a commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of the Company." *Id.* at § 2.4. He also was required to "remain familiar with and ensure compliance with all the Company's rules, policies, and procedures." *Id.* at 2.1(ii).

41.    The employment agreement reinforces Defendant Horanyi's obligations regarding confidential information and trade secrets such that:

> Employee acknowledges that by reason of his/her employment hereunder, Employee will occupy a position of trust and confidence with the Company and that Employee will have access to confidential and proprietary information and trade secrets of the Company, all of which are the unique and valuable property of the Company. Employee acknowledges that, among other things, its business methods, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, and employer's documentation (the "Confidential Information") have been developed through the expenditure of substantial time, effort and money which the Company wishes to maintain in confidence and withhold from disclosure to other persons. Accordingly, as a material inducement to the Company to enter into this Agreement, Employee acknowledges that s/he will become intimately involved and/or knowledgeable in regard to the Company's business and will be entrusted with the Company's confidential information, and both during his/her employment and after any termination thereof, Employee will use such information solely for the Company's benefit, and maintain as secret and will not disclose any of the Confidential Information to any third party (except as Employee's duties may require) without the Company's prior express written authorization.

*Id.* at § 5.3

> Employee acknowledges that all tangible property, documents, files, electronic records or data, or records or materials of any sort pertaining to the Company's business, whether prepared by Employee or otherwise coming into Employee's possession or control, are the sole and exclusive property of the Company and that Employee has no right to keep or use such documents or things following termination of his/her employment.

*Id.* at § 5.4; see also *id.* at § 5.9.

42.    Defendant Horanyi's employment contract also reinforces the duty of loyalty he owed to his employer through a non-solicitation clause, which was a material term to that agreement considering the position of trust and influence Defendant Horanyi maintained:

> For the period Employee is employed by Company and, in the event of termination, for twelve (12) months following the cessation of employment with the Company for any reason (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein), the Employee agrees and covenants not, directly or indirectly (whether on Employees own behalf, working with others, or on behalf of any other person, business or entity): (1) contact, solicit, or communicate in any way with any person employed by or under contract with the Company, including Former Employees of the Company, to in any way terminate or change his or her employment relationship with the Company, to apply for future employment with any other person, business or entity, or to engage in any other business activities; and/or (2) hire, attempt to hire, solicit for employment, employ, offer employment to, assist in offering employment to or solicit for purposes of employing or obtaining the services of (through any IRS W2, 1099, staffing company, employee leasing, partnership, company affiliation or other arrangement) any person employed by or under contract with the Company, including Former Employees of the Company.

> For purposes of this Section, "Former Employees" means any person (a) formerly employed by or under Contract with Company during any part of Employee's employment with the Company ... and (c) was employed by or under contract with the Company within the past twelve (12) months prior to Employee's separation date.

*Id.* at 5.8.

43.    The provisions within Defendant Horanyi's contract were fairly negotiated, reasonable and necessary, and in exchange for valuable consideration. Moreover, Defendant Horanyi agreed "that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Company herein, are reasonable and necessary." *Id.* at 5.11.

b. Defendant Lee

44.    Defendant Lee also began her employment with Luminate on January 12, 2021, as a Vice President of Branch Operations within the NEO division.

9

45.    The nature of Defendant Lee's position meant Luminate entrusted her with confidential and proprietary information regarding Luminate's operations, strategies, and employees.

46.    As a material term and consideration for her employment with Luminate, and in exchange for fair salary compensation, Defendant Lee reviewed and signed Luminate's Employee Handbook on December 6, 2022.   *See* Lee Employee Handbook Excerpt attached as Exhibit 4.

47.    The obligations for Ms. Lee established under her agreement to the Employee Handbook mirror those described in paragraphs 32-36 above.  *See id.*

48.    On or about December 9, 2022, as a material term and consideration for Defendant Lee's employment with Luminate, and in exchange for fair salary compensation, she signed Luminate's policy prohibiting any dual employment that could create a conflict of interest with Luminate.   *See* Lee Dual Employment Agreement attached as Exhibit 5.

c.   Defendant Havins

49.    Defendant Havins began her employment with Luminate on July 29, 2024, as a Project Manager within the NEO division.

50.    The nature of Defendant Havin's position meant Luminate entrusted her with confidential and proprietary information regarding Luminate's operations, strategies, and employees.

