1    Mark Johnson (SBN 135288)
     Mark.johnson@offitkurman.com
2    Offit Kurman, P.A.
     445 S. Figueroa Street
3    18th Floor
     Los Angeles, CA 90071
4    Office: (213) 629-5700

5    Ari Karen (*pro hac vice forthcoming*)
     akaren@mitchellsandler.com
6    Lucas Markowitz (*pro hac vice forthcoming*)
     lmarkowitz@mitchellsandler.com
7    Alexander Rogosa (*pro hac vice forthcoming*)
     arogosa@mitchellsandler.com
8    MITCHELL SANDLER PLLC
     2020 K Street NW, Suite 760
9    Washington, DC 20036
     Office: (202) 886-5265
10
     Attorneys for Plaintiff
11   LUMINATE HOME LOANS, INC.

12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15   LUMINATE HOME LOANS, INC.,        Case No.: 3:24-cv-2251-BAS-MSB

16              Plaintiff,             **LUMINATE HOME LOANS, INC.'S
                                       EMERGENCY MOTION FOR A
17        v.                           TEMPORARY RESTRAINIG
                                       ORDER AND A PRELIMINARY
18   BETTER MORTGAGE CO.,              INJUNCTION AND FOR
     DANIEL HORANYI, JEANETTE          EXPEDITED DISCOVERY**
19   LEE, & LAUREN HAVINS,
                                       Hearing Date: Monday, January 27, 2025
20              Defendants.
                                       **No Oral Argument Unless Ordered By
21                                     The Court**

22

23   **PLAINTIFF LUMINATE HOME LOANS, INC.'S MEMORANDUM OF
     POINTS AND AUTHORITIES IN SUPPORT OF ITS EMERGENCY
24   MOTION FOR A TEMPORARY RESTRAINING ORDER AND A
     PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

25        Plaintiff Luminate Home Loans, Inc. ("Luminate"), by and through its

26   undersigned counsel, pursuant to Rules 65 and 26(d) of the Federal Rules of Civil

27   Procedure, hereby submits this Memorandum of Points and Authorities in Support of

28

                                      1

its Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery against Defendant Better Mortgage Company ("Better") and Defendant Daniel Horanyi, Defendant Jeanette Lee, and Defendant Lauren Havins ("Individual Defendants") (collectively "Defendants"). All Defendants are represented by counsel who have agreed to accept service. However, since Defendants have not yet answered the Complaint, this matter is required to be heard as a Temporary Restraining Order. In any event, Defendants' respective attorneys have received copies of the Complaint and all related documents, are aware of and are being electronically served with copies of this Motion for injunctive relief. Plaintiff does not object to Defendants being afforded an opportunity to oppose this Motion, provided it does not unreasonably delay the requested relief as it is urgently needed justifying the expedited nature of Temporary Restraining Orders. In support thereof, Luminate avers as follows.

## **PRELIMINARY STATEMENT**

This is a case of corporate espionage. Defendants conspired to steal Luminate's extensive confidential, proprietary, and trade secret information and give it to Better. Defendants' goal was to enable this competitor to develop and launch an entirely new business line, but without making the requisite investment of time, money, blood, sweat, and tears that fair competition would dictate. Understanding that if the Individual Defendants left Luminate's employ, they would also lose access to its trade secrets, Better encouraged the Individual Defendants to remain Luminate employees for months while working in close coordination. This duplicitous scheme preserved Defendants' access to additional Luminate information and employees Defendants needed and the ability to funnel them to Better.

Better's aim was to raid and destroy Luminate's entire NEO division, including its hundreds of employees and numerous branches to Better, which had no prior experience or infrastructure for retail loan operations despite their work in other areas of mortgage lending. These actions were all in violation of the Individual

2

Defendants' employment obligations and fiduciary duties.  Better's encouragement and active participation in this activity violates numerous state and Federal laws.

The Individual Defendants, along with some other known co-conspirators, were terminated by Luminate on October 25, 2024.  Upon their termination, and consistent with the conspiracy, they joined Better immediately.  Following their terminations, the Individual Defendants and Better continued to have numerous meetings and obtain additional confidential, proprietary, and trade secret information of Luminate's from other current Luminate employees whose role in this scheme was not yet understood.  Defendants have recently ramped up their operations as their effort to duplicate Luminate's NEO division using Plaintiff's business model, documents, information, and employees nears completion.  They continue to solicit Luminate's employees with the benefit of having already wreaked havoc within Luminate's NEO division.  After stealing every scrap of confidential information and trade secrets Better could get its hands on, it set about poisoning the well to prime Luminate's other employees to join Better for months before their malfeasance was discovered.

Under Rule 65 of the Federal Rules of Civil Procedure, a temporary restraining order ("TRO") and preliminary injunction are warranted and necessary because Defendants' illicit actions have caused and continue to cause irreparable harm to Luminate.  Plaintiff's representatives have reached out to Defendants to cease and desist their unlawful activities multiple times but have been rebuffed.  Defendants have demonstrated their intent to continue this illicit plot despite its recent exposure and the filing of this Complaint.  More Luminate employees recently resigned on December 9, 2024, to join the new division at Better that Defendants created with Luminate's trade secrets and confidential and proprietary information.  Defendants' demonstrable intent is to absorb Luminate's entire NEO division by the end of February 2025.

As set forth below, Luminate can establish that: 1) it is likely to succeed on the

merits for its claims in this case; 2) it is likely to suffer irreparable harm if injunctive relief is denied; 3) that the balance of equities tip in Luminate's favor; and 4) that injunctive relief would be in the public interest and, as such, Luminate's request for injunctive relief should be granted.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## STATEMENT OF FACTS

### *Luminate Home Loans*

Luminate began as the entity AMEC Home Loans in 1998 and rebranded to Luminate Home Loans, Inc. in 2020.  *See* Verified Complaint ("Compl.") (ECF No. 1) at ¶ 12.  It operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products with over 500 loan originators operating across the country.  *Id.* at ¶¶ 12; 13.  In 2022, Luminate expanded its operations by acquiring a unique mortgage division known as NEO Home Loans ("NEO") from a struggling competitor, Celebrity Home Loans LLC ("Celebrity").  *Id.* at ¶ 14.

*a.  Luminate Acquires the Neo Division and All Its Intellectual Property.*

Following a diligent and arms' length analysis of the assets and liabilities of the division in conjunction with Celebrity, and good faith negotiations, the purchase was finalized on December 6, 2022, and announced publicly.  *See* Asset Purchase Agreement attached as Exhibit A.   The asset purchase agreement included Luminate's acquisition of all assets related to the NEO division and the operation of its branches, including but not limited to the relevant trade secrets and intellectual property associated therewith:

> Confidentiality. Seller acknowledges that the businesses and the business objectives of Buyer involve the acquisition of the Purchased Assets, including confidential and proprietary information relating to the Purchased Assets, in consideration for good and valuable consideration provided by Buyer as described in Article II hereof, the sufficiency of which is hereby acknowledged. Seller acknowledges and agrees that it would be unfair to divulge or utilize such information relating to such businesses and the Purchased Assets or goodwill

4

related thereto in competition with Buyer after a Branch Closing Date. Therefore, after a Branch Closing Date, neither Seller nor any of its Affiliates shall, directly or indirectly, divulge any trade secrets, customer lists, pricing information, marketing arrangements or strategies, business plans, internal performance statistics, training manuals, personnel information, Intellectual Property or any other information concerning the applicable Branch location or its operations ("Confidential Information") to any third party without Buyer's prior written consent or use any Confidential Information to compete with Buyer or Buyer's Affiliates; provided, however, that Seller may disclose or use Confidential Information if it is compelled to do so by judicial or administrative process, in which case Seller and its Affiliates shall, to the extent permitted by Applicable Law, notify Buyer promptly of the request or requirement so that Buyer and/or its Affiliates may seek an appropriate protective order or waive compliance with the provisions of this Section 6.5(a).

See Exhibit A at Section 6.5(a). Moreover, the agreement further defined intellectual property as:

"Intellectual Property" means: (a) patents, patent applications, and patent rights, (b) copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated with, any of the foregoing and (d) trade secrets, know-how and other confidential business information ("Trade Secrets"). For clarity and avoidance of doubt, Intellectual Property excludes the names "Celebrity", "Celebrity Home Loans", "Celebrity Financial" and all trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated therewith.

See Exhibit A at Section 1.1.

*b. Luminate Invests Substantially in the Newly Acquired Neo Division.*

Daniel Horanyi, who previously worked at Celebrity, was hired to serve as a Division President for Luminate helping to lead its new NEO division, along with others, when the division was purchased from Celebrity. *See* Compl. at ¶ 16. Luminate ultimately hired and onboarded approximately 350 people in this acquisition, investing significant resources to integrate these employees into

Luminate and sharing Luminate's infrastructure to provide support for this new division. *Id.* at ¶ 17. Luminate made significant developments to its NEO division over the ensuing years to refine its business strategies and make it a successful division, providing extensive support through marketing, hiring, cost-sharing, experience and communication, product support and data analytics, human resources, and other areas. *Id.* at ¶ 18. NEO functioned within Luminate's larger structure as one source of its mortgage operations and fulfillment offerings, with other branches of Luminate's business handling manufacturing processes for those NEO loans, such as appraisals, disclosures, and other aspects. *Id.* at ¶ 19. One notable development Luminate made with its NEO division was through creating a mortgage option that enabled borrowers to present "cash offers" on their home purchases, a major factor in having a bid accepted in today's competitive environment. *Id.* at ¶ 20.

