# <u>EXHIBIT A</u>

ASSET PURCHASE AGREEMENT

BY AND AMONG

LUMINATE HOME LOANS, INC.

AND

CELEBRITY HOME LOANS, LLC

AS OF DECEMBER 6, 2022

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ............................................................................1
    Section 1.1    Definitions.........................................................................1

ARTICLE II. PURCHASE AND SALE; BRANCH CLOSINGS ....................................8
    Section 2.1    Purchase and Sale of Branches ................................8
    Section 2.2    Branches...............................................................9
    Section 2.3    No Purchase or Transfer of Excluded Assets ..............9
    Section 2.4    No Assumption of Excluded Liabilities.......................9
    Section 2.5    No Assignment of Certain Assets ..............................9
    Section 2.6    Purchase Price..........................................................9
    Section 2.7    Branch Closings .......................................................10
    Section 2.8    Branch Closing Deliveries. ........................................10
    Section 2.9    Prorations as of the Effective Time ...........................12
    Section 2.10    Withholding ............................................................12

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF SELLER.............................12
    Section 3.1    Organization of Seller................................................12
    Section 3.2    Authority of Seller. ..................................................12
    Section 3.3    Employees...............................................................13
    Section 3.4    No Conflict..............................................................13
    Section 3.5    Recent Operations ....................................................14
    Section 3.6    Taxes.....................................................................14
    Section 3.7    Branch Permits........................................................15
    Section 3.8    Real Property. .........................................................15
    Section 3.9    No Litigation ...........................................................16
    Section 3.10    Intellectual Property.................................................16
    Section 3.11    Title to and Sufficiency of Branch Property.................16
    Section 3.12    Compliance with Applicable Law; No Violation, Litigation or Regulatory Action.................................................17
    Section 3.13    Branch Contracts......................................................18
    Section 3.14    Employee Relations and Agreements. .........................18
    Section 3.15    No Brokers .............................................................19
    Section 3.16    Transactions with Affiliates ......................................19
    Section 3.17    Disclaimer of Additional Representations and Warranties.....................19
    Section 3.18    Solvency.................................................................19
    Section 3.19    Mortgage Loans ......................................................19
    Section 3.20    No Substitution .......................................................19
    Section 3.21    No Undisclosed Liabilities.........................................19
    Section 3.22    Financial Statements ................................................19

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF BUYER...............................20
    Section 4.1    Organization of Buyer...............................................20
    Section 4.2    Authority of Buyer...................................................20
    Section 4.3    No Conflict..............................................................20

Section 4.4     Consents and Approvals ..................................................20
Section 4.5     No Litigation ...................................................................21
Section 4.6     No Brokers .......................................................................21
Section 4.7     Financial Ability .............................................................21
Section 4.8     Nonreliance on Additional Representations and Warranties ..................21
Section 4.9     Disclaimer of Additional Representations and Warranties ....................21

ARTICLE V. ACTION AFTER THE DATE HEREOF ..................................................21
Section 5.1     Access to Information ......................................................21
Section 5.2     Notification; Update of Schedules. ...............................22
Section 5.3     Consents of Third Parties; Governmental Approvals. ............................22
Section 5.4     Operations Prior to the Branch Closing Date. ................23

ARTICLE VI. ADDITIONAL AGREEMENTS ..........................................................25
Section 6.1     Tax Matters. .....................................................................25
Section 6.2     Exclusivity ......................................................................27
Section 6.3     Employees. ......................................................................27
Section 6.4     Seller's Post-Closing Existence. ..................................28
Section 6.5     Certain Restrictive Covenants. ...................................28
Section 6.6     Information Received after Branch Closing Date ...............29
Section 6.7     Stoddart Employment Agreement ...............................29
Section 6.8     ICE/Encompass Contract .............................................29
Section 6.9     Pipeline Mortgage Loans .............................................29
Section 6.10    Transition Services/Management Agreement ................30
Section 6.11    Seller's Capital Markets Group ....................................30

ARTICLE VII. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ........................30
Section 7.1     No Misrepresentation or Breach of Covenants and Warranties ..............30
Section 7.2     Necessary Consents, Notices and Approvals ................31
Section 7.3     Branch Manager .............................................................31
Section 7.4     No Restraint .....................................................................31
Section 7.5     Branch Contracts ............................................................31
Section 7.6     Bring Down Certificate ..................................................31
Section 7.7     Closing Documents ........................................................31
Section 7.8     No Material Adverse Change. .......................................31
Section 7.9     No Proceedings or Prohibitions ....................................31
Section 7.10    Member's Indemnity Agreement ..................................31
Section 7.11    Equity Investment in Luminate Capital Corp. ..............32

ARTICLE VIII. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ..................32
Section 8.1     No Misrepresentation or Breach of Covenants and Warranties ..............32
Section 8.2     No Restraint .....................................................................32
Section 8.3     Warehouse Lenders ........................................................32
Section 8.4     Sale of Computers and Other IT Equipment ................33

ARTICLE IX. INDEMNIFICATION ....................................................................33
Section 9.1     Survival ...........................................................................33
Section 9.2     Indemnification by Seller ..............................................33
Section 9.3     Indemnification by Buyer ..............................................34

Section 9.4     Notice of Claims ..................................................................34
Section 9.5     Determination of Amount; Satisfaction .................................34
Section 9.6     Third Party Claims..............................................................35
Section 9.7     Limitations ..........................................................................36
Section 9.8     Tax Treatment .....................................................................36

ARTICLE X. TERMINATION ...................................................................36
Section 10.1    Termination .........................................................................36
Section 10.2    Notice of Termination..........................................................37
Section 10.3    Effect of Termination...........................................................37

ARTICLE XI. GENERAL PROVISIONS ....................................................37
Section 11.1    No Public Announcement......................................................37
Section 11.2    Notices .................................................................................37
Section 11.3    Successors and Assigns; No Third Party Beneficiaries .........38
Section 11.4    Entire Agreement; Amendment .............................................38
Section 11.5    Interpretation.  For purposes of this Agreement: ..................39
Section 11.6    Waiver..................................................................................40
Section 11.7    Expenses ..............................................................................40
Section 11.8    Partial Invalidity..................................................................40
Section 11.9    Execution in Counterparts....................................................40
Section 11.10   Further Assurances...............................................................40
Section 11.11   Governing Law; Submission to Jurisdiction..........................41
Section 11.12   Attorneys' Fees ...................................................................41
Section 11.13   Waiver of Jury Trial.............................................................41
Section 11.14   Specific Performance ..........................................................41

<u>List of Annexes</u>:

Branch List

Branch Employees List


<u>List of Exhibits</u>:

Exhibit A – Form of Branch Assignment Agreement

Exhibit B – Form of Intellectual Property Assignment Agreement

Exhibit C – Form of Member Indemnity Agreement

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made as of December 6, 2022, by and among Luminate Home Loans, Inc., a Minnesota corporation ("Buyer"), and Celebrity Home Loans, LLC, an Illinois limited liability company ("Seller").

## RECITALS

WHEREAS, Seller is the owner of the Purchased Assets (as such term is hereinafter defined) and desires to sell the Purchased Assets and assign the Assumed Liabilities (as such term is hereinafter defined) to Buyer, and Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, all on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1    Definitions.  In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

"Action" means any claim, action, suit, arbitration, proceeding, or investigation by or against any Person before any Governmental Authority, before an arbitrator or mediator, or asserted directly against Seller or any of its Affiliates.

"Affiliate" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly Controls, is Controlled by or is under common Control with such Person.

"Agreement" means this Asset Purchase Agreement, including the Annexes, Exhibits, and Schedules attached hereto.

"Allocation Schedule" has the meaning specified in Section 6.1(b).

"Ancillary Agreements" means the agreements, instruments and documents being or to be executed and delivered by Buyer or Seller under this Agreement.

"Anti-Money Laundering Laws" means all applicable anti-money laundering laws and regulations, including the Bank Secrecy Act, the USA PATRIOT Act and the regulations of the Office of Foreign Asset Control.

"Applicable Law" means (a) any order, law, statute, regulation, rule, ordinance, writ, injunction, directive, judgment, decree, principle of common law, constitution or treaty enacted, promulgated, issued, enforced or entered by, or any stipulation or requirement of, or binding

agreement with, any Governmental Authority, as in effect at the applicable time, including, without limitation, any of the foregoing applicable to the operation of Seller's business of processing, origination, servicing of or the purchase, sale, enforcement and insuring or guaranty of, or filing of claims in connection with, the related Mortgage Loans, including applicable Anti-Money Laundering Laws (b) all applicable judicial and administrative judgments, orders, stipulations, awards and writs and (c) any applicable regulatory consent orders or court approved settlements with Governmental Authorities.

"Assumed Liabilities" means only such Liabilities that arise out of the Purchased Assets on or after the applicable Branch Closing Date and that do not relate to any action or inaction of Seller in the operation of the Purchased Assets prior to the applicable Branch Closing Date.

"Bankruptcy and Equity Exceptions" has the meaning specified in Section 3.2(a).

"Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA); each incentive, profit-sharing, bonus, commission, stock option, stock purchase or other equity-based plan, policy or agreement; each retirement plan, each healthcare or other welfare plan; each disability, vacation or other leave plan, policy or agreement; each change in control, retention, severance or transaction bonus plan or arrangement; each deferred compensation plan, policy or agreement and any other benefit plans, programs and agreements, in each case established or maintained by Seller or any of its Affiliates for the benefit of any Employees, managers, former employees, former managers or contractors of Seller (or the beneficiaries or dependents of such individuals) or to which Seller or any of its Affiliates contributes or is obligated to contribute, or with respect to which Seller or any of its Affiliates may have any liability.

"Branch" means one of the Seller's operating locations or any mortgage production branch location of Seller identified on the Branch List.

"Branch Assignment Agreement" means, with respect to each Branch Closing, a Branch Assignment and Assumption Agreement and Bill of Sale, substantially in the form attached hereto as Exhibit A.

"Branch Closing" means, with respect to any Branch, the closing of the transactions contemplated by this Agreement relating to such Branch.

"Branch Closing Date" has the meaning specified in Section 2.6.

"Branch Contracts" means, with respect to any Branch location, the Contracts necessary to operate such Branch location in the ordinary course of business, other than (i) the Branch Lease and (ii) any employment agreements with Branch Employees.

"Branch Employees" means, with respect to any Branch, the Branch Manager and other Employees who work at such Branch location in the ordinary course of business identified on the Branch Employees list annexed to this Agreement.

"Branch Facility" means, with respect to any Branch location, the real property, including all buildings, improvements and fixtures thereon and any easements, rights of way and other appurtenances thereto, leased pursuant to the Branch Lease of such Branch location.

"Branch Lease" means, with respect to any Branch location, the Lease pursuant to which the Branch Facility of such Branch location is leased.

"Branch Lease Deliverables" has the meaning specified in Section 2.7(a).

"Branch List" means the list of Branches annexed to this Agreement, including the related Branch Contracts, Branch Employees, Branch Leases, Branch Permits and Branch Property, in each case, identified by Branch location number, comprising Seller's "Apex", "Neo" and "Robert Coomer Group" management and/or reporting divisions.

"Branch Manager" means, with respect to any Branch location, the manager of such Branch location.

"Branch Permits" has the meaning specified in Section 3.7.

"Branch Property" means, with respect to any Branch location, all right, title and interest of Seller in and to the fixed assets owned or leased by, in the possession of, and/or used by Branch Employees with respect to such Branch location excluding computer and other IT equipment in accordance with Section 8.4.

"Bring Down Certificate" has the meaning specified in Section 7.6.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in Chicago, Illinois are authorized or obligated by law or executive order to close.

"Buyer" has the meaning specified in the preamble of this Agreement.

"Buyer Disclosure Schedule" means that certain document identified as the Buyer Disclosure Schedule delivered by Buyer to Seller in connection with the execution of this Agreement.

"Buyer Indemnified Parties" has the meaning specified in Section 9.2.

"Cap" has the meaning specified in Section 9.7.

"Code" means the Internal Revenue Code of 1986.

"Competing Transaction" has the meaning specified in Section 6.2.

"Confidential Information" has the meaning specified in Section 6.5(a).

"Contract" means any contract, agreement, commitment, note, bond, mortgage, indenture, guarantee, deed of trust, lease, sale or purchase order, license, subcontract, indemnity, warranty or other binding arrangement, whether written or oral.

"Control" means, as to any Person, the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.  The terms "Controlled by" and "under common Control with" shall have correlative meanings.

"Earnout Amount" means 5 basis points on total aggregate loan production from the Purchased Assets during the Earnout Period.

"Earnout Period" means the period of time commencing on the date six (6) months after the final Branch Closing Date hereunder and continuing through the date sixty-six (66) months after such final Branch Closing Date.

"Effective Time" means, with respect to each Branch Closing, 11:59 p.m., local time where such Branch is located, on the applicable Branch Closing Date.