51.    As a material term and consideration for her employment with Luminate, and in exchange for fair salary compensation, Defendant Havins reviewed and signed Luminate's Employee Handbook on July 29, 2024. *See* Havins Employee Handbook Excerpt attached as Exhibit 6.

52.    The obligations for Ms. Havins established under her agreement to the Employee Handbook mirror those described in paragraphs 32-36 above.  *See id.*

53.    On or about July 22, 2024, as a material term and consideration for

Defendant Havin's employment with Luminate, and in exchange for fair salary compensation, she signed Luminate's policy prohibiting any dual employment that could create a conflict of interest with Luminate. *See* Havins Dual Employment Agreement attached as Exhibit 7.

**Breaches of Fiduciary Duties; Theft of Trade Secrets and Computer Files**

54.    Luminate's Information Technology ("IT") department began reviewing the computer usage of the Individual Defendants and other NEO leaders under suspicions that they were meeting collectively about opportunities with other lenders and no longer optimizing NEO's services within Luminate.

55.    Luminate's IT department utilized a computer monitoring system called Teramind, pursuant to the terms of the Company's Employee Handbook, to investigate the download histories and external communications by the Individual Defendants.

56.    The review revealed substantial improper activity violating the terms of the Individual Defendants' employment, as well as state and federal laws, including through the transmission of Luminate's confidential information and trade secrets directly to their competitor, Better.

57.    The Teramind software was able to capture numerous images and activity records from the employees' computers, confirming the illicit conduct by the Defendants.

58.    One such image from Defendant Horanyi's work device, confirms he received a formal offer letter from Better on or about October 18, 2024, to join the company as Vice President of Distributed Retail to begin their retail mortgage lending operations. *See* Horanyi Offer Letter attached as Exhibit 8. The offer was contingent on a further Statement of Work meant to confirm a timeline and tasks required to establish the Distributed Retail Channel at Better, which would undoubtedly come through the provision and use of Luminate's trade secrets as well

as the siphoning of their key management employees to assist Defendant Horanyi in this undertaking.  *See id.*

59.    Defendant Horanyi did not receive this offer letter individually, but rather received it in an email that simultaneously provided offer letters to two of the other three Luminate NEO Division Presidents.  *See* Offer Letter Email attached as Exhibit 9.    The email with these offers was sent by Better's Vice President of Corporate Finance & Investor Relations, Hana Khosla.  *Id.*

60.    These offers proved to not be the result of spontaneous and individual desires to seek alternate employment, but rather stemmed from protracted negotiations and provision of Luminate confidential information and trade secrets by the Individual Defendants to Better to demonstrate how they could collectively jumpstart a retail division at Better using this information.

61.    On August 8, 2024, Ms. Khosla requested the NEO team provide an outline of the broker process flow used by Luminate's NEO division, such as Loan Officer training materials depicting the data gathering, intake of borrower applications, the provision of lending disclosures, and the data transmission process.  *See* Khosla August 8th Email Exchange attached as Exhibit 10.    These trade secrets detailing the retail lending process established by Luminate was expressly requested to enable Better's engineering team to develop a broker process system that would conform with this system that Luminate refined through years of experience and work.  *Id.*  The same day Defendant Lee provided a copy of a Luminate "job aid" and details regarding the attached material to Ms. Khosla, as well as Chad Smith, Better's President and Chief Operations Officer, with Defendant Horanyi copied on the exchange.  *Id.*  On October 18, 2024, Defendant Lee provided another copy of a Brokered Loans Job Aid and a detailed description of the process flow utilized by Luminate to efficiently handle loan applications.

62.    On August 12, 2024, Better requested extensive details regarding the

financial obligations and payment structures necessary to operate the NEO division if they proceeded with plans to attempt to steal this business group from Luminate. *See* Payment Structure Email Exchange attached as Exhibit 11. Ms. Khosla received insight from Luminate employees into the total payroll expenditures necessary to operate this division and breakdowns for how to structure individual manager compensation based on Luminate's confidential contractual agreements with its employees. *Id.*

63.    On September 7, 2024, Defendant Horanyi updated Ms. Khosla and Chad Smith at Better, confirming that he and the other Luminate NEO managers who were copied on the email had proceeded with their collective plan and approached Luminate Branch Leaders about moving to Better, and they presented the branch leaders with a write-up detailing how revenue would be shared at Better if they moved their branches there. *See* Better NEO Economic Model Email attached as Exhibit 12.