Luminate carefully protects its confidential information by maintaining it on secure data platforms and servers accessible only to Luminate employees with the requisite authorization to access the information and requires such employees to acknowledge the sensitive and protected nature of the material they are entrusted with as well as their obligations to safeguard it. *See* Compl. at ¶ 36; Declaration of Lucas Markowitz ("Decl.") attached as Exhibit B at ¶ 15. Luminate expends a significant amount of time and resources to develop its brand and to market itself to potential borrowers. It has taken Luminate years to build up its reputation and client base, which is premised on its confidential processes in an industry with substantial competition. *See* Compl. at ¶ 13.

Luminate's advancements as a company, including through its development of the NEO division, led to its recognition as the third fastest-growing nonbank mortgage originator in the nation in September 2024. *Id.* at ¶ 21. Luminate continued to support and expand its NEO division, devoting months of work in 2024 on plans to set up NEO as its own wholly owned subsidiary of Luminate's parent company, Luminate Bank, and entrusting NEO division managers, such as the Individual

Defendants, with further access to sensitive information on Luminate to prepare for this restructuring. *Id.* at ¶ 22.

### *Individual Defendants' Employment and Contractual Obligations*

Defendant Daniel Horanyi and Defendant Jeanette Lee joined Luminate in January 2021, as Division President and Vice President of Branch Operations, respectively, for Luminate's NEO division. *Id.* at ¶¶ 30; 44. Defendant Havins joined Luminate in July 2024 as a Project Manager within the NEO division. *Id.* at ¶ 49. The nature of Defendants' employment meant Luminate entrusted them with the fullest access to confidential and proprietary information regarding Luminate's operations, strategies, and employees. *Id.* at ¶¶ 31; 45; 50. As a material term and condition for their employment with Luminate, and in exchange for fair salary compensation, the Individual Defendants each signed and agreed to comply with the terms of Luminate's Employee Handbook that set forth certain obligations regarding their employment with Luminate. *See* Compl. at ¶¶ 32; 46; 51; and Compl. Exhibits 1; 4; 6 at § 5.2.

The Individual Defendants all acknowledged that it was a violation of Luminate's standard of conduct and the terms of their employment to disclose "company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company." *See* Compl. at ¶¶ 33; 47; 52; and Compl. Exhibits 1; 4; 6 at § 5.1.

The Individual Defendants all agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans. Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *See* Compl. at ¶¶ 36; 47; 52; and Compl. Exhibits 1; 4; and 6 at § 9.1. Unquestionably, they were on notice that they were "not permitted to use confidential

information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains." *See* Compl. at ¶¶ 36; 47; 52; and Compl. Exhibits 1; 4; and 6 at § 9.1.

The Individual Defendants each agreed when confirming they would comply with the Employee Handbook that they would not engage in outside employment which impacted the performance of their job duties at Luminate or presented a conflict of interest, which they further committed to when each additionally signed to abide by Luminate's Policy on Dual Employment given the restricted nature of the industry and privileged information about Luminate and its customers the Individual Defendants had access to. *See* Compl. at ¶¶ 38; 48; 53; and Compl. Exhibits 1; 4; 6 at § 5.2.

On or about February 16, 2023, Luminate further formalized the terms of Defendant Horanyi's at-will employment through an employment agreement as a material term and consideration for his continued employment with Luminate, and in exchange for fair salary compensation. Compl. at ¶ 39. Defendant Horanyi agreed that "employee shall not directly or indirectly render any related services of a commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of the Company." Compl. at ¶ 40; and Compl. Exhibit 3 at § 2.4.

The employment agreement reinforces Defendant Horanyi's obligations regarding confidential information and trade secrets such that:

> Employee acknowledges that by reason of his/her employment hereunder, Employee will occupy a position of trust and confidence with the Company and that Employee will have access to confidential and proprietary information and trade secrets of the Company, all of which are the unique and valuable property of the Company. Employee acknowledges that, among other things, its business methods, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, and employer's documentation (the "Confidential Information") have been developed through the expenditure of substantial time, effort and money which the Company

8

wishes to maintain in confidence and withhold from disclosure to other persons. Accordingly, as a material inducement to the Company to enter into this Agreement, Employee acknowledges that s/he will become intimately involved and/or knowledgeable in regard to the Company's business and will be entrusted with the Company's confidential information, and both during his/her employment and after any termination thereof, Employee will use such information solely for the Company's benefit, and maintain as secret and will not disclose any of the Confidential Information to any third party (except as Employee's duties may require) without the Company's prior express written authorization.

Compl. at ¶ 41; and Compl. Exhibit 3 at § 5.3.

Employee acknowledges that all tangible property, documents, files, electronic records or data, or records or materials of any sort pertaining to the Company's business, whether prepared by Employee or otherwise coming into Employee's possession or control, are the sole and exclusive property of the Company and that Employee has no right to keep or use such documents or things following termination of his/her employment.

Compl. at ¶, 41; and Compl. Exhibit 3 at § 5.4 & § 5.9.

Defendant Horanyi's employment contract also expanded upon the duty of loyalty he owed to his employer and the protection of his employer's trade secrets through a non-solicitation clause, which was a material term to that agreement considering the position of trust and influence Defendant Horanyi maintained. Compl. at ¶ 42; and Compl. Exhibit 3 at § 5.8.

For the period Employee is employed by Company and, in the event of termination, for twelve (12) months following the cessation of employment with the Company for any reason (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein), the Employee agrees and covenants not, directly or indirectly (whether on Employees own behalf, working with others, or on behalf of any other person, business or entity): (1) contact, solicit, or communicate in any way with any person employed by or under contract with the Company, including Former Employees of the Company, to in any way terminate or change his or her employment relationship with the Company, to apply for future employment with any other person, business or entity, or to engage in any other business activities; and/or (2) hire, attempt to hire, solicit for employment, employ, offer employment to, assist in offering employment to or solicit for purposes of employing or obtaining the services of (through any IRS W2, 1099, staffing company, employee leasing, partnership, company affiliation or other arrangement) any person employed by or under contract with the Company, including Former Employees of the Company.

> For purposes of this Section, "Former Employees" means any person (a) formerly employed by or under Contract with Company during any part of Employee's employment with the Company … and (c) was employed by or under contract with the Company within the past twelve (12) months prior to Employee's separation date.

*Id.* The provisions within Defendant Horanyi's contract were fairly negotiated, reasonable and necessary, and in exchange for valuable consideration. Compl. at ¶ 43. Moreover, Defendant Horanyi agreed "that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Company herein, are reasonable and necessary." *Id.*; Exhibit 3 at § 5.11.

### Defendants' Breached Their Fiduciary Duties and Stole Luminate's Trade Secrets and Computer Files

Luminate's IT Department began reviewing the computer usage of the Individual Defendants and other NEO leaders under suspicions that they were meeting collectively about opportunities with other lenders, no longer optimizing NEO's services for Luminate, and no longer coordinating on their restructuring efforts to establish the NEO division as a wholly owned subsidiary of Luminate's parent company. *See* Compl. at ¶ 54. Luminate's IT department utilized a computer monitoring system called Teramind, pursuant to the terms of the Company's Employee Handbook, to investigate the Individual Defendants' communications. *Id.* at ¶ 55. This investigation revealed substantial improper activity violating the terms of the Individual Defendants' employment, as well as state and federal laws, including through the transmission of Luminate's confidential information and trade secrets directly to their competitor, Better. *Id.* at ¶ 56.

On August 8, 2024, Better's Vice President of Corporate Finance & Investor Relations, Hana Khosla requested the NEO team provide an outline of the broker process flow used by Luminate's NEO division, such as Loan Officer training materials depicting the data gathering, intake of borrower applications, the provision

of lending disclosures, and the data transmission process. *Id.* at ¶ 61; and Compl. Exhibit 10. These trade secrets detailing the retail lending process established by Luminate were expressly sought to enable Better's engineering team to develop a broker process system that would conform with this system that Luminate refined through years of experience and work. *Id.* That same day Defendant Lee provided a copy of a Luminate "job aid" and details regarding the attached material to Ms. Khosla, as well as Chad Smith, Better's President and Chief Operations Officer, with Defendant Horanyi copied on the exchange. *Id.* On October 18, 2024, Defendant Lee provided another copy of a Brokered Loans Job Aid and a detailed description of the process flow utilized by Luminate to efficiently handle loan applications. Compl. at ¶ 61.

On August 12, 2024, Better requested extensive details regarding the financial obligations and payment structures necessary to operate the NEO division, which they could expect to incur after stealing this business line from Luminate. *See id.* at ¶ 62; Compl. Exhibit 11. Ms. Khosla received insight from Luminate employees into the total payroll expenditures necessary to operate this division and breakdowns for how to structure individual manager compensation based on Luminate's confidential contractual agreements with its employees. *Id.*

On September 7, 2024, Defendant Horanyi updated Ms. Khosla and Chad Smith at Better, confirming that he and the other Luminate NEO managers who were copied on the email had proceeded with their collective plan and approached Luminate Branch Leaders about moving to Better, and they presented the branch leaders with a write-up detailing how revenue would be shared at Better if they moved their branches there. Compl. at ¶ 63; and Compl. Exhibit 12.