"Employees" means the employees of Seller as of the Branch Closing Date.

"Encumbrance" means any lien, adverse claim, charge, judgment, imposition, levy, attachment, license, security interest, security agreement, financing statement, mortgage, deed of trust, encroachment, pledge, easement, covenant, restriction, right of first refusal, right-of-way, conditional sale or other title retention agreement, option, preemptive right, defect in title or other adverse claims or encumbrance of a similar nature.

"Excluded Assets" means all assets of Seller that are not Purchased Assets. For avoidance of doubt, Excluded Assets shall include any security or similar deposits held by landlords or third parties in connection with the Branch Leases transferred to Buyer on the applicable Branch Closing Date.

"Excluded Branches" means Branches listed on the Branch List that have been rejected by Buyer in accordance with Section 2.2 hereof.

"Excluded Liabilities" means all liabilities and obligations of Seller (other than the Assumed Liabilities), whether such liabilities or obligations relate to payment, performance or otherwise, arise before, after or at the Effective Time, are known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not such liabilities and obligations are required to be accrued on any financial statements of Seller. For the avoidance of doubt, and without limiting the generality of the foregoing, Excluded Liabilities shall include, without limitation, (i) all liabilities and obligations relating to or arising out of the Excluded Assets, (ii) all liabilities and obligations relating to or arising out of the Consolidated Omnibus Budget Reconciliation Act or the Family and Medical Leave Act of 1993 with respect to Seller's employment of the Employees and (iii) any Taxes of Seller, any Taxes related or with respect to the Purchased Assets that were incurred or are attributable to any period (or portion thereof) prior to the Effective Time of the applicable Branch Closing, any Taxes of another person for which Seller is liable by reason of Treasury Regulation Section 1.1502-6 (or any comparable or similar provision of federal, state, local or foreign law) as a transferee or successor, by contract or otherwise, and any income, transfer, sales, use or other Taxes arising in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement.

"FIRPTA Certificate" means an affidavit, sworn under penalty of perjury and in form and substance in compliance with Section 1445(b)(2) of the Code and the Treasury Regulations thereunder, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

"Fundamental Representations" means, collectively, the representations and warranties made in Section 3.1 (Organization of Seller), Section 3.2 (Authority of Seller), Section 3.11 (Title to and Sufficiency of Assets), Section 3.15 (No Brokers), Section 4.1 (Organization of Buyer), Section 4.2 (Authority of Buyer) and Section 4.6 (No Brokers).

"GAAP" means United States generally accepted accounting principles, consistently applied and as in effect on the date hereof consistently applied.

"Governmental Authority" means any United States federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body, board, department, instrumentality or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"Indebtedness" means any of the following (without duplication):

(a) indebtedness or liability for borrowed money;

(b) obligations evidenced by notes, bonds, debentures or similar instruments;

(c) obligations to pay the deferred purchase price of property or services (except trade accounts payable, amounts owed to Employees and other current Liabilities arising in the ordinary course of business that are not more than thirty (30) days past due);

(d) payment obligations under conditional sale agreements or title retention agreements;

(e) obligations as lessee under capitalized leases (or leases that, under GAAP, should be recorded as capital leases);

(f) obligations, contingent or otherwise, under acceptance credit, letters of credit (and related reimbursement agreements) or similar facilities;

(g) the net liability under interest rate, currency or commodity derivatives or hedging transactions;

(h) any indebtedness (including the types specified in (a) through (f) of this definition) that a Person guarantees or with respect to which a Person otherwise assures a creditor against loss;

(i) any indebtedness secured by an Encumbrance on the Person's assets, even if that Person has not assumed or become liable for the payment of that indebtedness;

(j) any amounts owed by a Person to any Person under any non-competition, consulting or deferred compensation arrangement; and

(k) all accrued interest, premiums, penalties and other fees or charges payable in connection with any of the foregoing.

"Indemnified Party" has the meaning specified in Section 9.4.

"Indemnitor" has the meaning specified in Section 9.4.

"Intellectual Property" means: (a) patents, patent applications, and patent rights, (b) copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated with, any of the foregoing and (d) trade secrets, know-how and other confidential business information ("Trade Secrets").  For clarity and avoidance of doubt, Intellectual Property excludes the names "Celebrity", "Celebrity Home Loans", "Celebrity Financial" and all trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated therewith.

"Intellectual Property Assignment Agreement" means that certain Intellectual Property Assignment Agreement in the form attached hereto as Exhibit B to be executed between Buyer and Seller.

"Lease" means a lease, sublease, concession, license or other similar agreement (whether written or oral), including all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto.

"Liabilities" means any Indebtedness, liability, claim, demand, expense, commitment or obligation (whether known or unknown, asserted or unasserted, direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, and including all costs and expenses related thereto.

"Losses" means actual losses, damages, costs and Liabilities of any kind, including (a) expenses (including costs of investigation and defense of any claim, Action or proceeding and the reasonable fees and charges of attorneys, accountants and other experts and consultants); (b) fines, penalties, judgments, payments in settlement of a claim, Action or proceeding or made in compliance with any judicial order; and (c) payments made and costs incurred under indemnification obligations to other Persons, other costs and payments (including the expenses of enforcing indemnification rights asserted under this Agreement); provided, that in no case shall "Losses" include any incidental, consequential, special or punitive damages, except to the extent paid to a Third Party in connection with a Third Party Claim.

"Member" means Celebrity Financial, Inc., a U.S. Virgin Islands corporation, which is the sole member in Seller.

"Mortgage Loan" means each first lien residential mortgage loan that has been closed and funded by Seller including, without limitation, the related mortgage loan documents and/or copies thereof pertaining to such mortgage loan, the file containing the documents relating to the origination and servicing of such mortgage loan and all other rights, benefits, proceeds and obligations arising from or in connection with such mortgage loan.

"Owned Intellectual Property" means Intellectual Property owned by Seller.

"<u>Parties</u>" means the parties to this Agreement.

"<u>Person</u>" means any natural person, corporation, general or limited partnership, company, limited liability company, joint venture, limited liability partnership, firm, trust, estate, Governmental Authority or other legal entity.

"<u>Pipeline Mortgage Loan</u>" means a Mortgage Loan, other than any Mortgage Loan that has been closed and funded by Seller on or before the date hereof, where (i) either the loan is in the underwriting stage or later with Seller or (ii) a rate lock agreement has been entered into by Seller. Notwithstanding the foregoing, the definition of "Pipeline Mortgage Loan" shall not include any Mortgage Loan that is in a "to be determined" or other loan status prior to being submitted or placed in the underwriting stage with Seller.

"<u>Pre-Closing Tax Period</u>" means, with respect to any Branch, any taxable year or period (or portion thereof) ending on or before the day immediately preceding the applicable Branch Closing Date.

"<u>Purchase Price</u>" has the meaning specified in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" means the Intellectual Property, Branch Contracts, Branch Lease, Branch Property and Branch Permits relating to or used by the Branches (but excluding the Excluded Branches) in the ordinary course of business, together with any other assets that Buyer deems necessary to conduct the business of such Branches immediately after the applicable Branch Closing in the same manner as the business of such Branch location has been conducted by Seller prior to the applicable Branch Closing.

"<u>Seller</u>" has the meaning specified in the preamble of this Agreement.

"<u>Seller Certificate</u>" means a duly executed certificate of Seller, attached to which are certified copies of Seller's (i) articles of organization (and all amendments thereto), (ii) operating agreement, (iii) a written consent of Member approving the execution and delivery of, and the performance of the transactions contemplated by, this Agreement and all Ancillary Agreements to which Seller is a party, (iv) the resolutions of the board of directors of Member approving this Agreement and the transactions contemplated hereunder, and (v) a certificate dated no more than ten (10) days prior to the date hereof as to the good standing and subsistence of Seller, issued by the Secretary of State of the State of Illinois

"<u>Seller Disclosure Schedule</u>" means that certain document identified as the Seller Disclosure Schedule delivered by Seller to Buyer in connection with the execution of this Agreement.

"<u>Seller's knowledge</u>" means the actual knowledge, after reasonable inquiry, of David Robnett, CEO of Celebrity Financial, Inc.

"<u>Seller Indemnified Parties</u>" has the meaning specified in <u>Section 9.3</u>.

"<u>Standstill Period</u>" has the meaning specified in <u>Section 6.2</u>.

"Tax" (and, with correlative meaning, "Taxes") means (i) any and all federal, state, local or foreign income, gross receipts, margin, premium, sales, goods, use, estimated, license, lease, excise, capital, escheat, abandonment, unclaimed property taxes (or similar), franchise, profits, employment, unemployment, occupation, workers compensation, disability, severance, environmental, windfall, payroll, withholding, insurance, social security (or similar), alternative or add-on minimum, ad valorem, value added, net worth, stamp, transfer, registration, documentary, recapture, estimated, or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, whether disputed or not, together with any interest or penalty, addition to tax, or additional amount imposed by any Governmental Authority, (ii) any liability for the payment of any amounts of the type described in (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any taxable period or as the result of being a transferee or successor thereof and (iii) any liability for the payment of any amounts of the type described in (i) or (ii) as a result of any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, declaration, form, report, claim for refund, or similar statement provided or required to be provided with respect to any Tax (including any attached schedules), including any information return, declaration of estimated Tax, any return of an affiliated, combined or uniting group, and including any amendment thereof.

"Termination Date" has the meaning specified in Section 10.1(e).

"Third Party" means a Person that is not (a) a Party to this Agreement or (b) an Affiliate of a Party to this Agreement.

"Third Party Claim" has the meaning specified in Section 9.6(a).

"Trade Secrets" has the meaning specified in the definition of Intellectual Property in this Section 1.1.

"Warehouse Lenders" means Seller's warehouse lenders.

## ARTICLE II.
## PURCHASE AND SALE; BRANCH CLOSINGS

Section 2.1    Purchase and Sale of Branches.  Subject to the terms and conditions of this Agreement, and in reliance upon the representations, warranties and covenants contained in this Agreement, on the applicable Branch Closing Date and effective as of the applicable Effective Time, with respect to the applicable Branches:

(a) Purchase and Sale of the Purchased Assets.  Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, the Purchased Assets of the applicable Branches, free and clear of all Encumbrances (other than any Encumbrances arising from an Assumed Liability), pursuant to a Branch Assignment Agreement; and

(b) Assignment and Assumption.  Seller shall assign to Buyer, and Buyer shall assume from Seller (and thereafter pay, perform, discharge or otherwise satisfy), the Assumed Liabilities relating to the applicable Branches.  The assumption of the Assumed Liabilities by Buyer

hereunder shall not enlarge any rights of Third Parties under any contracts or agreements with Buyer, Seller or any of their respective Affiliates.

Section 2.2    Branches.  Buyer agrees to purchase from Seller all of the Branches on the Branch List, unless Buyer notifies Seller in writing pursuant to this Section 2.2 that Buyer has rejected any of such Branches, in which case any such rejected Branches shall be Excluded Branches hereunder and Buyer shall have no obligation to purchase such Excluded Branches. Following the date of this Agreement and for a period of ten (10) business days after receipt by Buyer of pro forma financial statements of the Branches prepared by Seller and acceptable to Buyer, Buyer shall have the right to perform an additional due diligence review of the Branches, including an examination of the books and records of the Branches and an investigation of the Branches' offices and facilities, as it deems necessary. Seller shall cooperate in good faith with Buyer, and Buyer shall be provided with reasonable access to books, records, offices and facilities of the Branches. Buyer, in its sole discretion, shall determine within such ten (10) business days whether to reject any of the Branches, and if Buyer so determines, Buyer shall notify Seller in writing within such ten (10) business days that a Branch has been rejected and such Branch shall thereafter be an Excluded Branch hereunder.  With respect to Branches that are not rejected, the Parties shall cooperate in good faith to consummate as promptly as practicable Branch Closings pursuant to Section 2.7 for such Branches.  If Buyer rejects all of the Branches, this Agreement shall automatically terminate and be of no further force and effect.

Section 2.3    No Purchase or Transfer of Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Excluded Assets (a) are not part of any purchase or transfer contemplated hereunder (including, without limitation, the conveyances set forth under Section 2.1), (b) are excluded from the Purchased Assets and (c) shall remain the sole property of Seller.

Section 2.4    No Assumption of Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, (a) Buyer shall not assume any Excluded Liabilities and (b) all Excluded Liabilities shall remain the sole responsibility of, and shall be retained and paid, performed, discharged or otherwise satisfied solely by, Seller.

Section 2.5    No Assignment of Certain Assets.  If any provision of any Branch Contract would prohibit any attempted assignment thereof or of any right or interest thereunder (whether by operation of law, upon a change in control or otherwise) or impose a charge, discount or penalty upon an assignment (in each case, to the extent such provision is enforceable under Applicable Law) without the consent of the other party to such agreement, even though such assignment would not become effective until such consent was obtained, then except as hereinafter provided, nothing in this Agreement or any Branch Assignment Agreement shall be deemed an assignment of any such Branch Contract, and the Branch Contract shall not be a Purchased Asset hereunder unless and until such consent is obtained.