64.    On October 4, 2024, Defendant Horanyi provided Better, through Ms. Khosla and Mr. Smith, with a detailed roadmap of their plan to solicit key members of Luminate's NEO division, coordinate with Better for setting up this retail division at their company, and for onboarding the many employees they intended to bring with them. *See* Horanyi Transition Planning Email attached as Exhibit 13. Defendant Havins was also included on this exchange and designated to provide Better with Luminate's project roadmaps. *See id.* Defendant Horanyi in this exchange further provided Better with copies of Luminate employment agreements with suggested revisions, including Non-Producing Division Presidents, Producing Division Presidents, Producing Branch Managers, and Producing Managers, which were essentially all management levels needed for Better to set up retail loan operations that they previously had no experience with. *Id.*

65.    On October 5, 2024, Defendant Horanyi coordinated with another

Luminate employee, Necco Stevens, to send an executed P1 award letter for Luminate's NEO division to an attorney assisting Defendant Horanyi in this process with creating a separate company titled NEO Services LLC and a draft agreement for it to serve as a corporate subdivision at Better, including the provision of ownership shares in the company to co-conspirators who assisted the Defendants with the desired move to Better. *See* Horanyi and Stevens Email Exchange attached as Exhibit 14.

66.    The Defendants utilized Luminate's trade secrets and the insight the Individual Defendants acquired from Luminate's extensive efforts to set up NEO as its own wholly owned subsidiary of the Luminate parent company, Luminate Bank, to make these preparations.  If not for their privileged position observing and participating in these efforts by Luminate, they would not have the requisite understanding to assist Better with setting up NEO as a subdivision for its company.

67.    On October 18, 2024, Better provided the Individual Defendants with their detailed plans for launching NEO at Better, acknowledging their intent to effectively steal Luminate's division by references that they would replace Luminate's marketing material of "NEO Powered by Luminate" with "NEO Powered by Better," take over Luminate's neohomeloans.com website, continue utilizing the Youtube Channel set up for Luminate's NEO division and even maintain the marketing videos created by Luminate, and potentially keep the signage Luminate put in place for its NEO offices. *See* Better NEO Marketing Email attached as Exhibit 15.  The Defendants further exchanged a list of purchased leads and loan files by state for the last ninety days to ensure the NEO retail sales division at Better would begin with an unfair head-start with customers and revenue production to match the massive advantage they obtained by misappropriating Luminate's trade secrets for the establishment and management of such a retail sales division. *See id.*

68.    At a virtual meeting between Defendants on October 18, 2024,

Defendant Horanyi shared with better additional trade secrets and insight into Luminate's business operations, including a spreadsheet identifying every NEO branch, its employees, and their salaries to assist with Better's business development of a retail division and targeting of Luminate's employees. *See* October 18th Meeting Screenshot attached as Exhibit 16.

69.    The Defendants had numerous meetings to coordinate on the creation of a retail sales division at Better meant to operate as "NEO Powered by Better," all while the participants knew that the NEO team members continued to be employed by Luminate. On October 18, 2024, following one such meeting, Defendant Lee sent Better, at their request, a SimpleNexus application link for Luminate's system so Better could review the loan application process from the borrower's perspective inside of Luminate's system. *See* Application Link Email Exchange attached as Exhibit 17.

70.    On October 23, 2024, Defendant Horanyi coordinated for Better to receive a Luminate report breaking down each of its branches' margins for all loan type categories offered by Luminate, providing an extensive playbook on what type of loans Luminate considered worthwhile and their profitability broken down by region as well as loan officer, ultimately providing Better nearly five thousand fields of valuable proprietary data. *See* Branch Margin Email attached as Exhibit 18.

71.    On October 24, 2024, Defendant Lee pulled data on all full-time employees across Luminate's entire company, not merely the NEO division, with the evident intent to provide this information to Better as such information was not reasonably necessary for the performance of any of her Luminate job duties. *See* Teams Chat Screenshot attached as Exhibit 19.

**Better Had Actual Knowledge of the Wrongful Nature of Its Actions**

72.    At all times, Better and its representatives knew that this conduct was wrongful. Better's President, Chad Smith, sought to limit the trail for their use of

1    Luminate's documents, software, and systems.

2        73.    When Defendant Lee provided a copy of Luminate's job aid in August,

3    President Chad Smith took steps to have references to Luminate's company redacted

4    or deleted before their document would be distributed to Better's engineering team.