On October 4, 2024, Defendant Horanyi provided Better, through Ms. Khosla and Mr. Smith, with a detailed update on their plan to solicit key members of Luminate's NEO division, coordinate with Better for setting up this retail division at

their company, and for onboarding the many employees they intended to bring with them.  Compl. at ¶ 64; and Compl. Exhibit 13.  Defendant Havins was also included on this exchange and designated to provide Better with Luminate's project roadmaps.  *See id.*  Defendant Horanyi in this exchange further provided Better with copies of Luminate employment agreements with suggested revisions, including Non-Producing Division Presidents, Producing Division Presidents, Producing Branch Managers, and Producing Managers, which were essentially all management levels needed for Better to set up retail loan operations that they previously had no experience with.  *Id.*  Moreover, the Individual Defendants carried out these solicitations for Better while still Luminate employees, recruiting Luminate's branch leaders and high revenue producers.  *See* Sydney Lynn Teams Chat on October 25, 2024 attached as Exhibit C.  Under the guise of discussing Luminate business, they coordinated recruiting trips to Dallas and New York City for more than fifty key Luminate employees, including individuals not part of the NEO division or onboarded from Celebrity, during which they pitched them on moving to Better.  *See* Sydney Lynn Teams Chat on October 23, 2024 attached as Exhibit D.  Computer records for Sydney Lynn, a Director of Finance for Luminate coordinating with Better and the Individual Defendants, confirmed that Defendants directed Luminate's employees to seek expense reimbursement from the Company for these solicitations, but "regardless if Luminate [pays] or not you will be reimbursed" and "we will make it right by you."  *See* Sydney Lynn Teams Chat on October 23, 2024 attached as Exhibit D.  In other words, on top of lying about the purpose of the meeting, Defendants were keen on committing an actual fraud on Luminate.

On October 5, 2024, Defendant Horanyi coordinated with another Luminate employee, Necco Stevens, to send an executed P1 award letter for Luminate's NEO division to an attorney assisting Defendant Horanyi in this process with creating a separate company titled NEO Services LLC and a draft agreement for it to serve as a

corporate subdivision at Better, including the provision of ownership shares in the company to co-conspirators who assisted the Defendants with the desired move to Better. Compl. ¶ 65; and Compl. Exhibit 14. The Defendants utilized Luminate's trade secrets and the insight the Individual Defendants acquired from Luminate's extensive efforts to set up NEO as its own wholly owned subsidiary of the Luminate parent company, Luminate Bank, to make these preparations. *See* Compl. at ¶ 66; and Decl. at ¶ 12. They even provided copies of the contracts drawn up by Luminate and its counsel to facilitate these efforts. *Id.* If not for their privileged position observing and participating in these efforts by Luminate, the Individual Defendants would not have the requisite understanding to assist Better with setting up NEO as a subdivision for them. *Id.*

On October 18, 2024, Better provided the Individual Defendants with their detailed plans for launching NEO at Better, acknowledging their intent to effectively steal Luminate's division by references that they would replace Luminate's marketing material of "NEO Powered by Luminate" with "NEO Powered by Better," take over Luminate's neohomeloans.com website, continue utilizing the Youtube Channel set up for Luminate's NEO division and even maintain the marketing videos created by Luminate, and potentially keep the signage Luminate put in place for its NEO offices. Compl. at ¶ 67; and Compl. Exhibit 15. The Defendants further exchanged a list of purchased leads and loan files by state for the last ninety days to ensure the NEO retail sales division at Better would begin with an unfair head-start with customers and revenue production to match the massive advantage they obtained by misappropriating Luminate's trade secrets for the establishment and management of such a retail sales division. *See id.*

On or about October 18, 2024, Defendant Horanyi and other NEO managers received formal offer letters from Better to begin their retail mortgage lending operations, contingent on a Statement of Work meant to confirm a timeline and tasks

required to finish establishing the Distributed Retail Channel at Better, which would undoubtedly come through the provision and utilization of Luminate's trade secrets as well as the siphoning of Luminate's employees.  Compl. at ¶¶ 58; 59; and Compl. Exhibits 8; 9.

At a virtual meeting between Defendants on October 18, 2024, Defendant Horanyi shared additional trade secrets and insight into Luminate's business operations with Better, including a spreadsheet identifying every NEO branch, its employees, and their salaries to assist with Better's development of a brand-new retail division.  Compl. at ¶ 68; *see* Compl. Exhibit 16.  The Defendants had numerous meetings to coordinate the creation of a retail sales division at Better meant to operate as "NEO Powered by Better," all while the participants knew that the NEO team members continued to be employed by Luminate.  Compl. at ¶ 69.  On October 18, 2024, following one such meeting, Defendant Lee sent Better, at their request, a SimpleNexus application link for Luminate's system so Better could review Luminate's loan application process from the borrower's perspective to enable development of a comparable system.  *See id.*; and Compl. Exhibit 17.  On October 22, 2024, while still employed at Luminate and with no timeline for resigning, Defendant Lee coordinated with Better to receive a company laptop and immediately begin Better's training processes, as well as participate in a vendor call on Better's behalf.  *See* Compl. at ¶ 76; and Compl. Exhibit 21; Compl. Exhibit 22.

On October 23, 2024, Defendant Horanyi coordinated for Better to receive a Luminate report breaking down each of its branches' margins for all loan type categories offered by Luminate, providing an extensive playbook on what type of loans Luminate considered worthwhile and their profitability broken down by region as well as loan officer, ultimately providing Better nearly five thousand fields of valuable proprietary data.  Compl. at ¶ 70; and Compl. Exhibit 18.  On October 24, 2024, Defendant Lee pulled data on all full-time employees across Luminate's entire

company, not merely the NEO division, with the evident intent to provide this information to Better as such information was not necessary for the performance of any of her Luminate job duties.  *See* Compl. at ¶ 71; and Compl. Exhibit 19.  The same day, Better requested and Defendant Havens provided copies of all facility lease agreements for Luminate's NEO division, evidently intending for Better to take over these facilities, or at least all profitable offices, as part of their intended appropriation of Luminate's division.  *See* Compl. at ¶ 77; and Compl. Exhibit 23.

### Defendants Are Knowingly Misappropriating These Luminate Trade Secrets and Actively Covering Up Their Misconduct

Better sought to limit the trail for their use of Luminate's documents, software, and systems.  *See* Compl. at ¶¶ 72; 73.  For instance, when Better requested and obtained a copy of Luminate's job aid in August, Mr. Smith directed for references to Luminate in the document be redacted or deleted before it would be distributed to Better's engineering team for further use.  *See id.*; and Compl. Exhibit 7.  Better's associate general counsel created a shared Box[1] Folder for Luminate's employees, including the Individual Defendants, to funnel these trade secrets and confidential information to where Mr. Smith and Ms. Khosla could access them for Better.  Compl. at ¶ 75; and Compl. Exhibit 20.

Defendant Horanyi's employment agreement, which he was obligated to share with any subsequent employer, confirmed he did not own, bring, or control any confidential information when he joined Luminate, nor did he own or control any other company through which such material was brought to Luminate that he could retain control over in the event of termination.  *See* Compl. Exhibit 3 at § 5.2; 5.10; Addendum B.  Defendant Horanyi's contract provided an opportunity for him to identify any such information he, or a company which he controlled, allegedly had rights to rather than Luminate "including, without limitation, training materials,

---

[1] Box is an internet cloud-based data storage company, enabling all users with shared access to a folder to upload, view, download, and edit files in the folder.

tutorials, IP, trademarks, systems, and marketing related materials." Compl. Exhibit 3 at § 5.2. He initialed Addendum B when executing his employment agreement confirming that he had no such claims to any of this type of material related to the NEO division or otherwise, as all such material belonged to Celebrity before Luminate acquired it in their Asset Purchase Agreement. *See* Compl. Exhibit 3 at Addendum B; Exhibit A at § 6.5(a).

***Luminate Takes Action***

As the results of Luminate's investigation into this misconduct unfolded, on October 25, 2024, the Company terminated the employment of the Individual Defendants along with 6 other leaders from its NEO division. Compl. at ¶ 80. The detriment caused to Luminate's NEO division is already virtually incalculable and getting worse every day due to the restructuring required to manage and retain hundreds of employees without their division's leadership team. *See* Compl. at ¶¶ 81; 82. Making matters worse, Luminate was battling against Defendants' prior solicitations of Neo employees, the inherent difficulty for maintaining the profitability of their teams during these transitions, and the imminent presence of a competing lender using the same trade name, business strategies, loan offerings, and marketing materials of Luminate's division. *See id.* Additional key employees from Luminate's NEO division resigned on December 9, 2024, to join Better, and communications with other division managers demonstrate Defendants intend to effectuate their plans to bring most, if not the entirety, of Luminate's NEO division to Better by the end of February 2025 as they scale up their operations. *See* Decl. at ¶ 13.

Luminate's IT Department has now discovered that, shortly after those terminations on the 25th, their now former Director of Finance, Sydney Lynn, downloaded 3,998 Luminate files to a flash drive to preserve Better's access to this invaluable data. *See* Decl. at ¶¶ 14; 15; and Decl. Exhibits 3; 4. The various files downloaded feature considerable Luminate trade secrets and confidential and

proprietary information, as it includes training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for Luminate's divisions and branches, economic models, revenue and performance reviews, completed loan information, secondary market sales data, loan lead lists and leads, and is believed to include extensive nonpublic information on Luminate's borrowers. *Id.* Therefore, Luminate terminated Ms. Lynn on December 5, 2024, and demanded the immediate return of this material. *See* Decl. at ¶ 17; and Decl. Exhibit 5. While Ms. Lynn finally shipped back her Luminate computer on December 16, 2024, and confirmed her possession of this flash drive, to date she has not agreed to return it or to send it to a third-party forensic discovery vendor to safeguard Luminate's data and analyze the drive's dissemination. *See* Decl. at ¶ 18; and Decl. Exhibit 6. Ms. Lynn is to formally begin her employment with Better imminently. *See* Decl. at ¶ 19.