Section 2.6    Purchase Price.

(a)    At Branch Closing.  The aggregate consideration for the Purchased Assets and Assumed Liabilities (the "Purchase Price") shall be an amount equal to One Dollar ($1.00) per

Branch, adjusted for prorations in accordance with <u>Section 2.8</u> hereof, which Purchase Price shall be payable at the applicable Branch Closing.

(b)  <u>Post-Closing Earnout</u>.  In addition to the Purchase Price payable at Closing, Buyer shall pay to Seller the Earnout Amount, which shall be paid to Seller in accordance with this <u>Section 2.5(b)</u>.  Within thirty (30) days after the last day of each fiscal quarter of Buyer through and including the expiration of the Earnout Period, Buyer shall pay to Seller, in cash, the Earnout Amount for such fiscal quarter just ended.  Together with each such quarterly payment of the Earnout Amount, Buyer shall also deliver to Seller Buyer's quarterly financial statements for the Purchased Assets and the loan production therefrom during such fiscal quarter, certified as true and correct by Buyer's chief financial officer.  Within thirty (30) days after the last day of the fiscal quarter of Buyer in which the expiration of the Earnout Period occurs, Buyer shall pay to Seller, in cash, the full Earnout Amount less the sum of the quarterly payments of Earnout Amount theretofore previously paid by Buyer to Seller hereunder.  Together with such final payment of the Earnout Amount, Buyer shall also deliver to Seller Buyer's calculation of the full Earnout Amount certified as true and correct by Buyer's chief financial officer.

Section 2.7    <u>Branch Closings</u>.  Each Branch Closing shall be consummated by electronic exchange of a duly executed Branch Assignment Agreement on a Business Day agreed upon in writing by the Parties occurring within five (5) Business Days after all of the conditions set forth in <u>ARTICLE VII</u> and <u>ARTICLE VIII</u> with respect to such Branch Closing have been satisfied or waived in writing.  The date on which a Branch Closing occurs is referred to herein as the "<u>Branch Closing Date</u>."  Each such Branch Closing shall be effective as of the applicable Effective Time.  The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated in this Agreement on one Branch Closing Date and, in any event, not more than three (3) Branch Closing Dates (as mutually agreed upon by the Parties).

Section 2.8    <u>Branch Closing Deliveries</u>.

(a)  With respect to each Branch Closing, on or prior to the applicable Branch Closing Date, Seller shall execute, as applicable, and deliver, or cause to be delivered, to Buyer:

    (i)    a Branch Assignment Agreement, duly executed by Seller, with respect to the applicable Branches;

    (ii)    evidence reasonably satisfactory to Buyer that Seller has repaid or satisfied in full all Indebtedness (other than any Indebtedness that is an Assumed Liability) relating to the applicable Branches, and that all Encumbrances (other than any Encumbrances arising from an Assumed Liability) on Seller and all Encumbrances (other than any Encumbrances arising from an Assumed Liability) on the applicable Branches have been fully released and discharged to the satisfaction of Buyer;

    (iii)    the following deliverables related to each of the applicable Branch Leases for such Branch locations (each a "<u>Branch Lease Deliverable</u>" and collectively, the "<u>Branch Lease Deliverables</u>"):

1)      all consents, approvals, notices and any such other documentation, including a separate assignment and assumption agreement, if necessary, required by each applicable Branch Lease in connection with the consummation of the transaction contemplated hereby;

2)      a completed and signed Form W-9 and a completed insurance datasheet from each landlord, lessor, sublessor or licensor containing such information as Buyer may require to establish insurance coverage for the applicable Branch location as of the applicable Effective Time;

(iv)    a Bring Down Certificate;

(v)     the Intellectual Property Assignment Agreement, duly executed by Seller, with respect to the applicable Branches;

(vi)    a list of Pipeline Mortgage Loans as of the Branch Closing Date with respect to the applicable Branches;

(vii)   if applicable, a post-closing agreement in form acceptable to Seller and Buyer setting forth any Branch Closing documents or deliverables (including without limitation any Branch Lease Deliverables) that are not able to be delivered on the Branch Closing Date and the date/deadline for delivery of same (a "Post-Closing Agreement");

(viii)  the Member Indemnity Agreement, duly executed by Member (initial Branch Closing only);

(ix)    the Seller Certificate (initial Branch Closing only); and

(x)     such other documents as Buyer reasonably determines are necessary to consummate the transactions contemplated by this Agreement in accordance with the terms and conditions of this Agreement.

(b)  At or prior to the applicable Branch Closing Date, Buyer shall execute, as applicable, and deliver, or cause to be delivered, to Seller:

(i)     a Branch Assignment Agreement, duly executed by Buyer, with respect to the applicable Branches;

(ii)    the Branch Lease Deliverables, duly executed by Buyer, as necessary, with respect to the applicable Branch Leases;

(iii)   the Intellectual Property Assignment Agreement, duly executed by Buyer, with respect to the Intellectual Property; and

(iv)    if applicable, a Post-Closing Agreement.

Section 2.9    <u>Prorations as of the Effective Time</u>.    Buyer and Seller agree that the following items associated with the Branches shall be prorated as of the Effective Time, with Seller responsible for and to receive the benefit of the same for the period prior to the Effective Time, and Buyer to be responsible for and to receive the benefit of the same as of and after the Effective Time: (a) Taxes; (b) electric, gas, telephone and other utility charges; (c) rent under Branch Leases assigned to and assumed by Buyer; (d) charges under maintenance, service and other Branch Contracts; and (e) fees under Branch Permits.

Section 2.10    <u>Withholding</u>.    Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to Seller or any other recipient of payments pursuant to this Agreement all amounts required under the Code or any applicable provision of any state, local or foreign Tax law to be deducted and withheld with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax law, and to collect any necessary Tax forms, including IRS Forms W-8 or W-9, as applicable, or any similar information, from Seller and any other recipients of payments hereunder.  To the extent that any such amount is so deducted and withheld by Buyer, such amount shall be treated for all purposes of this Agreement as having been paid to the recipient with respect to which the payment would otherwise have been made.

ARTICLE III.
REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to Buyer that, except as specifically set forth in the Seller Disclosure Schedule, as of the date hereof:

Section 3.1    <u>Organization of Seller</u>.

(a)    Seller is validly existing and in good standing under the laws of the State of Illinois, with full power and authority to conduct its business as it is being conducted, and to perform all of its obligations under this Agreement and the Ancillary Agreements to which it is a party.  Seller is duly qualified to do business and is in good standing under the laws of each jurisdiction that requires such qualification, except where the failure to be in good standing or to be duly qualified would not reasonably be expected to have a material adverse effect, either individually or in the aggregate, on Seller. Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

Section 3.2    <u>Authority of Seller</u>.

(a)    Seller has the requisite power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is a party by Seller have been duly authorized and approved by all necessary action on the part of Seller and Member, and no other proceedings are necessary to authorize this Agreement and the other Ancillary Agreements to which it is a party or for Seller to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly authorized, executed and delivered by Seller and (assuming the valid authorization, execution and delivery of this Agreement by Buyer) is a legal, valid and binding obligation of Seller,

enforceable against Seller in accordance with its terms, and each of the Ancillary Agreements to which Seller is a party has been duly authorized by Seller and, upon execution and delivery by Seller (assuming the valid authorization, execution and delivery by each of the other parties thereto) will be a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles (the "<u>Bankruptcy and Equity Exceptions</u>").

(b)    Member has, by the unanimous vote of its board of directors: (i) determined that this Agreement, the Ancillary Agreements and the transactions contemplated herein and therein are in the best interest of Seller and Member and Member's stockholders, (ii) approved this Agreement, the Ancillary Agreements and the transactions contemplated herein and therein, (iii) submitted this Agreement, the Ancillary Agreements and the transactions contemplated herein and therein to the requisite number of stockholders of Member for their approval, and (iv) obtained any requisite stockholder approval of this Agreement, the Ancillary Agreements and the transactions contemplated herein and therein.

Section 3.3    <u>Employees</u>.

(a)    A true and complete list of each Employee, identified by Branch location number, is attached to the Branch List, showing for each Employee as of the date hereof such Employee's name, job title or description, initial date of employment, status (part-time, full-time, exempt, non-exempt, etc.), salary or wage level (including a summary description of any bonus, commission or deferred compensation arrangements other than any such arrangements under which payments are at the discretion of Seller), and also showing any bonus, commission or other remuneration other than salary paid during the year ending December 31, 2021 and showing projected bonus, commission or other remuneration other than salary to be paid during the year ending December 31, 2022.

(b)    To Seller's knowledge, all of the Employees required to maintain any registrations, certification, licenses or other approvals of any regulatory authorities in connection with the origination or servicing of the Mortgage Loans possess such registrations, certifications and approvals, in each case, in good standing.

Section 3.4    <u>No Conflict</u>.  The execution and delivery by Seller of this Agreement and the Ancillary Agreements to which it is a party, the consummation by Seller of any of the transactions contemplated hereby or thereby and the compliance with or fulfilment by Seller of the terms, conditions and provisions hereof or thereof will not:

(a)    assuming that all necessary consents, approvals, authorizations and other actions described in <u>Section 3.4(b)</u> of the Seller Disclosure Schedule have been obtained and all filings and notifications described in <u>Section 3.4(b)</u> of the Seller Disclosure Schedule have been made and any applicable waiting period has expired or been terminated, result in a violation or breach of the terms, conditions or provisions of, or constitute, an event of default upon Seller or any of the assets of Seller, including the Purchased Assets, under (i) any Branch Permit, (ii) Contract to which Seller is a party or by which any asset of Seller is bound or

(iii) any Applicable Law affecting Seller or the certificate of incorporation (as amended) and bylaws (as amended) of Seller; or

(b) except as set forth on <u>Section 3.4(b)</u> of the Seller Disclosure Schedule, require the approval, consent, authorization or act of, or the making by Seller with any declaration, filing or registration with, any Governmental Authority, except for such approvals, consents, authorizations, declarations, filings or registration the failure of which would not have a materially adverse effect on the operation of any Branch location by Buyer following the applicable Branch Closing Date.

Section 3.5    <u>Recent Operations</u>.  Except as specifically contemplated in this Agreement (including <u>Schedule 5.4(a)</u>) and the Ancillary Agreements, since December 31, 2021, Seller has conducted its business only in the ordinary course consistent with past practice and, since that date, there has not been any event, nor has any circumstance arisen, that would have a materially adverse effect on the operation of any Branch location by Buyer following the applicable Branch Closing Date or that would materially impair or delay the ability of Seller to consummate the transactions contemplated by, or to perform its obligations under, this Agreement or the Ancillary Agreements.

Section 3.6    <u>Taxes</u>.

(a) Seller has timely filed with the appropriate Governmental Authorities all Tax Returns required to have been filed by or for it with respect to the Purchased Assets. All such tax returns are true, correct and complete in all material respects.

(b) All Taxes due and payable by or for Seller with respect to the Purchased Assets have been paid to the appropriate Governmental Authorities whether or not shown on any Tax Return.

(c) There are no Encumbrances for Taxes on any of the Purchased Assets, other than for Taxes that are not yet due and payable.

(d) No Governmental Authority for a jurisdiction in which Seller does not file Tax Returns has asserted that the Purchased Assets are subject to Tax by that jurisdiction or required to file a Tax Return in such jurisdiction.

(e) Seller is not a party to or bound by any Tax allocation, Tax sharing agreement, Tax indemnity or similar contract or arrangement.

(f) None of the Purchased Assets is: (A) an interest in a partnership (including any entity treated as a partnership for federal income tax purposes), (B) an interest in a corporation (including any entity treated as an association taxable as a corporation for federal income tax purposes), or (C) an interest in an entity treated as a disregarded entity for federal income tax purposes (within the meaning of Treasury Regulations Section 301.7701-3).

(g) None of the Purchased Assets: (i) is property that is required to be treated as owned by any other person pursuant to the so-called "safe harbor lease" provisions of section 168(f)(8) of the Internal Revenue Code of 1954, as amended, subject to Section 168(g)(1)(A) of the Code, (ii) subject to a disqualified leaseback or long-term agreement as defined in Section 467 of the Code; (iii) directly or indirectly secures any debt the interest on which is tax-

exempt under Section 103(a) of the Code; or (iv) is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(h)     Seller has not been a party to any "reportable transaction," as defined in Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b) or a "listed transaction" as set forth in Treasury Regulation Section 301.6111-2(b)(2) or any analogous provision of state or local law.