5    *See* Exhibit 7.

6        74.    When Defendant Lee later provided the loan application link for Better's

7    employees to view Luminate's system for themselves from a borrower's perspective,

8    Mr. Smith stepped in to instruct them not to create such a test application, presumably

9    because that could be tracked by Luminate.  *See* Exhibit 17.

10        75.    Better took steps to try to limit the transmission of Luminate materials

11    directly into its servers, instead setting up an external Box Folder for Luminate's

12    employees to funnel these trade secrets and confidential information into where

13    Better's employees could then access them.  *See* Box Folder Screenshot attached as

14    Exhibit 20.  This folder was created by Max Goodman, an associate general counsel

15    at Better, who undoubtedly understood the legal implications of receiving and

16    utilizing Luminate's trade secrets, hence the desire to obfuscate how Better obtained

17    this material.  *See id.*  By keeping much of this material off of Better's company

18    servers, they likely hoped to claim in any ensuing litigation that they did not have

19    such responsive material in the company's possession.  *Id.*

20        76.    There can be no doubt that the Individual Defendants and Better

21    understood that these Individual Defendants were simultaneously working for a

22    competitor of Luminate and not merely exchanging information to assist with the

23    consideration of another employment opportunity.  On October 22, 2024, while still

24    employed at Luminate and with no signs of resigning, Defendant Lee coordinated

25    with Better to receive a company laptop, begin the company training process, and

26    participate in a vendor call on the company's behalf.  *See* Training and Laptop Email

27    attached as Exhibit 21.  On the following day, Defendant Lee received an email from

28    Better's IT Department welcoming her to joining the company and providing her

with login credentials and her email address to facilitate the performance of her job at this competing company. *See* Lee Login Credentials Email attached as Exhibit 22.

77.   On October 24, 2024, Better requested copies of all facility lease agreements for Luminate's NEO division, evidently intending to take over these facilities, or at least all profitable offices, when they went public with their intended theft of Luminate's division. *See* Facility Leases Email attached as Exhibit 23. Defendant Havins provided these confidential and proprietary Luminate business documents to Better. *Id.*

78.   This scheme, which violates multiple federal and state lending laws and regulations could not have been initiated without the knowledge, consent, and direction of Better.  Better extensively utilized Luminate's trade secrets and confidential information to gain the ability to create a retail loan division that the company had no previous experience with.  In addition, Better induced Luminate's employees to work on behalf of Better for months, while still officially Luminate employees, and to use their privileged positions as coworkers and managers to solicit employees within Luminate's NEO division to go to the new subdivision being organized for Better.

**Detrimental Impacts Unfolding From Defendants' Conduct**

79.   Following the review of its employees' work devices, Luminate had little choice but to terminate the employment of the ringleaders from its NEO division who were coordinating with Better against Luminate's interests, given the extent of dishonest conduct and employment violations.

80.   On October 25, 2024, Luminate terminated the employment of the Individual Defendants along with 6 other leaders from its NEO division who were coordinating with Better.

81.   Losing these managing employees for its NEO subdivision and observing the extent to which they had poisoned the well with individual branch

managers and leaders, Luminate also announced on October 25th that it intended to wind down its NEO division, requiring the Company to incorporate its many employees into other mortgage lending operations at the Company.

82.    Retention of these NEO employees and their obligatory reassignment to other Luminate teams puts additional strain on the company to absorb this workforce without causing other detrimental effects to its existing teams, including but not limited to jeopardizing their continued profitability.

**COUNT I**
**Breach of Contract Against Defendants Horanyi, Lee, and Havins**

83.    Luminate incorporates all previous paragraphs as if fully set forth herein.

84.    The Individual Defendants were all at-will employees of Luminate during the periods identified in this Complaint, up until their termination for cause on October 25, 2024.

85.    As a material term and condition for their employment with Luminate, and in exchange for fair salary compensation, the Individual Defendants each agreed to abide by the terms of Luminate's Employee Handbook that set forth certain obligations regarding their employment with Luminate. *See* Exhibits 1; 4; and 6 at § 5.2

86.    The Individual Defendants each agreed therein not to engage in outside employment which impacted the performance of their job duties at Luminate or presented a conflict of interest. They agreed to abide by "principles of fair dealing and ethical conduct" and to demonstrate "the highest standards of conduct and personal integrity." *See* Exhibits 1; 4; and 6 at § 5.2.