On December 4, 2024, Plaintiff's counsel sent cease and desist letters to each Defendant along with copies of the Complaint in this matter. *See* Decl. at ¶¶ 2; 3; and Decl. Exhibit 1. Over the last three weeks, Plaintiff's counsel met and conferred repeatedly via email and meetings with counsel for Better and counsel for the Individual Defendants regarding this dispute and efforts to avoid motions practice through a stipulated injunction. *See* Decl. at ¶¶ 4–10; and Decl. Exhibit 2. Luminate offered to narrow the relief in a stipulated injunction to limit the scope of any remaining dispute, that Defendants could reserve they were not admitting to any allegations of the Complaint, and even that they could delay filing a stipulated injunction unless direct coordination regarding the dispute proved unsuccessful, but Defendants refused all proposals. *Id.*

The most Defendants would consider was a private agreement by which they claimed Better would enact the relief Luminate proposed for the stipulated injunction. *See id.* Namely, Better would collect, segregate, and prevent further use

of Luminate's trade secrets and confidential and protected information, as well as committing to telling any incoming employees from Luminate not to bring Luminate materials, then having them sign an affidavit after hiring that they complied. *Id.* However, despite Defendants evidently acknowledging that at least these parts of Luminate's requested relief were reasonable, they refused to consent to Court oversight, expedited discovery, or other forms of monitoring, enforcement, or penalties for noncompliance. *Id.* Moreover, when Better's counsel presented their proposal in writing, they reserved Better could unilaterally withdraw and return to using Luminate's material with three days' notice, as well as conditioning the agreement on Luminate's disclosure of even more trade secrets and confidential and proprietary information regarding Luminate's NEO division. Decl. at ¶ 10; andDecl. Exhibit 2.

Additionally, Defendants subtly delineated between Luminate material and information they asserted belonged to NEO, despite NEO never constituting its own company or independent entity, thereby betraying Defendants' intent to continue using extensive trade secrets and confidential and proprietary information which Luminate owns the exclusive rights to. *Id.* Defendants' counsel did, however, agree to accept service for their clients. *See* Decl. at ¶ 11; and Decl. Exhibit 2. Additionally, they identified that based on Luminate's good faith efforts to reach a reasonable resolution without motion practice, if a motion for injunctive relief was deemed necessary, they would not assert a defense that Luminate was not diligent in seeking relief from the Court during this period in the context of analyzing irreparable harm. *See id.*

## **LEGAL ARGUMENT**

Considering Defendants' illicit and harmful conduct directed at Luminate, Luminate seeks both a TRO and preliminary injunction. To obtain a TRO and preliminary injunction, Luminate must show they are "likely to succeed on the merits,

that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor; and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *see also Winter* 557 U.S. at 20). "[T]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Jones. V. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012) (*quoting Dep't Parks & Rec. of Calif. v. Bazaar Del Mundo, Inc.,* 448 F.3d 1118, 1123 (9th Cir. 2006). Put another way, the Ninth Circuit "has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In analyzing Luminate's request for a TRO and preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 542 (1987). As set forth below, Luminate satisfies the well-established standard and, as such, this Court should enter a TRO and preliminary injunction.

"Most preliminary injunctions are prohibitory; they 'prohibit[ ] a party from taking action and 'preserve[ ] the status quo pending a determination of the action on the merits.'" *Fujikura Composite Am., Inc. v. Dee*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *4 (S.D. Cal. June 28, 2024) (*quoting Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009); *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)). Such injunctions carry a lesser burden on the movant than mandatory injunctions which would alter the status quo. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). However, such distinctions are not based on the conduct required by the proposed order, but rather "the last, uncontested status which preceded the pending controversy." *Marlyn*

*Nutraceuticals*, 571 F.3d at 879 (*quoting Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)).  "Here, the status quo involves the situation immediately before [the former employee] allegedly shared Plaintiff's trade secrets with [the competitor]."  *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *5 (*citing GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (defining status quo not as the "situation before the filing of a lawsuit," but instead as the situation "before Disney began using its [protected information]")).

## I.    Luminate Will Likely Succeed On The Merits.

Luminate is likely to succeed on the merits of each of the claims pled in its Complaint.  Defendants conspired to steal Luminate's confidential, proprietary, and trade secret information in violation of federal and state law and use the value of that material to stand up an entirely new business line without doing the hard work to build it.  Further, they conspired for the Individual Defendants to officially remain high-ranking Luminate employees in positions of trust at the Company while working on behalf of Better and soliciting Luminate's employees, most of whom they managed.  The highest levels of Better's management were involved in this conspiracy, including its Company President, Vice President, and general counsel's office.  Since Luminate terminated the Individual Defendants, Defendants collectively continued to utilize Luminate's misappropriated materials to build out their duplicate business, continue the solicitation efforts initiated by the Individual Defendants months before their misconduct was discovered, and attempt to wholesale divert Luminate's NEO division to Better.  Through these actions, the Individual Defendants violated their fiduciary duties as well as the employment obligations articulated in Luminate's employee handbooks that they each committed to comply with, the dual employment policies they all signed as conditions of their employment, and Mr. Horanyi's express employment agreement.  As set forth below, Luminate is likely to succeed on these claims.

a.   <u>The Individual Defendants Misappropriated Confidential Information and Worked On Behalf of Luminate's Competitor in Breach of Their Employment Terms.</u>

The Individual Defendants breached the terms of their employment at Luminate by misappropriating Luminate's confidential information and working on behalf of their employer's competitor, Better, for months before they were terminated.  The elements of breach of contract under California law are the same whether for an express or implied-in-fact contract – (1) the existence of a valid contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach.  *Soil Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 952 (S.D. Cal. 2021) (*citing Iconlab Inc. v. Valeant Pharm. Int'l, Inc.*, 2017 WL 7240856, at \*6 (C.D. Cal. Apr. 25, 2017), *aff'd sub nom. Iconlab, Inc. v. Bausch Health Companies, Inc.*, 828 F. App'x 363 (9th Cir. 2020) (applying California law)).   "California courts have recognized that an employer/employee relationship may create an implied-in-fact contract that prohibits the employee from revealing confidential information."  *SMC Networks Inc. v. Hitron Techs. Inc.*, No. SACV121293JLSRNBX, 2013 WL 12114104, at \*4 (C.D. Cal. Nov. 13, 2013) (*citing DeLuca v. State Fish Co., Inc.*, 217 Cal. App. 4th 671, 686 (2013)).  The importance of protecting trade secrets even serves as a valid exception to California's statutory prohibition on restrictive covenants.  "Under California law, non-competition agreements are unenforceable **unless** necessary to protect an employer's trade secret."  *Robert Half Int'l, Inc. v. Ainsworth*, 68 F. Supp. 3d 1178, 1185 (S.D. Cal. 2014) (emphasis added) (*quoting Asset Marketing Sys., Inc. v. Gagnon,* 542 F.3d 748, 758 (9th Cir. 2008).

i.   *The Individual Defendants' Agreement to Abide by Luminate's Employee Handbook Constituted an Implied-in-Fact Contract.*

When an employer dictates formal policies in "handbooks, manuals, and memoranda disseminated to employees, a strong inference may arise that the employer intended workers to rely on these policies as terms and conditions of their

21

employment, and that employees did reasonably so rely.  Both parties derive benefits from such an arrangement." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 344 (2000). As a material term and consideration for their continuing at-will employment with Luminate, and in exchange for fair salary compensation, each of the Individual Defendants agreed to be bound by the terms set forth in Luminate's employee handbook, as evidenced by the fact that they signed an acknowledgment that they not only received Luminate's employee handbook, but "read it, understand it, and agree to comply with it." *See* Compl. at ¶¶ 32; 46; 51; and Compl. Exhibits 1; 4; 6.

"Whether an implied-in-fact contract is created by an employee handbook is 'a factual question in each case.'" *Zoom Imaging Sols., Inc. v. Roe*, No. 219CV01544WBSKJN, 2022 WL 4025293, at *5 (E.D. Cal. Sept. 2, 2022) (*quoting Asmus v. Pac. Bell*, 23 Cal. 4th 1, 11 (2000)).  While in *Zoom*, the context of the employee handbooks did not demonstrate a contract, the Court based its decision on factors which cut the other way in the present circumstance.  First, in *Zoom* the confirmation of receipt did not "contain any language demonstrating an intent to promise or the individual defendants' intent to be bound by the handbooks." *Id.* (employees merely confirmed review rather than committed to comply with the obligations as here).  Second, the Plaintiff's past Human Resources Director testified the handbook did not restrict the relevant conduct, but merely discouraged it. *Id.* (Luminate maintains the confidentiality and dual employment provisions were mandatory, which is corroborated by the language in the handbook).  Third, in *Zoom* "not all of the individual defendants signed confirmation of receipt." *Id.*  None of those undercutting qualifications are present here as all contextual points confirm these were clear obligations for the Individual Defendants to maintain employment and receive their financial compensation from Luminate, and the Individual Defendants understood that to be the case.