Section 3.7     <u>Branch Permits</u>.  The Branch List contains a list of all material licenses, permits, approvals, and other authorizations from any Person that are necessary for Seller to lawfully conduct its business as conducted immediately prior to the date of this Agreement (herein collectively called "<u>Branch Permits</u>"), identified by Branch location number, and notes any such Branch Permits that are nontransferable.  Seller is in compliance in all material respects with the terms and conditions of the Branch Permits.  Seller has provided Buyer with true and complete copies of each Branch Permit.

Section 3.8     <u>Real Property</u>.

(a)     Seller does not own any real estate on which any of the Branches is located.

(b)     A true and complete copy of each Branch Lease, identified by Branch location number, is attached to the Branch List.  Neither Seller, nor, to Seller's knowledge, any other party to any of the Branch Leases is in breach of or default under any such Branch Lease in any material respect, and no event has occurred or circumstance exists which, with delivery of notice, passage of time or both, would constitute such a material breach of or default under or permit the termination, modification or acceleration of rent under any Branch Lease.

(c)     Each Branch Facility leased pursuant to a Branch Lease constitutes all real property, including all buildings, improvements and fixtures thereon and any easements, rights of way and other appurtenances thereto, necessary for Seller to operate the applicable Branch location in the ordinary course of business.

(d)     Seller has not leased, subleased or granted any Third Party the right to use or occupy any Branch Facility and there are no Third Parties in possession of any Branch Facility that are not entitled to such possession. Other than its interest in the Branch Facilities, Seller does not have any other direct or indirect interest in any real property, whether owned, leased or otherwise, that relate to the Branches.

(e)     Each of the Branch Leases is in full force and effect and constitutes a legal, valid, binding and enforceable Lease in accordance with its terms, subject to the Bankruptcy and Equity Exceptions.

(f)     (i) Seller's possession and quiet enjoyment of each Branch Facility has not been disturbed, and there are no material disputes with respect to any such Branch Facility or Branch Lease; (ii) no security deposit or portion thereof has been applied in respect of a breach or default under any Branch Lease that has not been redeposited in full; (iii) Seller has not collaterally assigned or granted any security interest in any of the Branch Leases or any interest therein; (iv) the transactions contemplated hereby do not require the consent of any other party to

any Branch Lease and will not result in a breach of or default under such Branch Lease; and (v) Seller has not collaterally assigned or granted any security interest in any of the Branch Facilities or any interest therein.

(g) To Seller's knowledge, there is no condemnation, expropriation or eminent domain proceeding of any kind pending or threatened against any Branch Facility, or any portion thereof, that would materially interfere with the use of such Branch Facility or other matters materially adversely affecting any of Seller's occupancy and use thereof for the operation of Seller's business as currently conducted.

(h) Seller does not owe, nor will it owe in the future in connection with activities conducted prior to the applicable Branch Closing Date, any brokerage commissions or finder's fees with respect to any Branch Lease or Branch Facility.

Section 3.9    No Litigation.  Except as disclosed on Section 3.9 of the Seller Disclosure Schedule, there is no pending or, to Seller's knowledge, threatened Action against Seller or any of its Affiliates, directors, officers or employees that could be reasonably expected, individually or in the aggregate, to have a material adverse effect on any Branch location or that involves any challenge to, or seeks damages or other relief in connection with, this Agreement or any transactions contemplated under this Agreement or under any of the Ancillary Agreements.

Section 3.10    Intellectual Property.

(a) Each item of Owned Intellectual Property is owned free and clear of any and all Encumbrances, other than non-exclusive licenses of Intellectual Property applicable thereto.

(b) The operation of the business of Seller as currently conducted does not infringe upon or misappropriate the Intellectual Property of any Third Party.

(c) To Seller's knowledge, no Third Party is engaging in any activity that infringes in any material respect upon the Owned Intellectual Property.

(d) Seller has taken commercially reasonable measures to protect the confidentiality of all Trade Secrets included in the Owned Intellectual Property.

Section 3.11    Title to and Sufficiency of Branch Property.

(a) The Branch List contains a true and complete list of each item of Branch Property that is material to the operation of each Branch location, identified by Branch location number. Seller has good, valid and marketable title to, or a valid leasehold interest in or a valid right to use, the Branch Property, free and clear of all Encumbrances other than Encumbrances to be released as of the applicable Branch Closing.

(b) The Branch Property constitutes all material personal property, including the fixed assets owned or leased by, in the possession of, and/or used by Seller at the applicable Branch location, and each other material tangible asset owned or leased by, in the possession of, and/or used by Seller at such Branch location, necessary to conduct Seller's business as

presently conducted at such Branch location or necessary to permit Buyer to conduct the business of such Branch location immediately after the applicable Branch Closing in the same manner as the business of such Branch location has been conducted by Seller prior to the applicable Branch Closing.

(c) Except as identified on the Branch List, none of the Branch Property is held under any Lease, security agreement, conditional sales contract or other title retention or security arrangement or located other than on the premises of the Branch Facilities.  Except as identified on the Branch List, no Encumbrances or other instrument encumbering any of the Branch Property has been recorded, filed, executed or delivered.

(d) All Branch Property is substantially fit for use in accordance with the past practices of Seller in all material respects. To Seller's knowledge, none of the Branch Property is in need of repair or replacement other than as part of routine maintenance in the ordinary course of business.

Section 3.12    Compliance with Applicable Law; No Violation, Litigation or Regulatory Action.

(a) Except as disclosed on Section 3.12 of the Seller Disclosure Schedule, Seller is in compliance with all Applicable Law except where failure to comply would not have a material adverse effect on any Branch.  The business and operations of the Branches have been and are being conducted in material compliance with all Applicable Laws, including all regulations pertaining to the receipt of customer information required by state and federal law concerning taxpayer identification numbers and social security numbers.  Seller has all licenses, franchises, permits and other governmental authorizations that are legally required to enable it to conduct its business at the Branches as presently conducted in all material respects. Seller has not received any written notice from any Governmental Authority asserting that it is not in compliance with any Applicable Law in any material respect. There is no order of any kind in existence, or, to Seller's knowledge, threatened, against, affecting or restraining Seller or any of its officers, employees, or directors, from taking any actions of any kind in connection with the performance of this Agreement.

(b) Except as disclosed on Section 3.12 of the Seller Disclosure Schedule, there is no Action of any kind pending or, to Seller's knowledge, threatened against Seller or any Branch. There are no outstanding orders, writs, judgments, decrees, injunctions or settlements with or of any Governmental Authority to which Seller is subject or to which any of the Purchased Assets are bound.

(c) Seller has received no written notice or communication from any Governmental Authority indicating that such authority will, and, to Seller's knowledge, no such authority would, object to, or withhold any approval or consent necessary for, the consummation by Buyer of the transactions contemplated by this Agreement.  There are no pending or, to Seller's knowledge, threatened legal or governmental proceedings against Seller that would affect Buyer's ability to obtain any regulatory approvals required in order to consummate the transactions contemplated by this Agreement.

Section 3.13    <u>Branch Contracts</u>.

(a)    The Branch List contains a true and complete list of each Branch Contract that is material to the operation of each Branch location, identified by Branch location number, and Seller has provided Buyer with true and complete copies of each such Branch Contract. Seller has not received any written notice of the intention of any party, and, to Seller's knowledge, no such party intends, to terminate any Branch Contract. Except as set forth on <u>Section 3.13(a)</u> of the Seller Disclosure Schedule, each of the Branch Contracts that is material to the operation of each Branch location may be assigned to Buyer by Seller without notice to or the approval or consent of any other person. Seller has delivered to Buyer true and correct copies of such material Branch Contracts and all attachments and addenda thereto. To Seller's knowledge, none of the Branches is subject to any oral contracts or arrangements.

(b)    Each Branch Contract is in full force and effect and constitutes a legal, valid and binding agreement, enforceable against Seller and each other party thereto, in accordance with its terms, subject to the Bankruptcy and Equity Exceptions. None of Seller nor, to Seller's knowledge, any other party to any Branch Contract is in default in any material respect under, nor has there occurred any event or condition that, with or without the passage of time or giving of notice (or both), would constitute a material default under, or permit the termination, modification or acceleration of, any such Branch Contract.

(c)    The Branch Contracts constitute all Contracts related to the applicable Branch location that are material to the operation of each Branch location, and no other Contract is necessary to conduct Seller's business as presently conducted at such Branch location or necessary to permit Buyer to conduct the business of such Branch location immediately after the applicable Branch Closing in the same manner as the business of such Branch has been conducted by Seller prior to such Branch Closing.

Section 3.14    <u>Employee Relations and Agreements</u>.

(a)    Seller is not a party to any collective bargaining agreement or other labor union contract applicable to any Employee.

(b)    Except as disclosed on <u>Section 3.14</u> of the Seller Disclosure Schedule, since January 1, 2019, there has been no unfair labor practice charge, complaint, or other proceeding pending or threatened against Seller, Seller has not engaged in any unfair labor practices and there have been no employment-related Actions pending or, to Seller's knowledge, threatened, against Seller before any Governmental Authority.

(c)    To Seller's knowledge, Seller is in compliance in all material respects with all Applicable Law related to its Employees, including provisions relating to wages, hours, collective bargaining and the payment of social security or other taxes, and worker's compensation or other insurance premiums with respect to the Employees.

(d)    There are no written employment contracts or similar agreements between Seller and any of the Branch Employees that will be assigned to Buyer at any Branch Closing.

Section 3.15    No Brokers.  Except as set forth on Section 3.15 of the Seller Disclosure Schedule, neither Seller nor any Person acting on behalf of Seller has paid or become obligated to pay any fee or commission to any broker, finder or intermediary, and no Person is or shall become entitled to any such fee or commission, for or on account of the transactions contemplated by this Agreement.  Buyer will have no obligation with respect to any such fee or commission or any similar charge or reimbursement of expenses owed to any broker, finder or intermediary, whether or not set forth on Section 3.15 of the Seller Disclosure Schedule.

Section 3.16    Transactions with Affiliates.  Except as set forth on Section 3.16 of the Seller Disclosure Schedule, Seller has not purchased, leased or otherwise acquired any material property or assets or obtained any material services from, or sold, leased or otherwise disposed of any material property or assets or provided any material services to (except with respect to remuneration for services rendered as a director, officer or employee of Seller), any employee, officer or director of Seller, or any of its Affiliates, except in the ordinary course of business and on arms-length terms.

Section 3.17    Disclaimer of Additional Representations and Warranties.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN THIS ARTICLE III OR IN ANY ANCILLARY AGREEMENT, NEITHER THE SELLER NOR ANY OTHER PERSON MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SELLER OR THE PURCHASED ASSETS, WHETHER EXPRESS OR IMPLIED, AND SELLER DISCLAIMS ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES.

Section 3.18    Solvency.  Seller is, and will be following the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, able to pay its debts as they become due.  The transactions contemplated by this Agreement do not constitute fraudulent transfers or fraudulent conveyances under Applicable Law.

Section 3.19    Mortgage Loans.  Seller is a Freddie Mac and Fannie Mae approved mortgagee and is duly qualified, licensed, registered and otherwise authorized under all Applicable Laws and is in good standing to (a) originate, sell, endorse and assign Mortgage Loans and, if applicable, the related Mortgage Loan collateral; and (b) to Seller's knowledge, no event has occurred that would make Seller unable to comply with Fannie Mae, Freddie Mac or the FHLB eligibility requirements or that would require notification to Fannie Mae and Freddie Mac.

Section 3.20    No Substitution.  From the date hereof to the final Branch Closing Date, Seller has not substituted, switched or otherwise replaced any asset or item included within the Purchased Assets with any other asset or item other than in the ordinary course of business.

Section 3.21    No Undisclosed Liabilities.  With respect to the Branches, to Seller's knowledge, Seller has not incurred any liability or obligation that would be required to be reflected or reserved against in a balance sheet of Seller prepared in accordance with GAAP.

Section 3.22    Financial Statements.  Seller has furnished Buyer with true and complete copies of the financial statements of the Branches (collectively, the "Financial Statements"), as of September 30, 2022, which are attached to Section 3.22 of the Seller Disclosure Schedule.  The

Financial Statements have been prepared in good faith, consistent with past practices, and present fairly the financial condition of the Branches at the dates shown and the results of its operations and changes in financial condition for the periods then ended.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller that, as of the date hereof:

Section 4.1    Organization of Buyer.  Buyer is validly existing and in good standing under the laws of the State of Minnesota.  Buyer has the requisite limited partnership power and authority to own or use its assets and to perform all of its obligations under this Agreement and the Ancillary Agreements to which it is a party.  Buyer is duly qualified to do business and is in good standing under the laws of each jurisdiction that requires such qualification, except where the failure to be in good standing or to be duly qualified would not reasonably be expected to have a material adverse effect, either individually or in the aggregate.