87.    The Individual Defendants all acknowledged that it was a violation of Luminate's standard of conduct and the terms of their employment to disclose "of company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business

strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company.  *See* Exhibits 1; 4; and 6 at § 5.1.

88.    The Individual Defendants all agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans. Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *See* Exhibits 1; 4; and 6 at § 9.1. They were clearly on notice that they were "not permitted to use confidential information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains."  *See* Exhibits 1; 4; and 6 at § 9.1.

89.    The Individual Defendants agreed not to "illegally duplicate any licensed software or related documentation … [they] may not duplicate, copy, or give software to any outsiders including clients, contractors, customers, and others." *See* Exhibits 1; 4; and 6 at § 9.3.

90.    The Individual Defendants further agreed as a material term and condition for their employment with Luminate to sign Luminate's distinct policy agreeing that they were prohibited from engaging in any dual employment that could create a conflict of interest with Luminate.  *See* Exhibits 2; 5; and 7.

91.    Defendant Horanyi, in addition to the other agreements governing his employment at Luminate, entered into a written Employment Agreement for his role as Non-Producing Division President for the NEO Division of Luminate.  *See* Exhibit 3.

92.    Defendant Horanyi expressly agreed that, in addition to the common law duty of loyalty and the standards of conduct and integrity previously outlined for his employment, he would not during the period of his employment or for twelve months thereafter "not, directly or indirectly (whether on Employees own behalf, working

with others, or on behalf of any other person, business or entity): (1) contact, solicit, or communicate in any way with any person employed by or under contract with the Company, including Former Employees of the Company, to in any way terminate or change his or her employment relationship with the Company." *Id.* at § 5.8.

93.    The Individual Defendants breached their employment terms by *inter alia*, using, disclosing, and/or stealing Luminate's trade secrets and confidential and proprietary information for their individual benefit and that of Luminate's competitor, Better, and by soliciting Luminate employees to terminate employment with Luminate.

94.    As a proximate result of the Individual Defendants' breach, Luminate has suffered, and will continue to suffer, damages and loss.

95.    The Individual Defendants' actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

96.    The Individual Defendants' conduct has and will continue to cause irreparable harm to Luminate.

**COUNT II**
**Breach of Fiduciary Duties Against Defendants Horanyi, Lee, and Havins**

97.    Luminate incorporates all previous paragraphs as if fully set forth herein.

98.    As leaders at Luminate for its NEO division, the Company placed confidence in the Individual Defendants to act in good faith with regard to Luminate's interests.

99.    The Individual Defendants were in a position of trust and influence at Luminate.

100.    Given the nature of the Individual Defendants' relationships with Luminate, they owed the Company certain fiduciary duties, including the duty of loyalty, good faith, fair dealing, to act in Luminate's best interest, and to avoid acting in a manner detrimental to its financial, business, and other interests.

101.   The Individual Defendants breached their fiduciary duties to Luminate by, among other things, soliciting and/or attempting to solicit Luminate employees while they were all still employees of Luminate, to terminate their employment and/or violate their obligations to their employer Luminate, and make arrangements to join Luminate's competitor, Better.

102.   During the periods identified in this litigation, the Individual Defendants ceased working on behalf of Luminate's interests and failed to execute their job duties with the Company, thereby inhibiting and diminishing the Company's productivity and revenue.

103.   The Individual Defendants also sought and received reimbursement from Luminate for expenses purportedly incurred during the performance of their job duties that were in actuality spent in furtherance of their efforts to solicit Luminate employees to join their competitor.

104.   The Individual Defendants directed and encouraged other Luminate employees to seek reimbursement for expenses they incurred while meeting to consider the Individual Defendants' solicitations to join Better and such wrongful reimbursement requests were submitted and paid by Luminate.

105.   In acting in the manner described above, the Individual Defendants did not exercise the care required in their positions, in that they used their positions of trust and confidence to further their own interests and the interests of Better, and in so doing, caused injury to Luminate.

106.   As a result, the Individual Defendants have breached their fiduciary duties and duty of loyalty owed to Luminate and Luminate has been and continues to be irreparably harmed by the Individual Defendants' actions.