The handbook provisions at issue here are particularly supported by California case law given that they govern the confidentiality of trade secrets and confidential information.  *See Asset Marketing Sys., Inc.*, 542 F.3d at 758.

The Individual Defendants agreed that it was prohibited for them to disclose "Company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company." *See* Compl. Exhibits 1; 4; 6 at § 5.1.  Moreover, the Individual Defendants agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans. Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *Id.* at § 9.1.  The Individual Defendants also agreed that they were "not permitted to use confidential information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains." *Id.*  They further agreed that after the termination of their employment, whether initiated by them or Luminate, they will not "disclose or use trade secrets or other confidential information learned during employment with Luminate Home Loans.  This includes any information not generally known to other persons who can obtain economic value from its disclosure or use and is treated as confidential or secret by Luminate Home Loans." *Id.* at § 6.16.  Moreover, the Individual Defendants agreed that if there was any "doubt as to whether certain information is or is not confidential, [they] must first clearly establish that appropriate management personnel have authorized such disclosure … Under no circumstances should [they] provide home telephone numbers, home addresses or any other personal information regarding another employee to anyone." *Id.* at § 9.1; 9.2.

  ii. *The Individual Defendants Contractually Agreed to not Engage in Conflicting Dual Employment.*

While the Individual Defendants confirmed via the Employee Handbook that they were prohibited from dual employment which presented a conflict of interest with Luminate, they all also signed and agreed to abide by Luminate's express policy on dual employment as a material term and consideration for their employment, and in exchange for fair salary compensation. *See* Compl. at ¶¶ 38; 48; 53; and Compl. Exhibits 2; 5; 7.   The Individual Defendants confirmed they would not simultaneously work with "other mortgage lenders" or "companies engaged in the real estate or mortgage finance business," because they acknowledged doing so would pose an inherent conflict of interest and likely violate federal government restrictions. *See* Compl. Exhibits 2; 5; 7.  Luminate had a legitimate business interest in protecting its competitively sensitive business information and ensuring that its employees were not simultaneously working on behalf of its competitors.  Moreover, regulators' prohibition on such dual employment is designed to protect borrowers from malfeasance in the industry.

iii.    *Defendant Horanyi Additionally Breached an Express Contract.*

On or about February 16, 2021, Defendant Horanyi, executed a written employment agreement in addition to his prior agreements to comply with Luminate's Employee Handbook and its Dual Employment Policy.  Compl. at ¶ 39; and Compl. Exhibit 3.   Therein, he confirmed that as a material condition of his continuing at-will employment and in exchange for fair compensation and being given access to Luminate's sensitive information, he agreed to "use such [confidential] information solely for the Company's benefit, and maintain [it] as secret."  Compl. at ¶ 41; and Compl. Exhibit 3 at § 5.3.  There is no question about who owns the rights to the information at issue in this case.  Defendant Horanyi, a division president for Luminate's NEO division, confirmed in his contract that

> Employee acknowledges that all tangible property, documents, files, electronic records or data, or records or materials of any sort pertaining to the Company's business, whether prepared by Employee or otherwise coming into Employee's possession or control, are the sole and exclusive property of the Company and that Employee has no right

to keep or use such documents or things following termination of his/her employment.

Compl. at ¶ 41; and Compl. Exhibit 3 at §§ 5.4; 5.9.  Moreover, he confirmed when initialing Addendum B to his contract that he did not bring or otherwise retain rights to any such Confidential Materials at issue, nor did any company Defendant Horanyi owned or controlled.  *See* Compl. Exhibit 3 at § 5.2; Addendum B.  All such information related the NEO division, prior to Luminate's ownership, was the property of Celebrity Home Loans and exclusively acquired by Luminate through the December 6, 2022 Asset Purchase Agreement.  *See* Exhibit A at §§ 1.1; 6.5(a).

> iv. *The Information Defendants Misappropriated Was Clearly Encompassed within the Parties' Agreements.*

The stolen information at issue is unquestionably covered by the various Agreements' consistent definitions of Confidential Information and, as set forth below, constitute Luminate's trade secrets.  This information included organizational documents, operational procedures and training information, contracts, loan offerings, pricing information, performance and revenue data for the NEO division, individual branches, and individual employees, employee rosters with contact information and salary lists, economic models, marketing information, branch and corporate cost allocations to profitably run the division, secondary market sales data, loan lead lists, leads, and potentially nonpublic borrower information.  All this information would provide any competitor with a significant advantage in copying Luminate's business model while avoiding the substantial investment needed to accomplish this organically.  Indeed, with the Confidential Information that Defendants illegally stole, they could copy many of Luminate's processes—processes that have taken Luminate years to develop and perfect—and apply them at Better, thereby eliminating the competitive advantage that Luminate has fought to create within this highly competitive industry.  Defendants' activities are even more egregious than other similar disputes among mortgage lenders because here Better

was not even a direct competitor for these type of lending operations previously. Better only entered retail lending through this acquisition of Luminate's material, with a demonstrable intent to usurp Luminate's entire division and their brand, advertising their operations as "NEO Powered By Better." Indeed, Luminate derives economic value from the processes, strategies and loan information obtained in the documents illicitly stolen, which are used by Luminate in interstate and intrastate commerce. Luminate took great efforts to secure this information in a confidential manner with limited access controls and requirements that employees sign that they will abide by the Company's confidentiality terms.

v. **The Dual Employment Engaged in by the Individual Defendants' Constituted a Separate Breach.**

Defendants in this case did not simply take Luminate's material when resigning for another opportunity. Here, Better and the Individual Defendants coordinated for them to remain at Luminate for months while Better pumped them for information on how to build their retail loan operations from the ground up in Luminate's image. The Individual Defendants only gained the insight to enable Better to formulate this competing enterprise as a wholly owned subsidiary for Better because they were privy to Luminate's ongoing efforts at such a restructuring. The Individual Defendants feigned commitment to that endeavor while working with Better, thereby providing them with additional confidential work product they could utilize to expedite that process for Better. Throughout the late summer and fall of 2022, the Individual Defendants met regularly with Better and committed countless working hours on Better's behalf while knowing that Better's interests were directly averse to and conflicting with Luminate's. Defendant Lee went so far as to meet with outside vendors as a representative of Better during Luminate company time.

The Individual Defendants further used their positions of trust and power at Luminate to solicit all the key branch leaders, high producers, and other individuals they needed to destroy the Neo division's value to Luminate and bring it to Better.

Beyond constituting conflicting employment, this expressly violated Defendant Horanyi's non-solicitation provision, which was reasonably tailored to one year based on the level of confidential information and trade secrets with which he was entrusted. *See* Compl. Exhibit 3 at § 5.8. Defendant Horanyi's contract confirms that "Employee agrees that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Company herein, are reasonable and necessary." *Id.* at § 5.11.

By engaging in these solicitations while employed as Luminate managers, it was harder for Luminate to identify their competitor's efforts to poach their employees – allowing Defendants to covertly target not only key personnel or even entire branches, but virtually a whole division of Luminate's consisting of hundreds of employees. The Individual Defendants worked against Luminate's interests to such an extent that they sought to deceive Luminate into reimbursing them and other employees for their solicitation meetings. Had Luminate not begun to finally catch on to these transgressions and terminated the Individual Defendants, they might still be working as double agents at Luminate today. There is no question that this behavior violates the terms of the Individual Defendants' employment.

   b.   Defendants Have Misappropriated Trade Secrets in Violation of Federal and State Law.

Federal law prohibits misappropriation of trade secrets through the Defend Trade Secrets Act ("DTSA"). A trade secret is "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3). California prohibits misappropriation of trade secrets through the California Uniform Trade Secrets Act ("CUTSA"). It defines "trade secrets" as

information "that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

Courts have analyzed claims under the Defend Trade Secrets Act and California Uniform Trade Secrets Act "together because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed under either statute, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58. A trade secret is "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret" through reasonable measures. *Id.* at 657, 660. "Plaintiff need not limit itself to one trade secret, but instead may proceed under the theory that Defendants misappropriated multiple concepts from them." *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *8.

"Under California law, information can be a trade secret even though it is readily ascertainable, so long as it has *not yet been ascertained* by others in the industry." *ABBA Rubber Co. v. Seaquist*, 286 Cal. Rptr. 518, 528–29 (Ct. App. 1991)). Plaintiff need only show it took "reasonable steps to maintain secrecy." *InteliClear*, 978 F.3d at 660.

There can be no dispute that Defendants misappropriated Luminate's information. In the months leading up to the termination of the Individual Defendants, they sent numerous emails discussing or attaching Luminate's proprietary information. This included, among other things, training materials, contracts, corporate structure information and cost allocations, employee lists including compensation, contact, and performance metrics, types of loan offerings and their margins, as well as lead lists and leads, nonpublic borrower financial and

personal information and pipeline reports which all constitute trade secrets under the DTSA and CUTSA. *Henry Schein, Inc. v. Cook*, No. 16-03166C, 2016 WL 3418537, at *4 (N.D. Cal. June 22, 2016) (holding customer information, margins, and profit percentages used to gain an advantage over competitors were protectable as trade secrets). "As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." *Courtesy Temporary Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287 (Ct. App. 1990). Plaintiff's identification that Defendants shared "the names of key employees to be poached and the total percentage of annual corporate sales made by those key employees, pricing and financing resources, … plans to expand and develop certain markets, [and] profitability … [are] sufficient to demonstrate specificity regarding the customer information" to qualify as trade secrets. *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 473 (N.D. Cal. 2020).