Section 4.2    Authority of Buyer.  Buyer has the requisite power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party. The execution, delivery and performance of this Agreement and the Ancillary Agreements by Buyer have been duly authorized and approved by Buyer's board of directors and do not require any further authorization or consent of its shareholders.  This Agreement has been duly authorized, executed and delivered by Buyer and (assuming the valid authorization, execution and delivery of this Agreement by Seller) is the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, and each of the Ancillary Agreements to which Buyer is a party has been duly authorized by Buyer, and upon execution and delivery by Buyer will be (assuming the valid authorization, execution and delivery by each of the other parties thereto) a legal, valid and binding obligation of such Buyer, enforceable against Buyer in accordance with its terms, in each case, subject to the Bankruptcy and Equity Exceptions.

Section 4.3    No Conflict.  Neither the execution and delivery of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, by Buyer will (a) result in a violation or breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any note, instrument, mortgage, license, lease, agreement, contract, franchise or financial obligation to which such Buyer is a party or by which Buyer is bound, (b) violate the organizational documents of Buyer, (c) violate any Applicable Law, other than any such violations, breaches, defaults, rights, loss of rights or Encumbrances that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer or would not prevent or materially impair or delay the consummation of any of the transactions contemplated hereby.

Section 4.4    Consents and Approvals.  Except as set forth on Section 4.4 of the Buyer Disclosure Schedule, no filing or registration with, no notice to and no permit, authorization, consent or approval of any Third Party or any Governmental Authority or other Person is necessary

for the consummation by Buyer of the transactions contemplated by this Agreement other than pursuant to the requirements of federal and state securities laws.

Section 4.5    No Litigation.  As of the date of this Agreement, there is no Action pending or threatened against Buyer that is reasonably expected to materially impair or delay the ability of Buyer to consummate the transactions contemplated by, or to perform its obligations under, this Agreement or any Ancillary Agreement to which it is a party.

Section 4.6    No Brokers.  Except as set forth on Section 4.6 of the Buyer Disclosure Schedule, neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder or intermediary, and no Person is or shall become entitled to any such fee or commission, for or on account of the transactions contemplated by this Agreement.  Seller will have no obligation with respect to any such fee or commission or any similar charge or reimbursement of expenses owed to any broker, finder or intermediary, whether or not set forth on Section 4.6 of the Buyer Disclosure Schedule.

Section 4.7    Financial Ability.  Buyer has sufficient available funds to satisfy, among other things, the obligation to pay (a) the Purchase Price and (b) all expenses payable by Buyer in connection with the transactions contemplated hereby.

Section 4.8    Nonreliance on Additional Representations and Warranties.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLER IN ARTICLE III OR IN ANY ANCILLARY AGREEMENT, BUYER ACKNOWLEDGES AND AGREES THAT IT HAS NOT RELIED UPON ANY OTHER REPRESENTATIONS, WARRANTIES, STATEMENTS, ASSURANCES OR GUARANTEES MADE BY OR ON BEHALF OF THE SELLER OR ANY OTHER PERSONS, EXPRESS OR IMPLIED.

Section 4.9    Disclaimer of Additional Representations and Warranties.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY BUYER IN THIS ARTICLE IV OR IN ANY ANCILLARY AGREEMENT, NEITHER THE BUYER NOR ANY OTHER PERSON MAKES ANY OTHER REPRESENTATIONS OR WARRANTIES WITH RESPECT TO BUYER OR ITS BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITIONS OR PROSPECTS, WHETHER EXPRESS OR IMPLIED, AND BUYER DISCLAIMS ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES.

ARTICLE V.
ACTION AFTER THE DATE HEREOF

The Parties covenant and agree to take the following actions after the date hereof and prior to the final Branch Closing Date:

Section 5.1    Access to Information.  Seller shall: (a) afford to the officers, employees and authorized representatives of Buyer (including accountants and attorneys) reasonable access during normal business hours, upon reasonable advance notice, to the Branch locations, employees and business and financial records (including computer files, retrieval programs and similar documentation); and (b) furnish or cause to be furnished to Buyer or its authorized representatives, such additional information as shall be reasonably requested for purposes of Buyer conducting its due diligence investigation of the Branches; provided, however, that: (i) Seller shall not be

required to violate any Applicable Law or obligation of confidentiality to which it is subject or to waive any privilege that it may possess in discharging its obligations pursuant to this Section 5.1; and (ii) Buyer shall not, without the prior written consent of Seller (such consent not to be unreasonably withheld, conditioned or delayed), contact or communicate with any vendor, customer, employee, independent contractor or other business partner of Seller with respect to or in connection with the transactions contemplated by this Agreement. Such investigation shall be conducted in such a manner as not to interfere unreasonably with the operations of Seller. Nothing in this Section 5.1 shall limit Buyer's right to operate the business of any Branch location after having acquired any Branch.

Section 5.2    Notification; Update of Schedules.

(a) Seller shall promptly notify Buyer of (i) any Action that is instituted or threatened against Seller to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement or (ii) any Action that may be threatened, brought, asserted or commenced against Seller that would have caused the representations and warranties of Seller in Section 3.9 and Section 3.12 to be untrue or incorrect, if such Action had arisen prior to the date hereof.

(b) Buyer shall promptly notify Seller of (i) any Action that is instituted or threatened against Buyer to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement or (ii) any Action that may be threatened, brought, asserted or commenced against Buyer that would have caused the representations and warranties of Buyer in Section 4.5 to be untrue or incorrect, if such Action had arisen prior to the date hereof.

(c) Seller shall, as soon as reasonably practicable after it obtains knowledge thereof, and to the extent permitted by Applicable Law, deliver to Buyer any information concerning the occurrence of any event or the existence of any circumstance that would be reasonably likely to cause any representation or warranty of Seller to be incorrect or breached if such representation and warranty were made at the time of such event or circumstance.

(d) Should any notification specified in this Section 5.2 require a change to the Seller Disclosure Schedule if the Seller Disclosure Schedule were dated the date of the notice, Seller shall promptly deliver to Buyer a supplement to the Seller Disclosure Schedule specifying the change.

Section 5.3    Consents of Third Parties; Governmental Approvals.

(a) Each Party will use its respective commercially reasonable efforts to obtain as promptly as practicable all consents, approvals and waivers necessary for the sale, transfer, assignment and delivery of any Branch Contracts, Branch Leases and Branch Permits so that all Branch Contracts, Branch Leases and Branch Permits in effect as of the date hereof will remain in full force and effect on and after the applicable Branch Closing Date. Without limiting the generality of the foregoing, Seller will give any notices to Persons required to be delivered pursuant to any Branch Contract or Branch Lease in connection with the consummation of the transactions contemplated by this Agreement and use its commercially reasonable

efforts to obtain all approvals, consents and waivers required pursuant to any Branch Contract or Branch Lease in connection with the consummation of the transactions contemplated by this Agreement. Seller shall be required to incur or pay all fees, costs or expenses that may be required to obtain any consent, approval or waiver relating to any Branch Contract, Branch Lease or Branch Permit, including any termination or penalty fees related to the foregoing.

(b) Seller and Buyer, as applicable, shall use their commercially reasonable efforts to obtain as promptly as practicable any consents and approvals of any Governmental Authority necessary, proper or advisable under Applicable Law to be obtained in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Section 7.2.  In connection therewith, Seller and Buyer, as applicable, shall use their respective commercially reasonable efforts to make all such filings promptly after the date hereof.

(c) With respect to the matters described in this Section 5.3, each Party shall (i) permit the other Party to review in advance any proposed communication to any Governmental Authority or other Third Party relating to the subject matter of this Agreement, (ii) promptly notify the other Party of any communication (whether written or oral) it or any of its Affiliates receives from any Governmental Authority or any other Third Party relating to such matters and (iii) provide to the other copies of all correspondence, filings or communications between it (or its advisors) and any such Governmental Authority or other Third Party relating to this Agreement or any of the matters described in this Section 5.3; provided, that any such correspondence does not contain or reveal confidential information of the sharing Party or any of its Affiliates.

(d) To the extent reasonably practicable, neither Party shall agree to participate in any meeting with any Governmental Authority (including via telephone or conference call) in respect of any filings, investigation or other inquiry related to the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate at such meeting.

Section 5.4    Operations Prior to the Branch Closing Date.

(a) Except (i) as required by Applicable Law, (ii) as otherwise contemplated by or necessary to effectuate this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby or (iii) with the written approval of Buyer (which approval shall not be unreasonably withheld, conditioned or delayed), Seller shall operate and carry on its business in the ordinary course and substantially as operated prior to the date of this Agreement.  Consistent therewith, Seller shall:

(i) comply with all Applicable Laws relating to the operation of the Branches;

(ii) retain all necessary business permits, licenses, registrations and authorizations relating to the Branches;

    (iii)    use its commercially reasonable efforts to preserve for Buyer all existing contracts, customers, account relationships and all other customer agreements, relationships and business at the Branches, in each case, related to the Purchased Assets and the Assumed Liabilities, and maintain and preserve intact its relationship with the Employees as the same now exists;

    (iv)    cause the fixed assets currently located at the Branches to be retained at the Branches at the Branch Closing Date;

    (v)    maintain in full force and effect through the last Branch Closing Date its present insurance coverage as it relates to the Purchased Assets; and

    (vi)    use its commercially reasonable efforts to: (A) preserve the business operations as conducted at the Branches; (B) cooperate with and assist Buyer in assuring the orderly transition of the business of the Branches to Buyer from Seller; and (C) maintain the fixed assets in their current condition, ordinary wear and tear excepted.

(b)  Without limiting the generality of the foregoing, Seller shall not:

    (i)    make any material change in the nature of its business or operations;

    (ii)    make any capital expenditures relating to a Branch location or enter into any Branch Contract requiring payment in excess of $100,000 in the aggregate, except for Branch Contracts related to the purchase or sale of mortgages, mortgage-backed securities, or hedge instruments in the ordinary course of business;

    (iii)    enter into any Branch Contract for the purchase or lease of real property;

    (iv)    initiate or settle any Action affecting any of the Purchased Assets other than in the ordinary course of business;

    (v)    sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets;

    (vi)    create, incur or assume, any Indebtedness or enter into, as lessee, any capitalized lease obligations (as defined in Statement of Financial Accounting Standards No. 13) relating to any of the Branch locations;

    (vii)    institute any increase in compensation to any Branch Employee or increase in any benefit provided under any Benefit Plan applicable to any Branch Employee, or adopt any profit-sharing, bonus, incentive, deferred compensation, insurance, pension, retirement, medical, hospital, disability, welfare or other employee benefit plan in which Branch Employees participate (other than as required by any such plan or Applicable Law);

(viii)    merge or consolidate with any other Person, or participate in any business combination, or restructure, recapitalize, reorganize or adopt any other corporate or legal entity reorganization, otherwise alter its legal structure or form or completely or partially liquidate;

(ix)    fail to operate its business in all material respects in accordance with the Applicable Law, or fail to maintain all, or renew any, Governmental Permits applicable to any Branch location;

(x)    make any change in its articles of organization or operating agreement or issue any equity securities in Seller (or securities exchangeable, convertible or exercisable for any equity securities in Seller);

(xi)    transfer any Employee to any of Seller's other Branches or any of Seller's Affiliates or transfer any other employee of Seller or any of Seller's Affiliates to the Branches, other than employees temporarily transferred to the Branches;

(xii)    invest in any fixed assets or make any improvements to the Branches which requires aggregate future payments outside the ordinary course of business;

(xiii)    take, or permit any Affiliate to take, any action impairing in any material respect Seller's rights in any Assumed Liabilities or Purchased Assets;

(xiv)    fail to timely file any required tax returns with all applicable taxing authorities or make any application for or consent to any extension of time for filing any tax return or any extension of the period of limitations applicable thereto;

(xv)    make changes of a material nature in the accounting procedures, methods, policies or practices applicable to the Branches or the manner in which its conducts its business and maintains its records; or

(xvi)    agree to take any of the foregoing actions.

ARTICLE VI.
ADDITIONAL AGREEMENTS

Section 6.1    Tax Matters.

(a)    Transfer Taxes.  All transfer, registration, stamp, documentary, value added, recording, filing, sales, use and similar Taxes (including all applicable real estate transfer or gains Taxes and transfer Taxes), incurred in connection with or arising out of the transactions contemplated by this Agreement shall be the responsibility of, and shall be timely paid by, the party responsible for payment of same under applicable law.  Seller shall file any and all Tax Returns and other documentation required to be filed in connection with such Taxes and, if required by applicable law, Buyer shall, and shall cause their Affiliates to, join in the execution of any such Tax Return and other documentation.