**COUNT III**
**Misappropriation of Trade Secrets in Violation of the**
**Defend Trade Secrets Act 18 U.S.C.A. § 1836 Against Defendants Better,**
**Horanyi, Lee, and Havins**

107.   Luminate incorporates all previous paragraphs as if fully set forth herein.

108.   The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

109.   Luminate's confidential and proprietary information stolen and misappropriated by Defendants include, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for its divisions and branches, economic models, lead lists and leads.

110.   This material constitutes trade secrets under the DTSA, all of which would provide a competitor a significant advantage in creating a competing retail loan division based on Luminate's model for its NEO division.

111.   Luminate derives independent economic value from its confidential data and trades secrets including its employee data, business organization and strategies, and its pricing information.

112.   Luminate's trade secrets are related to products or services used in interstate commerce.

113.   Luminate takes steps to protect this proprietary information by restricting employees' access, using password protected logins for certain information, and having employees who will be provided access to such privileged business information sign or acknowledge employment provisions confirming they will not distribute or misuse these trade secrets.

114.   The Individual Defendants were entrusted with trade secret information in the performance of their jobs.

115.   The Individual Defendants improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, for the use and benefit of Better, a competitor of Luminate.

116.   Better was aware of, facilitated, encouraged, directed, and induced the Individual Defendants in taking and using these trade secrets.

117.   Better reviewed, utilized, directed, and permitted the use of these trade secrets for its benefit.

118.   Defendants utilized such trade secrets without Luminate's express or implied consent, all to Luminate's detriment.   Indeed, Better has endeavored to replicate Luminate's operations and financials – or at least has been able to create the impression thereof – sufficient to prepare to enter the retail loan market, which could not have been accomplished without the trade secret and data theft described herein unless through the expenditure of years of effort and resources, or the financial commitment of purchasing a competing business in arm's length negotiations.

119.   As a direct result of Defendants' Actions, Luminate is entitled to damages in the amount of at least Ten Million Dollars.

**COUNT IV**
**Misappropriation of Trade Secrets in Violation of**
**California's Uniform Trades Secrets Act Against**
**Defendants Better, Horanyi, Lee, and Havins**

120.   Luminate incorporates all previous paragraphs as if fully set forth herein.

121.   The California Uniform Trades Secrets Act ("CUTSA"), C.A. Gen. Stat. § 3426 prohibits the misappropriation of trade secrets.

122.   The CUTSA defines "trade secret" as information that "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or

use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* C.A. Gen. Stat. § 3426.1

123.   The CUTSA defines misappropriation as "acquisition, of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:(A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id.*

124.   Luminate's confidential and proprietary information stolen and misappropriated by Defendants includes, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for its divisions and branches, economic models, lead lists and leads.

125.   This material constitutes trade secrets under the CUTSA, all of which would provide a competitor a significant advantage in creating a competing retail loan division based on Luminate's model for its NEO division.

126.   Luminate derives independent economic value from its confidential data and trades secrets including its employee data, business organization and strategies, and its pricing information.

127.   Luminate's trade secrets are related to products or services used in intrastate commerce.

128.   Luminate takes steps to protect this proprietary information by restricting employees' access, using password protected logins for certain information, and having employees who will be provided access to such privileged

business information sign or acknowledge employment provisions confirming they will not distribute or misuse these trade secrets.

129.    The Individual Defendants were entrusted with trade secret information in the performance of their jobs.

130.    The Individual Defendants improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, for the use and benefit of Better, a competitor of Luminate.

131.    Better was aware of, facilitated, encouraged, directed, and induced the Individual Defendants in taking and using these trade secrets.

132.    Better reviewed, utilized, directed, and permitted the use of these trade secrets for its benefit.

133.    Defendants utilized such trade secrets without Luminate's express or implied consent, all to Luminate's detriment.  Indeed, Better has endeavored to replicate Luminate's operations and financials – or at least has been able to create the impression thereof – sufficient to prepare to enter the retail loan market, which could not have been accomplished without the trade secret and data theft described herein unless through the expenditure of years of effort and resources, or the financial commitment of purchasing a competing business in arm's length negotiations.

134.    Defendants' misconduct detailed herein constitutes misappropriation of Luminate's trade secrets and violations Sections 3426 *et seq.* of the California Civil Code.  As a direct and proximate result of Defendants' conduct, Luminate has been damaged in an amount to be proven at trial.