The exhibits Luminate attached to its Complaint are also the tip of the iceberg as Defendants used a shared drive to enable near immediate and easy transmission of whichever documents they needed, without the traceable history from email exchanges. Moreover, Defendants demonstrably tried to conceal their use of Luminate's material by directing the Luminate's name be removed. As discussed above, there is no reasonable question that Luminate maintained the exclusive rights to this highly valuable information. Luminate derives commercial value through its unique strategies and processes with respect to the loan process as it gives Luminate a competitive advantage over its competitors that helps it attract and retain customers. Luminate undertakes reasonable efforts to maintain the secrecy of its confidential information. Luminate carefully protects its confidential information by maintaining it on secure data platforms and servers accessible only to Luminate employees with the requisite authorization to access the information. The Company requires such authorized personnel to agree to comply by their extensive Confidentiality and

computer use policies. As a result of Defendants' misappropriation, Luminate's entire division is being duplicated by a competitor. At best, this leaves the Company with a difficult competitor to contend with for potential borrowers; one that has copied its playbook to provide the same offerings and undercuts its marketing to consumers. This will undoubtedly reduce Luminate's overall revenue and may force a reduction in its profitability per loan to secure new business over a competitor which knows its pricing formulas. At worst, this misappropriation will prove so successful that Luminate is forced to shutter its division, losing a major and profitable, piece of its business. Luminate's extensive efforts to restructure its NEO division into a wholly owned subsidiary are already deemed wasted resources given that information and the contracts developed were utilized by their competitor instead and degrading Luminate's trust to grant its managers such autonomy. For these reasons, Defendants' theft, disclosure and use of Luminate's Confidential Information constitutes misappropriation under both the CUTSA and DTSA. It is actively being used by Defendants to continue setup and operations of the NEO subsidiary at Better.

> d.    All Defendants Have Tortiously Interfered with Luminate's Contracts and Business Relations.

To establish tortious interference with a contract, Luminate must show "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Courts have found tortious interference when a competitor recruits Plaintiff's employees "to join [it] in the plan to compete against [Plaintiff], while [Defendant] remained employed at Plaintiff's. *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 477 (N.D. Cal. 2020). Moreover, when they

"then directly recruited other [Plaintiff's] employees to provide trade secrets to [competitor] to develop a business model for competing with [Plaintiff]," this constitutes tortious interference. *Id.* California enables employers to recover for tortious interference with at will employment when they "plead and prove that the defendant engaged in an independently wrongful act—i.e., an act 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard'—that induced an at-will employee to leave the plaintiff." *Albert's*, 445 F. Supp. 3d 463, 478 (N.D. Cal. 2020) (*quoting Reeves v. Hanlon*, 33 Cal. 4th 1140, 1153 (2004); *see also Ixchel Pharma, LLC v. Biogen, Inc.*, 930 F.3d 1031, 1037 (9th Cir. 2019). Besides the misappropriation of trade secrets, such wrongful acts can be demonstrated by breach of contract and breach of fiduciary duties by working with a competitor against the employer's interest before resigning. *See Albert's* 445 F. Supp. 3d at 478.

Addressing these claims as they arise in connection with interference regarding employment contracts and prospective employment contracts, there can be no dispute that Defendants had knowledge of the existence of valid employment contracts. Defendant Horanyi's updated contract, for instance, was an express rather than implied contract. Therein, regarding the prohibition on solicitation of other Luminate employees,

> Employee agrees that the Company expends considerable time, money and resources in recruiting, training and developing the skills and abilities of its employees; that the Company has entered into contractual relationships with its employees; that the Company has a legitimate business interest in maintaining its employment relationships and not having those relationships interfered with; and that the ongoing relationship between the Company and its employees is a part of the goodwill of the Company and shall remain the sole and exclusive property of the Company.

Compl. Exhibit 3 at § 5.8. Moreover, Defendant Horanyi was required to share this contract with his subsequent employer, Better. In fact, Defendants reviewed numerous Luminate contracts as part of their efforts to copy their intent to restructure the NEO division as a wholly owned subsidiary.

As such, Luminate is likely to prevail on its claim for Tortious Interference in Count V of its Complaint.

e.    The Individual Defendants Breached their Fiduciary Duties to Luminate and Better has Aided and Abetted this Breach.

Count II of the Complaint alleges that Defendants Horanyi, Lee, and Havins breached their fiduciary duties to Luminate and that Better assisted in this breach and/or interference with their contractual obligations.  During the time that the Individual Defendants were Luminate employees, there can be no question that they owed Luminate fiduciary duties of loyalty and fidelity that required them to act only in Luminate's interests.

"The elements of a cause of action for breach of a duty of loyalty, by analogy to a claim for breach of fiduciary duty, are as follows: (1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007).  "During the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" *Fowler v. Varian Assocs., Inc.*, 196 Cal. App. 3d 34, 41, 241 Cal.Rptr. 539 (1987) (quoting *Sequoia Vacuum Sys. v. Stransky*, 229 Cal. App. 2d 281, 287, 40 Cal.Rptr. 203 (1964)).  "The duty of loyalty is breached, and the breach 'may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.'" *Id.* at 414, 58 Cal.Rptr.3d 527 (quoting *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295, 48 Cal.Rptr.2d 673 (1995)).

"Moreover, the California Court of Appeal has explained that '[t]he duty of loyalty embraces several subsidiary obligations.'" *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1122 (S.D. Cal. 2020) (*Huong*, 150 Cal. App. 4th at 416, 58 Cal.Rptr.3d 527).

> These obligations include: (1) "the duty 'to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors'; (2) "the duty 'not to acquire a material benefit from a third party in connection with ... actions taken ... through

the agent's use of the agent's position' "; and (3) "the duty 'not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party.'" *Id.* at 416, 58 Cal.Rptr.3d 52.

*Erhart*, 612 F. Supp. 3d at 1122.  While California provides that an officer may prepare to compete prior to resigning his office, he may not solicit customers or do other acts in direct competition to the current business prior to leaving that business. *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 346 (1966).  The employee breaches their fiduciary duties if "he supplie[d] the competitor with a selective list of the corporation's employees ... together with the salary the corporation [was] paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment." *Id.* at 350–51.  As discussed above, the actions of the Individual Defendants are far more egregious in this case and unquestionably constitute a breach of the duty of loyalty.

  f. <u>Defendants Have Engaged in Unfair Competition.</u>

  The final cause of action in the Complaint, Count VI, asserts a claim of unfair competition against all Defendants pursuant to California's Unfair Competition Law ("UCL").  *See* Cal. Bus. & Prof. Code §17200 *et. seq.*  It prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice." *Id.*  "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002).  Its coverage is "sweeping, embracing 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal citations omitted).  A "business act or practice" is "unlawful" under the unfair competition law if it violates a rule contained in some other state or federal statute.  *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 12 (2017) (*citing Rose v. Bank of America, N. A.,* 57 Cal. 4th 390, 396 (2013).

  "A practice may be deemed unfair even if not specifically proscribed by some other law."  *Cel-Tech*, 20 Cal. 4th at 180.  "[T]he Legislature ... intended by this

sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. *Id.* at 181 (*quoting American Philatelic Soc. v. Claibourne*, 3 Cal.2d 689, 698 (1935)).

While specific conduct has been addressed herein as it pertains to specific causes of action, the overall scheme utilized by Better and carried out by Luminate's former employees is immoral, unethical, and unscrupulous in its scope and its attack on Luminate. Taking a step back, it becomes clear that Better implemented a plan to recruit high-level executives from the highly successful Luminate, a model for privately-held mortgage companies as the third fastest growing company in the country. Once it obtained the interest of these high-level individuals, Better then directed them to solicit other Luminate employees and misappropriate trade secrets, confidential, and proprietary information. Defendants encouraged them to continue their employment on paper at Luminate to preserve access to Luminate's confidential information and trade secrets that they could pass to Better, as well as to have a marked advantage at soliciting Luminate's employees. Defendant Horanyi was offered $600,000 per year in addition to lucrative equity rights for his role in leading this scheme to jump start Better into the retail loan market by providing Luminate's contracts, business plans, company data, and ultimately its employees. *See* Compl. Exhibit 8. These unfair practices were orchestrated by the highest levels of Better, directly implicating the Company's President and knowingly engaged in by the Individual Defendants with full understanding of the wrongfulness of their conduct. For these reasons, Luminate is likely to succeed on Count 6 of their Complaint.

## II.    Luminate will Suffer Irreparable Harm if the Injunction is Denied

In the absence of a Temporary Restraining Order and Preliminary Injunction, Luminate will suffer further irreparable harm caused by Defendants' continuing to use Luminate's confidential and proprietary information and trade secrets, as well as the ongoing recruitment of Luminate's employees. That recruitment is built off impermissible solicitation efforts the Individual Defendants engaged in while they

were employees of Luminate and continues to be in violation of Defendant Horanyi's applicable employment agreement. Luminate is not only facing the permanent loss of numerous employees, many of whom hold leadership positions, institutional knowledge and are large producers for Luminate, but also faces the loss of goodwill as a result of Defendants' actions. Indeed, it is impossible to currently calculate the extensive revenue that will be lost from Defendants' unlawfully built NEO division, the illicit recruitment of Luminate's employees, and from the future business that Luminate would have derived without the intervening competition, the loss of its employees, and the public mark against its brand among prospective borrowers and employees alike. Defendants' illicit activity is forcing Luminate to take steps to wholly restructure its NEO division and bring hundreds of employees and branches under new management or incorporated into other aspects of its business. *See* Compl. at ¶ 29. That is a best case scenario at this point as Defendants have a professed intent to acquire without fair compensation the entirety of Luminate's NEO division and all profitable employees and offices they desire.