(b) <u>Allocation</u>.  Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) and the Assumed Liabilities among the Purchased Assets in accordance with Code Section 1060 and the Treasury Regulations thereunder (and any similar provision of state or local law, as appropriate) (the "<u>Allocation Schedule</u>").  Buyer shall deliver the Allocation Schedule to Seller by January 31 of each calendar year hereafter through and including the calendar year following the year in which the Earnout Period expires.  Buyer and Seller and their Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistently with such Allocation Schedule, as finally determined.  Any adjustment to the Purchase Price shall be allocated in a manner consistent with the Allocation Schedule.  Seller shall timely and properly prepare, execute, file and deliver all such documents, forms, and other information as Buyer may reasonably request to prepare such Allocation Schedule.  Neither Buyer nor Seller shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by Applicable Law.

(c) <u>Cooperation on Tax Matters</u>.

(i)    Buyer and Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the preparation and filing of any Tax Return and any audit or other proceeding with respect to Taxes, including the timely signing of any such Tax Returns or documents relating to any audit or other proceeding upon the request of such other Party.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Seller agrees (A) to retain all books and records with respect to Tax matters pertinent to Seller relating to any Pre-Closing Tax Period, and to abide by all record retention agreements entered into with any Tax Authority, (B) to give Buyer reasonable written notice prior to destroying or discarding any such books and records and, if Buyer so requests, shall allow Buyer to take possession of such books and records, and (C) to provide to Buyer any powers of attorney or other similar documents reasonably necessary for Buyer to exercise its rights and duties under <u>Section 6.1(b)</u>.

(ii)    Seller agrees to make available to Buyer records in the custody of Seller or of any Affiliate of Seller, to furnish other information (including all adjustments to and changes in Tax items of Seller for Pre-Closing Tax Periods) and otherwise to cooperate to the extent reasonably required for (A) the preparation, filing or audit of or other proceeding with respect to Tax Returns required to be filed by Buyer or (B) compliance with ASC 740-10.

(d) <u>Tax Indemnities</u>.  Seller shall be responsible for and shall indemnify and hold Buyer harmless from Taxes of Seller attributable to any Pre-Closing Tax Period.  Seller shall

indemnify Buyer for any breaches of representations and warranties related to Taxes under Section 3.6 and for Taxes that are the responsibility of Seller under this Section 6.1, and this indemnity shall not be subject to the indemnity limitations of Article IX. Buyer shall be responsible for and shall indemnify and hold Seller harmless from Taxes of Buyer attributable to any Post-Closing Tax Period. Buyer shall indemnify Seller for Taxes that are the responsibility of Buyer under this Section 6.1, and this indemnity shall not be subject to the indemnity limitations of Article IX.

Section 6.2    Exclusivity. Seller shall (and shall cause each of its Affiliates, directors, advisers, agents, employees and any other Person acting on its behalf to) immediately cease all existing discussions and negotiations, if any, with any Person or entity other than Buyer and its representatives with respect to any transaction similar to, competing with or that could affect the consummation of transactions contemplated under this Agreement (a "Competing Transaction"). From the date of this Agreement until the earlier of: (y) the termination of this Agreement; or (z) such other date as mutually agreed to by the Parties in their reasonable discretion (the "Standstill Period"), Seller shall not (and shall cause each of its Affiliates, directors, advisers, agents, employees and any other Person acting on its behalf not to) (a) solicit offers, inquiries or proposals for, or entertain any offer, inquiry or proposal to enter into, a Competing Transaction including any direct or indirect sale or other transfer of all or any portion of the equity interest or assets of Seller (or interests therein) to any Person or entity other than Buyer, or (b) engage in any discussions or negotiations with, provide any information to, or enter into any agreement, arrangement or understanding with any Person other than Buyer and its advisers, regarding a Competing Transaction.

Section 6.3    Employees.

(a) Seller shall be responsible for compliance with the Worker Adjustment, Retraining and Notification Act of 1988 and any similar federal or state Applicable Law requiring the giving of notice to employees regarding terminations, lay-offs, site closings or other comparable events.

(b) Buyer and Seller agree that Buyer shall make an offer of employment to all Branch Employees for employment from and after the applicable Branch Closing Date. The terms and conditions of any such offer of employment shall be determined by Buyer in its sole discretion.

(c) Seller shall be responsible for the payment to Employees of unused vacation and sick time wages upon termination of employment if and to the extent that payment of such wages is required under Applicable Law. Until the final Branch Closing Date, Seller shall (i) maintain its Benefit Plans as in effect on the date hereof and (ii) comply in all material respects with any obligations it may have under the Consolidated Omnibus Budget Reconciliation Act and the Family and Medical Leave Act of 1993. Buyer shall be solely responsible for all Liabilities arising as a result of, or related to, Buyer's employment of Employees.

(d) Buyer and Seller acknowledge and agree that all provisions contained in this Section 6.3 with respect to Employees are included for the sole benefit of Buyer and Seller, and that

nothing herein, whether express or implied, shall create any third-party beneficiary or other rights in any other Person, including, without limitation, any Employees (or former Employees), or any dependent or beneficiary thereof.

Section 6.4    Seller's Post-Closing Existence.

(a) Seller shall remain a limited liability company, validly existing and in good standing under the laws of the State of Illinois, and shall not declare bankruptcy, dissolve or liquidate (or enter into or adopt a plan of dissolution or liquidation) or otherwise terminate its existence for as much time as is necessary for Seller to perform its obligations under this Agreement, the Ancillary Agreements and under Applicable Law, including its indemnification obligations under Article IX.

Section 6.5    Certain Restrictive Covenants.

(a) Confidentiality.  Seller acknowledges that the businesses and the business objectives of Buyer involve the acquisition of the Purchased Assets, including confidential and proprietary information relating to the Purchased Assets, in consideration for good and valuable consideration provided by Buyer as described in Article II hereof, the sufficiency of which is hereby acknowledged.  Seller acknowledges and agrees that it would be unfair to divulge or utilize such information relating to such businesses and the Purchased Assets or goodwill related thereto in competition with Buyer after a Branch Closing Date. Therefore, after a Branch Closing Date, neither Seller nor any of its Affiliates shall, directly or indirectly, divulge any trade secrets, customer lists, pricing information, marketing arrangements or strategies, business plans, internal performance statistics, training manuals, personnel information, Intellectual Property or any other information concerning the applicable Branch location or its operations ("Confidential Information") to any third party without Buyer's prior written consent or use any Confidential Information to compete with Buyer or Buyer's Affiliates; provided, however, that Seller may disclose or use Confidential Information if it is compelled to do so by judicial or administrative process, in which case Seller and its Affiliates shall, to the extent permitted by Applicable Law, notify Buyer promptly of the request or requirement so that Buyer and/or its Affiliates may seek an appropriate protective order or waive compliance with the provisions of this Section 6.5(a).

(b) No-Hire.  Each of Seller and Buyer agrees that it shall not, for a period of twenty-four (24) months following the final Branch Closing hereunder, directly or indirectly, on its own behalf or on behalf of any Affiliate, hire or attempt to hire any employee of the other Party, or solicit or induce, or attempt to solicit or induce, any employee of the other Party to leave the employ of the other Party or to work for Seller (or an Affiliate of Seller) or Buyer (or an Affiliate of Buyer), as applicable. Notwithstanding the foregoing, nothing herein shall restrict or preclude either Seller or Buyer from making generalized solicitations by use of advertisements in the media (including trade media) or otherwise, so long as such advertisements are not targeted at the employees of Seller or Buyer.

(c) Injunctive Relief for Breach.  Seller acknowledges and agrees that the restrictions and covenants contained or referenced in this Section 6.5 are reasonable and necessary to

protect the legitimate business interests of Buyer and its Affiliates and that any violation of such restrictions may result in irreparable injury and harm to Buyer and its Affiliates or their successors in interest, for which damages will not be an adequate remedy. Seller specifically acknowledges and agrees that Buyer and/or any of its Affiliates shall be entitled to seek, without limitation, injunctive relief for a breach of any restriction contained in this <u>Section 6.5</u>, and that neither Seller nor its Affiliates will oppose such relief on the grounds that there exists an adequate remedy at law.

(d) <u>Enforceability</u>. If any provision contained in this <u>Section 6.5</u> shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this <u>Section 6.5</u>, but this <u>Section 6.5</u> shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Notwithstanding the foregoing, it is the intention of the Parties that if any of the restrictions or covenants contained in this <u>Section 6.5</u> is held to cover a geographic area or to be for a length of time which is not permitted by Applicable Law, or in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent such provision would be valid or enforceable under Applicable Law, a court of competent jurisdiction shall construe and interpret or reform this <u>Section 6.5</u> to provide for a covenant having the maximum enforceable geographic area, time period and other provisions (not greater than those contained herein) as shall be valid and enforceable under such Applicable Law.

Section 6.6     <u>Information Received after Branch Closing Date</u>. For ninety (90) days after a Branch Closing Date, Seller shall forward promptly to Buyer any notices or other correspondence received on or after the Branch Closing Date that relate to the Purchased Assets or the Assumed Liabilities.

Section 6.7     <u>Stoddart Employment Agreement</u>. Buyer agrees to hire Seller's President, Michael Stoddart ("<u>Stoddart</u>"), and Seller agrees to release Stoddart from the conditions and restrictions of Stoddart's employment agreement with Seller provided Seller receives (a) $310,000 in cash, being one-half of the $620,000 sign-on bonus/forgivable loan given by Seller to Stoddart, which amount shall be paid to Seller in twelve (12) equal monthly installments beginning on January 1, 2023 and continuing on the first day of each and every calendar month thereafter through and including December 1, 2023, and (b) document(s) executed by Stoddart, in form satisfactory to Seller, releasing Seller and its Affiliates of and from any and all claims, causes of action and further obligations under such employment agreement including, without limitation, any obligation to pay Stoddart any bonus for performance year 2022 or otherwise.

Section 6.8     <u>ICE/Encompass Contract</u>. The Parties agree to consult and reasonably cooperate with each other, in good faith, with respect to the negotiation of any amendments, modifications or extensions of Seller's and Buyer's respective agreements with ICE/Encompass, with the purpose of achieving a fair and equitable economic and business result for each Party in light of the transactions contemplated by this Agreement.

Section 6.9     <u>Pipeline Mortgage Loans</u>. At each Branch Closing, Seller will deliver to Buyer a schedule of Pipeline Mortgage Loans with respect to the applicable Branches as of such Branch Closing Date. Buyer agrees that it shall not close or fund, and shall not permit any of the

purchased Branches to close or fund, any of such Pipeline Mortgage Loans, it being understood and agreed that Seller shall have the sole right to close and fund all such Pipeline Mortgage Loans for its own account. In the event Buyer (including the purchased Branches) closes or funds any of such Pipeline Mortgage Loans, then Buyer shall pay to Seller, as liquidated damages, the sum of $10,000 for each Pipeline Mortgage Loan closed or funded by Buyer (including any of the purchased Branches). Such payment to Seller shall be made within ten (10) business days after such Pipeline Mortgage Loan is funded. Buyer agrees that Seller shall have reasonable audit rights to confirm whether any such Pipeline Mortgage Loans were funded by Buyer, and Buyer shall cooperate with Seller and to provide to Seller reasonably requested documents in response to related audit inquiries Seller may make of Buyer pursuant to this Section.

Section 6.10    Transition Services/Management Agreement. The Parties agree to consult and reasonably cooperate with each other, in good faith, in connection with the negotiation of a transition services and/or management agreement on terms and conditions reasonably satisfactory to Buyer and Seller, in order to facilitate an efficient and orderly transition of Branch operations from Seller to Buyer, with the purpose of achieving a fair and equitable economic and business result for each Party in light of the transactions contemplated by this Agreement.

Section 6.11    Seller's Capital Markets Group. If Buyer desires to hire Seller's capital markets executive, Jerry Kaplan ("Kaplan"), then Seller and Buyer shall cooperate with each other, in good faith, in connection with the negotiation of a business arrangement pursuant to which Kaplan would be allowed to perform services for both Seller and Buyer, with the purpose of achieving a fair and equitable economic and business result for each Party in light of the transactions contemplated by this Agreement.

ARTICLE VII.
CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to purchase the Purchased Assets from Seller and assume from Seller the Assumed Liabilities related thereto shall be subject to the satisfaction or, at the option of Buyer, waiver (to the extent permissible under Applicable Law), on or prior to the applicable Branch Closing Date, of the following conditions:

Section 7.1    No Misrepresentation or Breach of Covenants and Warranties.

(a)    There shall not have been any failure by Seller in the performance of any of its covenants and agreements in this Agreement or any Ancillary Agreement that shall not have been remedied or cured, other than failures to perform that are not, individually or in the aggregate, material.

(b)    The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on the applicable Branch Closing Date as though made on such Branch Closing Date (except to the extent that they expressly relate to an earlier date, in which case such representations and warranties need only be true and correct in all material respects as of such date); provided, that any representation or warranty already qualified by the concept of materiality must be true and correct in all respects.

Section 7.2    <u>Necessary Consents, Notices and Approvals</u>.  With respect to each Branch, all material consents, notices, approvals, waivers and actions contemplated by <u>Section 5.3</u> shall have been obtained or taken place.  All consents, notices, approvals, waivers and actions required by the entities listed on <u>Section 4.4</u> of the Buyer Disclosure Schedule shall have been obtained or taken place.