135.    Luminate has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Defendants' misappropriation.  As a further proximate result of the misappropriation and use of Luminate's trade secrets, Defendants were unjustly enriched.

136.    Pursuant to Section 3426.2 of the California Civil Code, Luminate is entitled to an injunction to prohibit Defendants from using, disclosing and/or

otherwise benefiting from Luminate's trade secrets; to eliminate any commercial advantage that Defendants may otherwise derive from their misappropriation; and to require Defendants to immediately return to Luminate all of its confidential information, documents, and any other misappropriated materials.

137.    Pursuant to Section 3426.3 of the California Civil Code, Luminate is entitled to recover its damages incurred by virtue of Defendants' wrongful misuse of its trade secrets, in addition to disgorgement of all amounts by which Defendants have been and will be unjustly enriched or the payment of a reasonable royalty, in an amount to be proven at trial.

138.    In performing the conduct described herein, Defendants acted willfully and maliciously, intending to injure Luminate and to wrongfully obtain an advantage at Luminate's expense.  Pursuant to Section 3426.3 of the California Civil Code, Luminate is entitled to all remedies available under the law to compensate Luminate, including but not limited to, an award of exemplary damages against Defendants.

139.    Pursuant to Section 3426.4 of the California Civil Code, Luminate is also entitled to an award of its attorneys' fees and costs incurred in this action.

**COUNT V**
**Tortious Interference with Contractual Relations Against**
**Defendants Better, Horanyi, Lee, and Havins**

140.    Luminate incorporates all previous paragraphs as if fully set forth herein.

141.    Luminate's employment terms with its at-will employees included their agreement not to engage in outside employment which conflicted with their job duties at Luminate or the Company's interests.  Moreover, its employees agreed to abide by "the principles of fair dealing and ethical conduct" and to demonstrate "the highest standards of conduct and personal integrity."  *See* Exhibits 1; 4; and 6 at § 5.2.

142.    Defendant Horanyi, in addition to the other agreements governing his employment at Luminate, entered into a written Employment Agreement for his role as Non-Producing Division President for the NEO Division of Luminate in which he

agreed as a material term and in exchange for fair compensation that he would not during the period of his employment or for twelve months thereafter "not, directly or indirectly (whether on Employees own behalf, working with others, or on behalf of any other person, business or entity): (1) contact, solicit, or communicate in any way with any person employed by or under contract with the Company, including Former Employees of the Company, to in any way terminate or change his or her employment relationship with the Company." *See* Exhibit 3 at § 5.8.

143.  Upon information and belief, Defendants knew that Luminate's employees had such obligations as terms of their employment.

144.  As alleged in detail above, Defendants offered lucrative compensation terms to these high-level Luminate employees if they engaged in the solicitation of other Luminate employees to join Better in direct violation of their contractual agreements.

145.  Defendants induced Luminate employees to breach the terms of their employment by offering lucrative contracts with Better and revealing their plans to surreptitiously move Luminate's NEO division to Better, without fair compensation to Luminate, as well as by encouraging and facilitating other Luminate employees to meet with Better representatives about employment at the competing NEO division they were creating.

146.  Defendants knew that their misconduct would cause Luminate to lose employees and the business they generate.  They engaged in such misconduct with the purpose of causing this loss.

147.  As a result of Defendants' purposeful actions, Luminate has suffered and continues to suffer damages in the form of monetary losses.

148.  Upon information and belief, Defendants took these actions to economically harm Luminate, for their own personal enrichment and that of Luminate's competitor, Better.

**COUNT VI**

## **Unfair Competition in Violation of California Business and Professions Code Section 17200, *et seq.* Against Defendant Better**

149.   Luminate incorporates all previous paragraphs as if fully set forth herein.

150.   Luminate brings this action pursuant to §17200 *et. seq.* of the Bus. & Prof. Code, the Unfair Competition Act (the "UCL").

151.   Luminate brings this claim pursuant to *Bus. & Prof. Code §17204* which prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." Luminate seeks compensation for the loss of its employees, its customers, and the personal financial impacts they have suffered as a result of the unfair business practices Defendant Better engaged in.  Luminate suffered injury, damages in fact and out of pocket losses due to Better's unlawful, unfair, unconscionable, and deceptive conduct and practices, as described above.