"The threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). That is essentially the threat posed by Defendants' wrongful conduct with respect to Luminate's NEO division, which comprises an enormous portion of its operations and which it was working to establish as a wholly owned subsidiary business before Defendants' misconduct came to light. "The loss of … an ongoing business representing many years of effort and the livelihood of its … owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages." *HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019).

As it pertains to Defendants' misappropriation of Luminate's confidential, proprietary and trade secret information, California courts have held that misappropriation of a trade secret is an injury justifying the entrance of a temporary

restraining order because once perpetrated its usage represents a continuous and frequent recurrence that no reasonable redress can be had in a court of law. *See Acrisure of Cal., LLC v. Comfort Ins. Services, LLC*, No. 20-cv-02224, 2020 WL 8575185, at *1 (S.D. Cal. Nov. 24, 2020); *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*, No. 13-cv-00784, 2013 WL 2151553, at *6 (E.D. Cal. May 16, 2013) (concluding employee's transmission of company competitive information before resigning justified preventing their subsequent business from poaching business).

"California courts have presumed irreparable harm when proprietary information is misappropriated." *TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF, 2010 WL 1028254, at *8 N.D. Cal. Mar. 18, 2010. "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg International Sales Co. v. John D. Brush & Co.* 240 F.3d 832, 841 (9th Cir. 2001). Moreover, a competitor should not be allowed to "profit from its head start" by misappropriating Plaintiff's trade secrets. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). That is precisely what Defendants would be allowed to do here if a temporary restraining order and preliminary injunction is not issued. "Numerous district courts in this Circuit have held that 'a defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm.'" *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *5 (*quoting SolarPark Kor. Co. v. Solaria Corp.*, No. 23-CV-01181-AMO, 2023 WL 4983159, at *8 (N.D. Cal. Aug. 2, 2023); *E.W. Bank v. Shanker*, No. 20-CV-07364-WHO, 2021 WL 3112452, at *12 (N.D. Cal. July 22, 2021)).

     a.   <u>Defendants' Ongoing Conduct Poses an Existential Threat to Luminate if the Court Does not Take Decisive Action.</u>

If left unchecked, the continued possession and use of Luminate's Confidential Information, as well as the deliberate raiding of Luminate's employees in key markets will have a deleterious effect on Luminate's business as Luminate. Indeed,

in the absence of licensed loan officers, Luminate may not, in the short term, be able to adequately service customers, which may in turn create problems with potential referral sources. More importantly, the loss of goodwill brought by the short-term problem caused by Defendants' conduct may have far-ranging long-term effects that Luminate cannot contemplate at this time. If Better is allowed to continue accessing Luminate's trade secrets, they will almost assuredly obtain nonpublic customer information, if they have not already. This is highly suspected to be among the four thousand files downloaded to a flash drive by Luminate's former Director of Finance, Sydney Lynn, who is expected to formally join Better any day now. This dissemination would require Luminate to report a data breach to regulators as well as their customers, causing unimaginable harm to their brand. Better's ability to use Luminate's confidential information to replicate Luminate's processes and strategies, as well as the branding and marketing tools they appropriated, to potentially solicit Luminate's customers could impact Luminate's ability to operate in unimaginable ways.

The extreme nature of Defendants' conduct in this case requires an appropriate remedy to be equally stringent. Through this misappropriated information, Better is launching into retail loan operations it otherwise could not have entered, at least not without additional years of effort and/or an expensive arms' length negotiation and acquisition from another lender. All loans they generate through this new business platform will be the fruit of the poisonous tree, exacerbated tenfold if they can continue this jumpstart by utilizing Luminate's current and former employees to execute the business model they copied. Luminate does not seek that the Court wholly enjoin Better from entering the retail loan market to remedy this issue, although such redress would not be unreasonable in this context. Nor does Luminate seek to completely prevent Better from hiring Luminate current or former employees as Luminate respects the rights of employees to choose their employer. However, the information that Better stole and their scheme to destroy Luminate's goodwill in

the Neo division and the employment marketplace cries out for strict injunctive relief to redress the extent of irreparable harm posed to Luminate.

Given the scope of Defendants' misconduct, the ongoing unfair advantage they enjoy, and their continued targeting of Luminate's employees, it is appropriate to prevent Defendants from further reaping the benefit of their misappropriation and pre-termination solicitations. This can only be accomplished by segregating such hires from the duplicate business Better is developing and requiring Better to instead employ any Luminate hires in other parts of their mortgage operations. While California is hesitant to restrict employment opportunities, it has gone even further than Luminate requests when trade secret misappropriation is at issue. When, as here, "Plaintiff has offered substantial evidence suggesting that [the former employee] *used* the trade secret in question, Plaintiff need not rely on inevitable disclosure" and an injunction precluding their work for a competitor may be granted. *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *13. This supersedes California's typical rejection of the inevitable disclosure doctrine in circumstances where the Plaintiff is unable "to prove the employee has taken or threatens to use trade secrets." *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1459 (2002). Unlike those cases, Better would still be free in this context to compete fairly in their new retail loan endeavors, instead of being prohibited entirely from the business line they developed with the misappropriated trade secrets. Better could work, as Luminate and others in the industry do, to attract employees from other lenders to staff the retail loan division they created with Luminate's information. Luminate would have always welcomed such competition from Better or others if the new entrant was not enjoying an immeasurable head start compared with a true expansion launch. This free and fair competition helped make Luminate the third fastest growing private mortgage lender in the country up until Defendants tried to seize that successful model for themselves.

b.    <u>Luminate Tried to Work with Defendants to Limit the Harm at Issue.</u>

Luminate attempted to engage with Defendants in good faith to limit the extent of the harm they were wreaking on the Company and, thereby, lessen the injunctive relief now required from the Court.   However, those efforts were rebuffed and demonstrated that Defendants actively intend to continue reaping the benefits of the information they misappropriated from Luminate under the baseless guise that it was "NEO's" information.  This is demonstrably false as recounted above because NEO was never an independent entity capable of ownership of intellectual property.  All information related to it as a division was owned and controlled by Luminate and, beforehand, its prior owner, Celebrity from which Luminate acquired and expanded on such proprietary information.

Luminate's good faith efforts in this matter cannot be counted against it. "Courts have declined to weigh 'delay caused by a plaintiff's good faith efforts to investigate' misappropriation against the issuance of injunctive relief," or when a Plaintiff "sent [Defendants] multiple warnings regarding [their] alleged use of its trade secrets in the hope of obviating court intervention.  *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *6 (*quoting BP Chemicals Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000)).  Moreover,

"A reasonable delay before filing suit, or between filing suit and moving for [a] preliminary injunction, may be excused if a [movant] can demonstrate it has attempted to protect its rights through out-of-court protests or negotiations." *CrossFit, Inc. v. Nielsen*, No. 3:12-cv-325 AJB (WVG), 2012 WL 12872471, at *4 (S.D. Cal. Sept. 12, 2012); *see also HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884-MMA (WMC), 2013 WL 12074966, at *8 (S.D. Cal. Oct. 3, 2013) (granting preliminary injunction motion filed eight months after complaint where the plaintiff had sought a negotiated resolution); *Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1286 (C.D. Cal. 1997) ("The nine month delay from the cease-and-desist letter to the filing of suit is a reasonable time for Plaintiff to have allowed Defendants to

respond to its request and pursue settlement avenues."); *Ikhana Grp., LLC v. Viking Air Ltd.*, No. 23-CV-01306-BAS-DEB, 2023 WL 7348411, at *12 (S.D. Cal. Nov. 7, 2023) (ten month delay before filing for injunctive relief was reasonable in light of documented efforts towards informal resolution). Moreover, Defendants in the Parties' negotiation regarding this dispute affirmed Luminate's good faith efforts and that Plaintiff has diligently sought an appropriate remedy such that no argument for unreasonable delay would be appropriate in this context. On the contrary, Luminate has acted with haste to investigate this matter, address it internally, and then seek legal redress when its context became clearer. It is now apparent that Defendants intend to build off their prior improper solicitations and their unreasonable knowledge of Luminate's operations to continue hiring away large swathes of Luminate's NEO division with an express goal of taking the entire division, or at least all valuable aspects of it, by the end of February 2025.

As demonstrated by the facts set forth above, as well as the applicable law, Luminate has suffered and will continue to suffer irreparable harm because of Defendants' misappropriation of trade secrets and confidential and proprietary information, breach of contract, tortious interference, breach of fiduciary duties, and unfair practices. Further, Luminate's damages are not the type of damages that can be identified or estimated with any reasonable certainty. Indeed, how Better will continue to use and, potentially, disseminate Luminate's Confidential Information is impossible to predict. Likewise, Luminate cannot know how many Luminate employees Better will continue to solicit, or the impact of their loss to Luminate's ability to service and attract new customers. Furthermore, the Individual Defendants are all individuals with unknown financial assets. As such, there is no way to know that they could adequately compensate Luminate for the harm they have and will continue to cause, if not enjoined.