Section 7.3    <u>Branch Manager</u>.  The Branch Manager of each applicable Branch shall have executed an employment agreement, acceptable to Buyer in its sole discretion, with Buyer.

Section 7.4    <u>No Restraint</u>.  No Applicable Law shall have been enacted, entered, promulgated or enforced by a Governmental Authority that restrains or prohibits the applicable Branch Closing.

Section 7.5    <u>Branch Contracts</u>.  Seller shall have not received any notice of early termination from any counterparty to any Branch Contract that is material to the ongoing business and operations of any of the Branches after the applicable Branch Closing Date.

Section 7.6    <u>Bring Down Certificate</u>.  Seller shall have delivered to Buyer a certificate, dated as of the applicable Branch Closing Date, signed on behalf of Seller by a duly authorized officer of Seller (a "<u>Bring Down Certificate</u>"), certifying that the conditions set forth in <u>Sections 7.1</u>, <u>7.2</u>, <u>7.4</u> and <u>7.5</u> have been satisfied with respect to the Branches.

Section 7.7    <u>Closing Documents</u>.  Seller shall have tendered for delivery all of the certificates, documents and other items set forth in <u>Section 2.8</u>.

Section 7.8    <u>No Material Adverse Change</u>.  There shall have been no material adverse change in the Purchased Assets or Assumed Liabilities between the date of this Agreement and the Branch Closing Date.

Section 7.9    <u>No Proceedings or Prohibitions</u>.  At the time of the Branch Closing, there shall not be any litigation, investigation, inquiry or proceeding pending or threatened in or by any court or agency of any government or by any third party that in the reasonable judgment of the executive officers of Buyer, with the advice of counsel, presents a *bona fide* claim to restrain, enjoin or prohibit consummation of the acquisition of the Purchased Assets or assumption of Assumed Liabilities or that might result in rescission in connection with such transactions.  No preliminary or permanent injunction or other order by any federal or state court that prevents the consummation of the transactions contemplated by this Agreement shall have been issued and shall remain in effect.

Section 7.10    <u>Member's Indemnity Agreement</u>.  On or before the initial Branch Closing hereunder, Member shall have executed an indemnity agreement, in the form attached hereto as <u>Exhibit C</u> (the "<u>Member Indemnity Agreement</u>"), in favor of Buyer pursuant to which Member agrees to indemnify Buyer for a period of thirty (30) months after the final Branch Closing Date with respect to certain claims and causes of action arising out of Mortgage Loans funded by Seller and any loan servicing defaults by Seller with respect to such Mortgage Loans, which Member Indemnity Agreement shall be in form satisfactory to Buyer, Seller and Member each in its sole discretion.

Section 7.11   Equity Investment in Luminate Capital Corp..   Provided that Buyer has purchased pursuant to this Agreement Branches comprising in not less than 70% of the total aggregate loan production for the 11-months ended November 30, 2022 of all the Branches on the Branch List, then, on or before the final Branch Closing Date, one or more of the individual shareholders in Member who: (a) are agreeable to LCC; (b) qualify as subchapter S shareholders; and (c) are "Accredited Investors" as defined in Rule 501(a) of the Securities Act of 1933, as amended (the "New LCC Stockholders"); shall have executed binding subscription agreements and/or purchase agreements to invest not less than an aggregate of $6,000,000 of equity capital in Luminate Capital Corp., a Delaware Corporation ("LCC") and the holding company for Luminate Bank, a Minnesota state-chartered bank and sole owner of Buyer (collectively, the "Equity Investment").   The Equity Investment shall be used by LCC for working capital purposes.   The subscription and/or purchase documents with respect to the Equity Investment shall be in form reasonably satisfactory to LCC and each of the New LCC Stockholders.

ARTICLE VIII.
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to sell, transfer, assign, convey and deliver the Purchased Assets to Buyer shall be subject to the satisfaction or, at the option of Seller, waiver (to the extent permissible under Applicable Law), on or prior to the applicable Branch Closing Date, of the following conditions:

Section 8.1   No Misrepresentation or Breach of Covenants and Warranties.

(a)   There shall not have been any failure by Buyer in the performance of any of its covenants and agreements in this Agreement or any Ancillary Agreement that shall not have been remedied or cured, other than failures to perform that are not, in the aggregate, material.

(b)   The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on the applicable Branch Closing Date as though made on such Branch Closing Date (except to the extent that they expressly relate to an earlier date, in which case such representations and warranties need only be true and correct in all material respects as of such date); provided, that any representation or warranty already qualified by the concept of materiality must be true and correct in all respects.

Section 8.2   No Restraint.   No Applicable Law shall have been enacted, entered, promulgated or enforced by a Governmental Authority that restrains or prohibits the applicable Branch Closing.

Section 8.3   Warehouse Lenders.   Seller shall have confirmed to its satisfaction that its Warehouse Lenders will continue to fund Pipeline Mortgage Loans from and after the applicable Branch Closing Dates, it being understood and agreed that all such Pipeline Mortgage Loans shall be funded by Seller for its own account.   If Seller's Warehouse Lenders decline to fund Pipeline Mortgage Loans from and after any Branch Closing Date, then Buyer and Seller shall have executed an agreement pursuant to which Buyer shall purchase Pipeline Mortgage Loans from Seller and fund such Pipeline Mortgage Loans through Buyer's warehouse lenders, which agreement shall be in form satisfactory to Buyer and Seller, each in its sole discretion.

Section 8.4    <u>Sale of Computers and Other IT Equipment</u>.    In connection with each Branch Closing hereunder, an Affiliate of Buyer shall purchaser from Seller, and Seller shall convey to such Affiliate of Buyer by bill of sale, the computers and other IT equipment of the applicable Branches, the purchase price for which shall be agreed upon and documented between Seller and such Affiliate of Buyer in a side letter-agreement.

ARTICLE IX.
<u>INDEMNIFICATION</u>

Section 9.1    <u>Survival</u>.    The representations and warranties contained herein, along with all rights and remedies with respect to breaches or inaccuracies thereof, shall survive for eighteen (18) months; <u>provided</u>, <u>however</u>, that (i) all Fundamental Representations shall, along with all rights and remedies with respect to any breaches or inaccuracies thereof, survive for a period ending on the date seven (7) years after the date hereof and (ii) the representations and warranties made in <u>Section 3.6</u> shall survive until sixty (60) days after the applicable statute of limitations expires.    An Indemnified Party's claim for indemnification under this <u>Article IX</u> shall be made on or prior to the date on which the survival period for such representation and warranty expires, it being understood that claims made in writing in accordance with the notice provisions hereof on or prior to such expiration date and describing the claim in reasonable detail shall survive such expiration date and claims first made after such expiration date shall be barred.    The right of any Person to indemnification, payment, reimbursement or other remedy based upon breaches of such representations and warranties shall not be affected by any investigation conducted with respect to, or any knowledge of any Person acquired at any time, whether before or after the execution and delivery of this Agreement or the applicable Branch Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation or warranty.

Section 9.2    <u>Indemnification by Seller</u>.    From and after the date hereof, subject to the limitations set forth in this <u>Article IX</u>, Seller agrees to indemnify and hold Buyer, its Affiliates and its and their directors, managers, officers, employees, agents and representatives (the "<u>Buyer Indemnified Parties</u>") harmless from and against any and all Losses paid, suffered or incurred by any Buyer Indemnified Party as a result of or arising from:

(a)    any breach of any warranty or the inaccuracy of any representation of Seller contained in this Agreement or any Ancillary Agreement;

(b)    any breach by Seller of, or failure by Seller to perform, other than as a result of Buyer's breach of any terms of this Agreement or any Ancillary Agreement, any of its covenants or obligations contained in this Agreement or any Ancillary Agreement;

(c)    any of the Excluded Assets or Excluded Liabilities; or

(d)    Seller's ownership and operation of the business of Seller and the Branches prior to the applicable Branch Closing Date;

<u>provided</u>, <u>however</u>, that Seller's indemnity obligations with respect to Taxes shall be governed by <u>Section 6.1</u>, rather than by this <u>Article IX</u>.

Section 9.3    <u>Indemnification by Buyer</u>.  From and after the date hereof, Buyer agrees to indemnify and hold Seller, its Affiliates and its and their directors, managers, officers, employees, agents and representatives (the "<u>Seller Indemnified Parties</u>") harmless from and against any and all Losses incurred by any Seller Indemnified Party as a result of or arising from:

(a)    any breach of any warranty or the inaccuracy of any representation of Buyer contained in this Agreement;

(b)    any breach by Buyer of, or failure by Buyer to perform, other than as a result of Seller's breach of any terms of this Agreement or any Ancillary Agreement, any of its covenants and obligations contained in this Agreement or any Ancillary Agreement;

(c)    Buyer's ownership and operation of the Branches from and after the applicable Branch Closing Date; or

(d)    any and all liabilities, costs and expenses incurred by Seller in connection with early payoff of any Mortgage Loan(s) funded by Seller to the extent such early payoff is caused by refinance of any such Mortgage Loans by Buyer (including, without limitation, by any of the Branches included in the Purchased Assets), it being understood and agreed that Buyer shall pay, or reimburse Seller for, any such early payoff obligations upon Seller's written demand.

Section 9.4    <u>Notice of Claims</u>.  In the event that a Buyer Indemnified Party or a Seller Indemnified Party, as applicable (the "<u>Indemnified Party</u>"), is seeking indemnification hereunder from Seller or Buyer, as applicable (the "<u>Indemnitor</u>"), in connection with a claim that does not involve a Third Party Claim, the Indemnified Party shall promptly deliver to the Indemnitor a notice of such claim setting forth in reasonable detail the facts giving rise to such claim (to the extent known by the Indemnified Party) and the amount or estimated amount (to the extent reasonably estimable) of Losses arising out of, involving or otherwise in respect of such claim, and shall include a reference to the provision of this Agreement or any Ancillary Agreement upon which such claim is based.  The failure to give notice as provided in this <u>Section 9.4</u> shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been materially prejudiced as a result of such failure.

Section 9.5    <u>Determination of Amount; Satisfaction</u>.  The amount of any Losses payable in accordance with this <u>Article IX</u> shall be calculated net of any third-party insurance, indemnification or other proceeds that have actually been recovered by the Indemnified Party under any insurance policy or other Contract in connection with the facts giving rise to the right of indemnification (net of any applicable collection costs and reserves, deductibles, premium adjustments and retrospectively rated premiums), it being understood that an Indemnified Party shall not be obligated to obtain or maintain any type of insurance coverage or initiate any Action in order to obtain recovery under insurance policies with respect to any particular indemnifiable matter.  Any amounts payable pursuant to this <u>Article IX</u> shall be paid without duplication, and in no event shall any Person be indemnified under different provisions of this Agreement for the same Loss.

Section 9.6      Third Party Claims.

(a)  Any Party seeking indemnification provided for under this Agreement in respect of, arising out of or involving a claim or demand made by any third Person against the Indemnified Party (a "Third Party Claim") shall promptly notify the Indemnitor in writing of such Third Party Claim (setting forth in reasonable detail the facts giving rise to such Third Party Claim (to the extent known by the Indemnified Party) and the amount or estimated amount (to the extent reasonably estimable) of Losses arising out of, involving or otherwise in respect of such Third Party Claim and shall include a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such Third Party Claim is based.  Thereafter, the Indemnified Party shall promptly deliver to the Indemnitor copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim.  The failure to give notice as provided in this Section 9.6 shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been materially prejudiced as a result of such failure.

(b)  In the event of the initiation of any Action against Seller in connection with a Third Party Claim, Buyer may, within ten (10) days after receipt of such notice and upon notice to Seller, assume, at the sole cost and expense of Buyer, the settlement or defense thereof (in which case any Losses associated therewith shall be the sole responsibility of Buyer); provided, that Seller may participate in such settlement or defense through counsel chosen by it at its sole expense.