152.   Better's conduct, as described above, has been and continues to be detrimental to Luminate which is seeking to enforce important rights affecting the public interest within the meaning of the *Code of Civil Procedure §1021.5.*

153.   Better's acts, as alleged herein, include their tortious interference with contracts, and aiding and abetting breaches of fiduciary obligations and duties of loyalty, as well as the diversion of employees constituting unfair, unlawful, or fraudulent business practices in violation of *Business and Professions Code §17200 et. seq.*  Better's acts and practices described herein offend established public policies, and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous.

154.   Better improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), intentionally and willfully caused and directed Luminate employees to remain at the Company after they agreed to work for Better's company, during which time they used their position to unfairly reach out to coworkers and subordinates to solicit them to also join Better and the division they were informing employees that

they were moving from Luminate to Better, without fair and reasonable compensation to Luminate.

155.    As a direct result of Better's Actions, Luminate was harmed and continues to be harmed.  Better's unfair and/or deceptive acts has caused and will continue to cause significant negative impact to Luminate's business activities.  As a result, Luminate is entitled to treble damages and to recover reasonable attorneys' fees.

## COUNT VII
### Civil Conspiracy Against Defendants Better, Horanyi, Lee, and Havins

156.    Luminate incorporates all previous paragraphs as if fully set forth herein.

157.    Beginning in or about August 2024, Better and the Individual Defendants conspired to move NEO's Luminate division to Better and for the Individual Defendants to solicit other Luminate employees to join its competitor while they officially remained Luminate employees so as to utilize an unfair and uncompetitive advantage in achieving these goals.

158.    This enabled the Individual Defendants continued ease of access and positions of control to target various employees for solicitation that Better was interested in.

159.    Defendants took the tortuous actions described herein, in direct violation of applicable laws to usurp the business opportunities of Luminate for their personal benefit and that of Luminate's competitor, Better.

160.    As a result of Defendants' conspiracy to take tortious and unlawful action against Luminate, Luminate suffered and continues to suffer substantial economic impact and monetary damages.

## PRAYER FOR RELIEF

**WHEREFORE**, as to all counts, Luminate respectfully requests that the Court enter judgment in its favor and award the following relief:

A. Ten Million dollars ($10,000,000.00) in actual damages or such other amount as may be proven at Trial;

B. Trebling of actual damages arising out of Luminate's conspiracy claim, DTA, CUTSA, and/or UCLs;

C. Punitive damages arising out of Defendants' statutory violations in an amount not less than Fifty Million Dollars ($50,000,000.00);

D. Pre- and post- judgment interest;

E. Costs;

F. Statutory attorneys' fees; *and*

G. Granting Luminate such other and further relief as the Court may deem just, equitable, and proper.

## **Demand for Jury Trial**

Luminate respectfully requests and demands a jury trial on all issues so triable.

Respectfully submitted this 2nd day of December, 2024.

/s/ *Ari Karen*
Ari Karen (*pro hac vice forthcoming*)
Lucas Markowitz (*phv forthcoming*)
Alexander Rogosa (*phv forthcoming*)
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, DC 20006
Office: (202) 886-5265
E-mail:        akaren@mitchellsandler.com
lmarkowitz@mitchellsandler.com
arogosa@mitchellsandler.com

/s/ *Mark Johnson*
Mark Johnson (SBN 135288)
Offit Kurman, P.A.
445 S. Figueroa Street
Los Angeles, CA 90071
Office: (213) 629-5700
Facsimile: (213) 624-9441
mark.johnson@offitkurman.com

**ATTORNEYS FOR PLAINTIFF**

1

### VERIFICATION

2

3 _____Taryn Reuter_____ states that I serve as ___CEO___

4 for Luminate Home Loans, Inc., the Plaintiff in this matter. I have read and

5 understand this Complaint and now the contents to be true of my own personal

6 knowledge, except for those matters and things set forth upon information and belief,

7 and as to those matters and things, I believe them to be true.

8

9 _____

10

11 Sworn to and subscribed before me this 25th day of November, 2024.

12

13 _____
    Notary Public

14

15 My commission expires: ___01/31/2026___.

16

17

18 
    DIANE SCHNELL
    NOTARY PUBLIC
    MINNESOTA
    My Commission Expires   01/31/2026

19

20

21

22

23

24

25

26

27

28

31