As is stands, Luminate is not simply facing the possibility of losing additional employees but is being attacked systematically in a way where its confidential

information is being used to strategically solicit Luminate employees such that Luminate is vulnerable to being unable to service its customers which may lead to the loss of referral sources and evaporation of its pipeline. Luminate's customers also run the risk of their nonpublic personal financial information—information provided solely to Luminate—being used in an inappropriate manner by Better.    In other words, Defendants' plan to transition Luminate's entire NEO division to Better is presently well under way.    Defendants will soon reap massive benefits from this misconduct to Luminate's immeasurably damage if the Court does not return the Parties' relationship to its status quo before the transmission of Luminate's trade secrets.

### III.    The Balance of Harm Weighs Heavily in Luminate's Favor

The Court "must 'balance the interests of all parties and weigh the damage to each.'"    *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (*quoting Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)).

When a Plaintiff is likely to succeed on the merits, harm to the infringer's business stemming from lost sales of the infringing work/product "cannot be accorded significant–if any–weight." *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829–30 (9th Cir. 1997); *see also Rebecca Bamberger Works, LLC v. Bamberger*, No. 24-CV-706 JLS (DDL), 2024 WL 2805323, at *19 (S.D. Cal. May 31, 2024) (declining to "reward [the d]efendants for their likely unlawful actions"). Presumption of irreparable harm for misappropriation of proprietary information weighs significantly in Plaintiff's favor against potential harm to Defendant.    *See TMX Funding, Inc.*, No. C 10-00202 JF, 2010 WL 1028254, at *8.

The balance of harm weighs heavily in favor of the requested injunctive relief. Nothing in Plaintiff's injunctions prevents Defendant Better from developing other retail loan operations, establishing and selling other loan products, or recruiting employees from other mortgage lenders.    Luminate merely wants the return of information that Defendants never had any right to possess let alone utilize in the first

41

place.    Given the continued threat of irreparable harm, Luminate needs its confidential information and trade secrets returned, an understanding of everything that was misappropriated, and to ensure that this information—which should have never been possessed by Defendants in the first instance—is not used any further. Defendants can literally point to no harm in having to return information they should never have possessed.

With respect to solicitations, Luminate has experienced, and continues to experience, great hardship because of Defendants' deliberate actions.    Numerous employees have already resigned because of Defendants solicitations from inside the Company before the Individual Defendants were terminated.    Luminate's trade secrets have been copied and are being utilized, shared, and possibly disseminated, diminishing their value.  Moreover, because of Defendants' conscious concealment, Luminate only realized this recently.    As such, Defendants have already reviewed and used Luminate's trade secrets for far longer than they should have.

Defendants' successful solicitation of dozens of Luminate employees, coupled with the attempted solicitation of tens if not hundreds of other Luminate employees, has caused irreparable harm to Luminate and threatens to deprive Luminate of its livelihood.    Conversely, the only "harm" to Defendants would be to require the Individual Defendants to abide by the contractual and legal obligations previously agreed upon.  Further, any injunction against Better would simply prohibit them from profiting from the illegal activities described herein.  Conversely, Defendants being permitted to retain Luminate's trade secret information will have a deleterious impact on Luminate.  Not only have Defendants impermissibly used this information to solicit its employees but Defendants are now positioned to use Luminate's trade secrets to replicate Luminate's processes, products and strategies, thereby destroying Luminate's competitive advantage.    Considering Defendants' bad acts that have directly and severely harm Luminate and threaten to continue to do so, the balance of harm swings squarely to the side of Luminate.

**IV.    Enforcing Trade Secret Protections and Fair Business Practices is in the Public Interest.**

Lastly, issuing a Temporary Restraining Order and Preliminary Injunction promotes the public interest.  "The public interest inquiry primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  In deciding what issues are imbued with "public interest," courts have given considerable weight to impact on public policies.  *See, e.g., American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983).

"Courts often find that the public has a strong interest in protecting intellectual property rights."  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 854 (N.D. Cal. 2019).  Further, the public interest is served when a defendant "is asked to do no more than abide by trade laws and the obligations of contractual agreements."  *Ikhana Grp., LLC v. Viking Air Ltd.*, No. 23-CV-01306-BAS-DEB, 2023 WL 7348411, at *13 (S.D. Cal. Nov. 7, 2023) (*quoting Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016)).  "Congress and California's legislature, by passing trade secret legislation, have indicated that the public interest favors the issuance of injunctions that prevent continued misuse of trade secrets and trademarks."  *Fujikura*, No. 24-CV-782 JLS (MSB), 2024 WL 3261214, at *15.  While California also has a strong policy in favor of mobility, California has regularly weighed in favor of trade secret protection, which is even stronger in cases such as this "where an employee has been caught stealing specific documents or schematics from his company's hard drive."  *Id.*  Moreover, the Individual Defendants need not be entirely enjoined from working for Luminate's competitor, only that they not be permitted to work in the retail loan division they have attempted to create using Luminate's trade secrets and proprietary and confidential information.  Thereby, California's public policy interest in the freedom of employee's movement is preserved as they can continue to work in their chosen field with Better in other areas of mortgage lending.  All such individuals

43

would also still be free to seek employment with other competitors who are not enjoining this ill-gotten advantage.

## V.    No Bond or a De Minimis Bond is Warranted.

Federal Rule of Civil Procedure 65(c) provides in relevant part that "[t]he court may issue a … temporary restraining order only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  A district court retains discretion "as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted) (emphasis in original).  The court may dispense with the filing of a bond if "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).  There is no realistic likelihood of harm from enjoining a defendant from continuing to misappropriate trade secrets in violation of statute or contract, and thus no reason to require a bond under Rule 65(c).

"The party affected by the injunction [bears the burden] of presenting evidence that a bond is needed. *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).  Here, Plaintiff has provided extensive evidence from Defendants' own communications regarding their misappropriation of Luminate's trade secrets and how it was essential for their establishment of retail loan operations and a competing NEO division at Better.  Therefore, there is no likelihood that any of the Defendants would be wrongfully enjoined if an injunction is issued which prevents them from benefiting from their misuse.

## CONCLUSION

**WHEREFORE** Plaintiff Luminate Home Loans, Inc., respectfully requests that an Order be entered:

A. Ordering Defendants Horanyi, Lee, and Havins (the "Individual Defendants") to provide for inspection, data collection, and analysis to a

jointly selected third-party forensic expert, any desktop, laptop, smartphone, tablet computer, external hard drive, Cloud Servers, or cloud-based storage used by the Individual Defendants, including but not limited to iPhones, Androids, Blackberries, CD-ROMs, USB drives, and thumb drives;

B. Order Better to provide an affidavit setting forth all information and documentation received by Better, including information and documentation received through electronic mail, server, thumb drive, cloud storage accounts and/or digital files, related to and/or regarding Luminate, its clients, and/or employees (including but not limited to its NEO division);

C. That all such information in Better's possession be segregated, returned to Luminate with a thorough record of what is being returned and how it came into Better's possession;

D. Enjoining the Defendants, and all other persons or entities acting in concert with them or on their behalf from, directly or indirectly, using, disclosing, or deleting any proprietary, confidential or trade secret information of Luminate;

E. Ordering the Individual Defendants to provide for inspection, data collection, and analysis to a third-party forensic expert selected by Luminate, all storage accounts and all email accounts and emails therein used by the Individual Defendant in the last 12 months, as well as all information needed to access the Cloud Servers or cloud storage accounts and email accounts, including user identification and password;

F. Ordering the Defendants, and any employees or prospective employees under their control, to return to counsel for Luminate any and all documents, electronic, or digital files prepared during, arising from, or containing information related to Luminate, including, but not limited to, all originals and copies of such documents, and all computer diskettes,

smart phones, flash drives, or other data storage media containing such information;

G. Ordering the Defendants to certify that they have returned all information set forth in the above paragraphs, and that they have not retained any copies of such information regardless of the form of such information (e.g., original document, hard copy of document, facsimile copy, electronic email or image);

H. Ordering Defendants to respond to Luminate's First Set of Request for Production of Documents within fourteen (14) days and requiring Defendants to each sit for a deposition, if requested by Luminate, within the next thirty (30) days.

I. Enjoining Defendants from employing any current or former Luminate employee from working at Better's NEO subdivision, or any such NEO entity owned or controlled by Defendants;

J. Contractual attorneys' fees;

K. Ordering Defendants, jointly and severally, to bear all costs related to data collection, as set forth above; *and*

L. Granting Luminate such other and further relief as the Court may deem just, equitable, and proper.

Respectfully submitted this 26th day of December, 2024.

*/s/ Lucas Markowitz*
Ari Karen (*pro hac vice forthcoming*)
Lucas Markowitz (*phv forthcoming*)
Alexander Rogosa (*phv forthcoming*)
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, DC 20006
Office: (202) 886-5265
E-mail:      akaren@mitchellsandler.com
lmarkowitz@mitchellsandler.com
arogosa@mitchellsandler.com

/s/ *Mark Johnson*
Mark Johnson (SBN 135288)
Offit Kurman, P.A.
445 S. Figueroa Street
Los Angeles, CA 90071
Office: (213) 629-5700
Facsimile: (213) 624-9441
mark.johnson@offitkurman.com

**ATTORNEYS FOR PLAINTIFF**