(c)  In the case of any assumption of a defense, negotiation or settlement of any Action, claim or demand pursuant to Section 9.6(b), each of the Parties agrees to cooperate with the other Party in connection with such defense, negotiation or settlement and to make available to the other Party all witnesses, pertinent records, materials and information in such Party's possession or under such Party's control relating thereto as is reasonably required by the other Party; provided, however, that prior to providing such records, materials and information, such other Party shall enter into a customary confidentiality agreement with respect thereto.  To the extent the Indemnitor elects not to defend such Action, claim or demand, and the Indemnified Party defends against or otherwise deals with any such Action, claim or demand, the Indemnified Party may retain counsel and control the defense of such Action, claim or demand.  Notwithstanding the foregoing, irrespective of whether the Indemnitor assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, settle, compromise or discharge, such Third Party Claim without the Indemnitor's written consent (not to be unreasonably withheld, conditioned or delayed).  If the Indemnitor assumes the defense of any Third Party Claim, then (i) the Indemnified Party may participate, at its own expense, in the defense of such Third Party Claim and (ii) the Indemnitor may not settle any such Action, claim or demand which settlement obligates the Indemnified Party to pay money, to perform obligations or to admit liability without the written consent of the Indemnified Party (not to be unreasonably withheld, conditioned or delayed).  After any final judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the time in which to appeal therefrom has expired, or a settlement shall have been consummated, or the Indemnified Party and the Indemnitor shall arrive at a mutually binding agreement with

respect to each separate matter alleged to be indemnified by the Indemnitor hereunder, the Indemnified Party shall forward to the Indemnitor notice of any sums due and owing by it with respect to such matter, and the Indemnitor shall pay all of the sums so owing to the Indemnified Party by wire transfer, certified or bank cashier's check within five (5) Business Days after the date of such notice.

(d)     To the extent of any inconsistency between this <u>Section 9.6</u> and <u>Section 6.1</u> (relating to Tax matters), the provisions of <u>Section 6.1</u> shall control with respect to Tax matters.

Section 9.7    <u>Limitations</u>.  The aggregate amount payable in respect of indemnification by Seller pursuant to <u>Section 9.2(a)</u> (other than with respect to Fundamental Representations) shall be limited to an amount that is equal to the aggregate amount of the Purchase Price paid by Buyer to Seller under this Agreement (the "<u>Cap</u>").  The Cap shall not apply to claims made pursuant to <u>Sections 9.2(a)</u> (with respect to Fundamental Representations) or any claim based on actual fraud. The aggregate amount payable in respect of indemnification by Buyer pursuant to <u>Section 9.3(a)</u> (other than with respect to Fundamental Representations) shall be limited to an amount equal to the Cap. The Cap shall not apply to claims made pursuant to <u>Sections 9.3(a)</u> (with respect to Fundamental Representations) or any claim based on actual fraud.

Section 9.8    <u>Tax Treatment</u>.  All indemnification payments made under this Agreement (including, but not limited to, the indemnification described in <u>Section 6.1(d)</u>) shall be treated by Seller and Buyer as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Applicable Law.

ARTICLE X.
<u>TERMINATION</u>

Section 10.1    <u>Termination</u>.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Branch Closing Date:

(a)     by the mutual written consent of Buyer and Seller;

(b)     by Buyer if Seller has breached, in any material respect, any of its representations, warranties, covenants or agreements contained in this Agreement or any Ancillary Agreement and such breach would give rise to the failure of a condition set forth in <u>Article VII</u> and cannot be or has not been cured by the Termination Date; <u>provided</u>, that Buyer is not then in material breach of this Agreement;

(c)     by Seller if Buyer has breached, in any material respect, any of its representations, warranties, covenants or agreements contained in this Agreement or any Ancillary Agreement and such breach would give rise to the failure of a condition set forth in <u>Article VIII</u> and cannot be or has not been cured by the Termination Date; <u>provided</u>, that Seller is not then in material breach of this Agreement;

(d)     by Buyer or Seller if any Governmental Authority shall have issued a final and non-appealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that prior to invoking this provision as a result of any such order, decree

or ruling, the Party invoking it shall negotiate in good faith with the other Party to attempt to agree to modify the transactions on mutually agreeable terms and on an equitable basis (including by implementing alternative means of structuring the transactions in a mutually satisfactory manner), in a way that would eliminate such restraint or prohibition; or

(e) by Buyer or Seller if the final Branch Closing shall not have occurred on or before the ninetieth (90th) day after the date hereof (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 10.1(e) shall not be available to any Party whose actions, or failure to act, or whose breach of its obligations contained in this Agreement has been the cause of, or resulted in, the failure of such Branch Closing to have occurred on or prior to the Termination Date.

(f) in accordance with Section 2.2.

Section 10.2    Notice of Termination.  Any Party desiring to terminate this Agreement pursuant to Section 10.1 shall give written notice of such termination to the other Parties.

Section 10.3    Effect of Termination.  If this Agreement shall be terminated pursuant to this Article X, (i) all further obligations of the Parties under this Agreement (other than those obligations in Article XI) shall be terminated without further liability of any Party to the other; provided, however, that nothing herein shall relieve any Party from liability for its fraudulent acts or willful, knowing or intentional breach of this Agreement, and (ii) with respect to any Branch for which a Branch Closing has not occurred, such Branch shall be deemed to be removed from the Branch List.

ARTICLE XI.
GENERAL PROVISIONS

Section 11.1    No Public Announcement.  Seller shall not, without the prior written consent of Buyer, make any press release or other public announcement concerning the transactions contemplated by this Agreement; provided, however, that the foregoing shall not preclude communications or disclosures (a) necessary to implement the provisions of this Agreement or (b) required by Applicable Law.

Section 11.2    Notices.  All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered when delivered personally, sent by e-mail (and immediately after transmission, receipt of which has been confirmed by telephone by the sender) or delivered by registered or certified mail (postage prepaid, return receipt requested) or by an internationally recognized overnight courier service addressed as follows:

If to Buyer, to:

Luminate Home Loans, Inc.
2523 S. Wayzata Blvd., Suite 200
Minneapolis, MN 55405
Attention:    Taryn Reuter
Telephone:   (612) 315-2801
Email: taryn.reuter@goluminate.com

If to Seller, to:

> Celebrity Home Loans, LLC
> 1 Mid America Plaza, Suite 800
> Oakbrook Terrace, IL 60181
> Attention:  David Robnett
> Email:  david.robnett@celebrityhomeloans.com

With a copy to:

> Celebrity Financial, Inc.
> 9800 Buccaneer Mall, Box 16
> Bldg. 1, Second Floor
> St. Thomas, VI 00802
> Attention:  John Matheson, General Counsel
> Email:  john.matheson@celebfinancial.com

or to such other address as such Party may indicate by a notice delivered to the other Party in accordance herewith.  If the date by which a required notice must be given is not a Business Day, the deadline for giving such notice shall be extended to the next Business Day.

Section 11.3    Successors and Assigns; No Third Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither Party may assign its rights or delegate its obligations under this Agreement without the express prior written consent of the other Party; provided, however, that Buyer, at its option and without the consent of Seller, may assign all of its rights and obligations hereunder to (a) a direct or indirect wholly-owned subsidiary of Buyer, or (b) one or more lenders for collateral security purposes, in each case, upon notice to Seller.  Notwithstanding the foregoing, Buyer agrees that Seller may, after the final Branch Closing, assign this Agreement or certain rights and/or obligations of Seller hereunder (including but not limited to Seller's right to receive the Earnout Amount) to Member.  It is expressly agreed that nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person other than the Parties and their respective successors and assigns permitted hereby, any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 11.4    Entire Agreement; Amendment.  This Agreement and the documents delivered pursuant hereto (including the Ancillary Agreements) contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all other prior representations, warranties, agreements, understandings or letters of intent between or among any of the Parties.  Except as otherwise set forth herein, this Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

Section 11.5    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation";

(b)    the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole, including all Annexes, Exhibits and Schedules attached to this Agreement; and

(c)    any rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by the Parties.

(d)    Unless the context otherwise requires, references herein: (i) to Articles, Sections, Annexes, Exhibits and Schedules mean the Articles and Sections of, and the Annexes, Exhibits and Schedules attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended from time to time; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder, in each case through the date of this Agreement.

(e)    The Annexes, Exhibits and Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Titles to Articles and headings of Sections are inserted for convenience of reference only and shall not be deemed a part of or to affect the meaning or interpretation of this Agreement.

(f)    The Seller Disclosure Schedule and Buyer Disclosure Schedule shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item in the Seller Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in the Seller Disclosure Schedule is or is not material for purposes of this Agreement. The inclusion of any specific item in the Seller Disclosure Schedule shall not imply that such item is or is not in the ordinary course of business, and no Party shall use the fact that such item was or was not set forth in the Seller Disclosure Schedule as evidence that such item is or is not in the ordinary course of business.  The information set forth in the Seller Disclosure Schedule or Buyer Disclosure Schedule shall be deemed to provide the information contemplated by, or otherwise qualify, the representations and warranties of Seller and Buyer, respectively, set forth in the corresponding section or subsection of this Agreement and any other section or subsection of this Agreement if and to the extent that it is readily apparent on the face of the disclosure that it applies to such other section or subsection of this Agreement and regardless of whether such section or subsection of this Agreement makes specific reference to the Disclosure Schedule or a specific section thereof.  Disclosure concerning any agreement or other document to which

reference is made in the Seller Disclosure Schedule or Buyer Disclosure Schedule is qualified by reference to the agreement or other document.

(g)    Time is of the essence in this Agreement and each Ancillary Agreement.

Section 11.6    <u>Waiver</u>.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized representative of such Party.  The failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 11.7    <u>Expenses</u>.  Except as expressly set forth herein, each Party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel,  independent public accountants and other advisors.

Section 11.8    <u>Partial Invalidity</u>.   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under Applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 11.9    <u>Execution in Counterparts</u>.  This Agreement may be executed and delivered (including by email in portable document format (PDF)) in counterparts, each of which shall be considered an original instrument, but all of which shall be deemed to constitute one and the same agreement, which agreement shall become effective when one or more counterparts have been signed by each of the Parties and delivered to all of the other Parties, it being understood that all Parties need not sign the same counterpart.

Section 11.10   <u>Further Assurances</u>.  Subject to, and not in limitation of, the provisions set forth elsewhere in this Agreement, each of the Parties agrees to use its commercially reasonable efforts to take or cause to be taken all action, to do or cause to be done, and to assist and cooperate with the other Party in doing, all things reasonably necessary, proper or advisable under Applicable Law to consummate and make effective the transactions contemplated by this Agreement, including: (a) the satisfaction of the conditions precedent to the obligations of any of the Parties; and (b) the execution and delivery of such instruments, and the taking of such other actions, as the other Party may reasonably require in order to carry out the intent of this Agreement.  From and after each Branch Closing, Seller and Buyer will execute and deliver, and will cause their respective Affiliates to execute and deliver, such further instruments of conveyance and transfer and take such other actions as might reasonably be requested by any Party to carry out the purposes and intent of this Agreement and any other Ancillary Agreement, including the acquisition of

necessary authorizations or consents that were not required to be obtained prior to a Branch Closing (or as to which delivery at a Branch Closing was waived).

Section 11.11 <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Minnesota without regard to the conflicts of law principles thereof.  By the execution and delivery of this Agreement, Seller and Buyer submit to the exclusive personal jurisdiction of any state or federal court in the State of Minnesota in any Action arising out of or relating to this Agreement and the Ancillary Agreements.  In any such Action, each Party hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any such Action brought in such court and any claim that any such Action brought in such court has been brought in an inconvenient forum.  Each Party also agrees that any final, non-appealable judgment against a Party in connection with any Action may be enforced in any court of competent jurisdiction, either within or outside the United States.  A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment.  Each Party agrees that any process or other paper to be served in connection with any Action under this Agreement shall, if delivered, sent or mailed in accordance with <u>Section 11.2</u>, constitute good, proper and sufficient service thereof.

Section 11.12 <u>Attorneys' Fees</u>.  If any Action at law or in equity is necessary to enforce or interpret the terms of this Agreement, then the prevailing party shall be entitled to reasonable attorneys' fees, costs, and disbursements in addition to any other relief to which such party may be entitled.

Section 11.13 <u>Waiver of Jury Trial</u>.  Buyer and Seller hereby expressly waive any right to trial by jury in any dispute, whether sounding in contract, tort or otherwise, between Buyer and Seller arising out of or related to the transactions contemplated by this Agreement or any of the Ancillary Agreements, or any other instrument or document executed or delivered in connection herewith or therewith.  Either Buyer or Seller may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their right to trial by jury.

Section 11.14 <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the terms or provisions of this Agreement related to the transactions contemplated hereby were not performed in accordance with their specific wording or were otherwise breached.  It is accordingly agreed that, notwithstanding anything to the contrary contained in this Agreement, each of the Parties shall be entitled to an injunction or injunctions and other equitable relief to prevent such breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States of America or any state having jurisdiction, such remedy being in addition to any other remedy to which any Party may be entitled at law or in equity.  Each of the Parties hereto hereby waives (a) the defense that a remedy at law would be adequate and (b) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

SELLER:

CELEBRITY HOME LOANS, LLC

By: _____

Name: _David Robnett_____

Its: _C E O_____

BUYER.

LUMINATE HOME LOANS, INC.

By: _____

Name: _____

Its: _____

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

SELLER:

CELEBRITY HOME LOANS, LLC

By: _____
Name: _____
Its: _____


BUYER:

LUMINATE HOME LOANS, INC.

By: _____
Name: TARYN S REUTER
Its: CHAIRMAN + CEO