1  JASON E. MURTAGH (SBN 294830)
   jason.murtagh@bipc.com
2  BUCHANAN, INGERSOLL & ROONEY, LLP
   600 West Broadway, Suite 1100
3  San Diego, CA 92101-3387
   Telephone:  619 346 7592
4  Facsimile:  619 702 3898

5  Attorney for Defendants
   Daniel Horanyi, Jeanette Lee, and Lauren Havins
6

7

8                 **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10                        **SAN DIEGO**

11  LUMINATE HOME LOANS, INC.,          Case No.: 3:24-cv-02251-BAS-MSB

12                  Plaintiff,          **DEFENDANTS' MEMORANDUM OF**
                                        **POINTS AND AUTHORITIES IN**
13          vs.                         **OPPOSITION TO PLAINTIFF'S**
                                        **MOTION FOR TEMPORARY**
14  BETTER MORTGAGE CO.,                **RESTRAINING ORDER AND**
    DANIEL HORANYI, JEANETTE            **PRELIMINARY INJUNCTION AND**
15  LEE, & LAUREN HAVINS,               **EXPEDITED DISCOVERY**
16                  Defendants.
                                        *[Declarations of Daniel Horanyi, Sydney*
17                                      *Lynn, Chris Ledlie, Ryan Grant, and*
                                        *Jason E. Murtagh, and Proposed Order*
18                                      *denying Motion concurrently filed*
19                                      *herewith]*

20                                      Hearing Date:   January 24, 2025
21                                                      (*See* ECF No. 5)
                                        Time:           1:30 p.m.
22                                      Judge:          Hon. Cynthia Bashant
23                                      Complaint Filed:  December 2, 2024
24

25

26

27

28

# TABLE OF CONTENTS

I.  Introduction ........................................................................................1

II.  Statement of Relevant Facts ............................................................4

    A.  NEO's Formation, Vision, and Early Development..................4

    B.  Discussions and Partnership With Luminate ............................6

    C.  Transition to Luminate and Operational Challenges................7

    D.  Termination of the Individual Defendants.................................9

    E.  NEO's Transition to Better .....................................................10

    F.  Luminate's Allegations,  Defendants' Proactive Measures and Collaboration.........................................................................11

III.  Legal Standard................................................................................12

IV.  Argument........................................................................................12

    A.  Luminate Fails to Prove Ownership of Alleged Trade Secrets 12

    B.  Luminate Identifies No Legally Cognizable Trade Secrets......14

    C.  Luminate Will Not Succeed on Contract-Based Claims. .........16

    D.  Luminate's Contract-Based Claims Violate California Law....17

    E.  Luminate's Delay Undermines Its Claims of Irreparable Harm........................................................................................18

    F.  Luminate's Speculative Claims of Harm Cannot Justify Injunctive Relief and are Compensable by Monetary Damages ..................................................................................................20

    G.  The Balance of Equities Strongly Favors Defendants.............21

    H.  Expedited Discovery is Unwarranted .....................................23

    I.  Luminate Has Produced No Competent or Admissible Evidence ..................................................................................................24

V.  Conclusion......................................................................................24

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Agency Solutions.Com, LLC v. TriZetto Group, Inc.*,
   819 F. Supp. 2d 1001 (E.D. Cal. 2011).................................………..14, 15

6

7

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
   28 Cal. App. 5th 923 (2018).................................................................17

8

*Brown v. TGS Mgmt. Co., LLC*,
   57 Cal. App. 5th 303 (2020)..................................................................17

9

10

*Carribean Marine Servs. Co., Inc. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988)................................................................19

11

12

*Citcon USA, LLC v. MaplePay Inc.*,
   No. 19-cv-02112-NC, 2021at (N.D. Cal. Apr. 2, 2021) .................................24

13

*Dahl v. Swift Distribution, Inc.*,
   No. CV 10-00551 SJO, 2010 WL 1458957 (C.D. Cal. Apr. 1, 2010)............19

14

15

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
   234 F.R.D. 4 (D. D.C. 2006) ................................................................12

16

17

*Dowell v. Biosense Webster, Inc.*,
   179 Cal. App. 4th 564 (2009).................................................................18

18

*Edwards v. Arthur Andersen LLP*,
   44 Cal. 4th 937 (2008).........................................................................17

19

20

*Grooms v. Legge*,
   CASE NO. 09cv489 - IEG - POR, 2009 BL 362879 (S.D. Cal. Mar. 17, 2009)
   ...................................................................................................12

21

22

*Henry Schein Inc. v. Cook*,
   191 F. Supp. 3d 1072 (N.D. Cal. 2016) .....................................................23

23

24

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013).................................................................20

25

26

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
   978 F.3d 653 (9th Cir. 2020)...............................................................2, 14

27

28

ii

*JDA Software, Inc. v. Bissett*,
   282 Fed. App'x 532 (9th Cir. 2008)...................................................................13

*Marina Vape, LLC v. Nashick*,
   No. 16-cv-1028-JAK, 2016 U.S. Dist. LEXIS 189500, 2016 WL 9086939
   (C.D. Cal. May 6, 2016)...................................................................................14

*Oakland Tribune, Inc. v. Chronicle Publishing Co., Inc.*,
   762 F.2d 1374, 1377 (9th Cir. 1985)...............................................................19

*P2i Ltd. v. Favored Tech USA Corp.*,
   No. 23-CV-01690-AMO, 2024 WL 4294652 (N.D. Cal. Sept. 24, 2024).......23

*Probo Med., LLC v. Heart Med., LLC*,
   No. 24-cv-0433-BAS-VET, 2024 BL 257235 (S.D. Cal. July 26, 2024)........14

*RMS, NA. Inc. v. RMS (Aus) Pty Ltd.*,
   No. 24-cv-01366-AJB-MMP, 2024 BL 368461 (S.D. Cal. Oct. 15, 2024).....12

*Sanchez v. Sanchez*,
   No. 10-CV-1628 JLS RBB, 2010 WL 4790179 (S.D. Cal. Nov. 17, 2010)....19

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
   208 F.R.D. 273 (N.D.Cal.2002) ........................................................................12

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
   No. CV 18-9536-MWF (ASx), 2019 at *9 (C.D. Cal. Mar. 11, 2019)............13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) .....................................................................12, 20

*TriNet Grp., Inc. v. Krantz*,
   2017 WL 10702187 (C.D. Cal. Aug. 4, 2017)................................................15

*Waste and Compliance Mgmt, Inc. v. Stericycle, Inc.*,
   No. 17-cv-967-DSM, 2017 U.S. Dist. LEXIS 162889, 2017 WL 4358145
   (S.D. Cal. Oct. 2, 2017) ...................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................12, 21

**Statutes**

18 U.S.C. § 1839(3) ................................................................................................15

iii

Cal. Civ. Code § 3426.1(d) ....................................................................................15

California Business and Professions Code § 16600 ............................................17

California Business and Professions Code § 16600.5(c)....................................18

California Labor Code Section 96 ........................................................................18

Labor Code Section 925........................................................................................18

**Rules**

Rule 65(d)......................................................................................................22, 24

## I. Introduction[1]

Plaintiff's "emergency" Motion for Injunctive Relief and a Temporary Restraining Order is nothing more than its attempt to improperly assert ownership over the independent operations and proprietary assets of Neo Services LLC ("NEO")—an entity it never owned or acquired—and unlawfully intimidate NEO's employees and executives from pursuing their lawful right to seek other employment. Daniel Horanyi is the managing member and part-owner of NEO. Luminate sued him, Jeanette Lee, and Lauren Havins[2] ("Individual Defendants"), as part of Luminate's effort to stifle lawful competition under the guise of protecting "trade secrets" that it never owned and contractual rights it does not possess. The Motion is riddled with fatal procedural flaws. It fails to satisfy the stringent requirements for injunctive relief under Rule 65, the Defend Trade Secrets Act ("DTSA"), and California's Uniform Trade Secrets Act ("CUTSA").[3]

First, Plaintiff seeks extraordinary injunctive relief to enjoin practices that the Defendants *have already ceased*. Indeed, Better and the Individual Defendants

---

[1] Individual Defendants adopt and incorporate the Opposition filed by Defendant Better Mortgage Co. ("Better"), including the Evidentiary Objections therein.

[2] Having first denied having an arbitration agreement with her, Luminate now has filed a dismissal of Lauren Havins from this action after she located and provided it a copy of its arbitration agreement. ECF No. 12. Luminate has not instituted an arbitration, and apparently no longer seeks any emergency relief against her.

[3] This submission is without prejudice to Horanyi's right to seek arbitration. Horanyi signed a "Non-Producing Division President Employment Agreement" with Luminate (Compl. ¶39; Exhibit 3; ECF. 1-4). Pursuant to that Agreement, Luminate and Horanyi agreed to arbitrate any disputes, including those for "temporary injunctive relief...." (*Id.* A Art. VIII). Horanyi asked Plaintiff to dismiss this action and proceed in arbitration. Luminate refused. Luminate also has refused to produce the personnel files for any of the individual defendants despite repeated requests. (Murtagh Decl. ¶ 7; Ex. 3.). If this Court were inclined to consider granting Plaintiff's request for injunctive relief, it should instead stay the case pending arbitration with Horanyi and/or Ms. Havins.

1   have proactively addressed any concerns raised by Luminate through the
2   sequestration of potentially relevant information. These measures neutralize any
3   claim of imminent harm, and render Luminate's request for emergency relief
4   unnecessary and unjustified.

5   Second, Luminate is unlikely to prevail on the merits of its claims. It
6   stumbles at the very starting line under both DTSA and CUTSA, because it cannot
7   establish that it is the "owner" of any information it alleges is a trade secret. And
8   it falls over its feet further along the course by mixing alleged "trade secrets" with
9   "confidential information," and even publicly available information, thus failing
10  to "describe the subject matter of the trade secret with sufficient particularity."
11  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)
12  (citations omitted). Luminate's proposed order demonstrates an astonishingly
13  sweeping request for relief, demanding any "desktop, laptop, smartphone, tablet
14  computer, external hard drive, Cloud Servers, or cloud based storage" Horanyi or
15  Lee ever used, including any "iPhones, Androids, Blackberries, CD-ROMs, USB
16  drives, and thumb drives," demands that they provide their passwords and access
17  to any "storage accounts [and] email accounts" that they have used "in the last 12
18  months," and that they return "all documents, electronic, or digital files *prepared*
19  *during, arising from, or containing information related to* Luminate or its NEO
20  division…." Proposed Order paragraphs 1, 4, 5. Setting aside the question of
21  ownership of information, it goes without saying that iPhones contain information
22  that are not trade secrets, as do email accounts, and that all sorts of documents and
23  information "prepared during" the last few years fall far short of being a trade
24  secret. Luminate provides no principled explanation as to how this Court should
25  determine what is a trade secret and what is not.

26  And that is because Luminate's true motive—shown through a pattern of
27  behavior and the relief it now seeks in paragraph 8 of its proposed order—is to
28  assuage its regret over a failed business deal by asking this Court to prevent

2

competition, in violation of California law. Luminate and the NEO leadership negotiated for several months the possibility of NEO staying as a partner with Luminate. During that time, Luminate's leadership was aware that Better was also courting NEO. Luminate decided not to proceed with a deal with NEO, announced to the world that it was shuttering the relationship, and now, feigning surprise, wants the Court to prevent Better from hiring or using NEO employees. Luminate, left at the altar for its own failings, wants this Court to stop anyone else from having the spouse it neglected and dismissed.

Luminate's claims go beyond good faith assertions of trade secret ownership. It asserts—falsely—that "NEO never constituted its own company or independent entity." (Mot. at 18). In reality, a simple search of publicly available documents shows that this is not true. NEO is an independently formed entity established by Horanyi (and others) long before he and the named defendants joined Luminate (not, as Luminate incorrectly states, in October 2024, *see* Mot. at 12). Horanyi serves as its manager and his San Marcos home address is an address for the company. (Horanyi Decl. ¶4; Ex. 1).

Luminate's flexible approach to the truth does not stop there; it brazenly misrepresents evidence in its Motion. For example, at pages 9 and 10 it claims that Horanyi was contractually forbidden from soliciting employees, and purports to quote extensively from Section 5.8 of an agreement. But Luminate's quote picks up the section in the middle, ***omitting the very first sentence of the section***. That sentence directly contradicts Luminate's representations, by making clear that all of the employees of the NEO division who came over with Horanyi were exempted: "***The prohibitions detailed in this Section do not apply to any individual Employee recruited to join [Luminate] to work at [NEO].***" Horanyi was explicitly allowed to solicit Luminate employees who worked for his NEO entity, notwithstanding the legerdemain of Plaintiff's motion.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

Third, while Luminate's Motion asserts that it faces (unquantifiable) imminent harm that justifies a TRO, its Complaint admits that it *only* seeks monetary damages and does not request permanent injunctive relief. This creates a fatal contradiction: while the Motion demands an injunction to prevent Defendants from using allegedly misappropriated information pending resolution of the merits, the Complaint fails to request a permanent injunction to enforce those restrictions. This inconsistency confirms that injunctive relief is neither necessary to prevent irreparable harm nor is it viewed by Luminate as essential. Equally remarkable, Luminate's Motion asserts that monetary damages are inadequate, yet the Complaint *exclusively* seeks monetary remedies—$10 million in actual damages and $50 million in punitive damages—further undermining its argument for extraordinary relief.

Finally, as a procedural matter, Luminate's evidence is inadmissible because it is presented solely through Luminate's out-of-state outside counsel, Lucas Markowitz. He lacks personal knowledge of the facts and cannot establish a foundation for any alleged business records. Mr. Markowitz is neither an employee nor an officer of the company. And notably, Markowitz's declaration does not even attempt to authenticate the Asset Purchase Agreement ("APA"), which is central to Luminate's ownership claim; instead, the APA is merely attached as "Exhibit A" to the Motion with no attempt at authentication.

Luminate's Motion is unsupported by law or fact. It is not filed to pursue legitimate legal relief. It is an attempt by a scorned partner to use this Court's authority to prevent lawful competition. The Court should deny the Motion.

## II.    Statement of Relevant Facts

### A.    NEO's Formation, Vision, and Early Development

Long before any involvement with Luminate, Horanyi, Ryan Grant, Chris Ledlie, and others formed NEO as an independent company, to address inefficiencies in retail mortgage operations. (Horanyi Decl. ¶4). Among them,

NEO's three co-founders have a combined fifty years of experience in the retail mortgage market. Based on this experience, NEO has designed its own well-established and lucrative brand, as well as its own unique financial models, a workflow known as "The NEO Way," and many other policies, practices, and resources. (Horanyi Decl. ¶6; Grant Decl. ¶13; Ledlie Decl. ¶6). These have become the cornerstone of its operations over the course of its existence. (Horanyi Decl. ¶¶6-7; Grant Decl. ¶16; Ledlie Decl. ¶9). Horanyi serves as NEO's managing member (a member of the Board of Managers), and, under NEO's LLC agreement, decisions to transfer membership interests in the LLC required the consent of the Board of Managers. (Horanyi Decl. ¶¶4-7).

NEO's intellectual property includes its email domain (@neohomeloans.com), intranet ("NEONet"), and its trademark, for which the application was filed well before any association with Luminate or its affiliates. (Horanyi Decl. ¶5; Ex. 2; Grant Decl. ¶¶8-9). NEO has always associated with other companies, including Celebrity, Luminate, and now Better, but it has done so in order to access certain shared services, such as licensing, compliance, and human resources, and has continued to own its own brand, trademark, proprietary information and intellectual property. While operating under the umbrella of Celebrity, for example, NEO leveraged Celebrity's infrastructure for compliance, licensing, and administrative tasks. (Horanyi Decl. ¶¶6-7; Grant Decl. ¶13; Ledlie Decl. ¶6).

NEO's consistent independence, whether under Celebrity or, later, under Luminate, underscores NEO's unique identity and control over its operations and intellectual property. (Horanyi Decl. ¶7). Importantly, NEO has never sold its assets to any entity, be it Celebrity, Luminate, or Better. (Horanyi Decl. ¶7; Grant Decl. ¶14; Ledlie Decl. ¶7). With respect to Celebrity, NEO never sold or transferred ownership of its assets to that company. Indeed, NEO's LLC Operating Agreement makes clear that if it ever were to sell its assets, it would

cease to exist. (Horanyi Decl. ¶7; Ex. 3). Although Luminate argues that it acquired NEO's assets under the APA, NEO Services LLC was not a signatory to that document, and Luminate has not, and could not, submit any evidence showing that NEO Services LLC ever sold its intellectual property assets. (Horanyi Decl. ¶9)

## B.    Discussions and Partnership With Luminate

In mid-2022, as Celebrity faced financial challenges, NEO and its leadership began exploring partnerships to stabilize operations. (Horanyi Decl. ¶10). In the late spring or early summer of 2022, Luminate's CEO, Taryn Reuter, contacted Horanyi about partnering with Luminate. (Horanyi Decl. ¶10) This led to a meeting in early August 2022, followed by additional meetings in late August and September 2022 focused on partnership terms, including stock grants, warrants, profit-and-loss structures, and the possibility of NEO taking over the Luminate Home Loans brand. (Horanyi Decl. ¶¶10-12; Grant Decl. ¶¶18-19; Ledlie Decl. ¶¶10-11). In November 2022, Mr. Reuter asked Horanyi to send Mr. Reuter NEO's detailed financial information (known as pro-formas) for review to his personal Gmail account. (Horanyi Decl. ¶13).

Prior to the August meeting with Mr. Reuter, Luminate and NEO Home Loans executed a "Mutual Non-Disclosure Agreement," dated August 11, 2022. (Horanyi Decl. ¶11; Ex. 4). Mr. Reuter signed on behalf of Luminate, and Horanyi signed on behalf of Neo Home Loans. (*Id.*). The address for any notices for Neo Home Loans was the same address as that for Neo Services, LLC. (*Id.*). Paragraph 1 of the Agreement expressly contemplated that Luminate was seeking to discover "Proprietary Information" *owned by* Neo Home Loans: "For purposes of this Agreement. . . the Parties acknowledge and agree that (A) all Proprietary Information disclosed by a Party shall be deemed to be the Proprietary Information of such Party." (*Id.*). Notably, Celebrity was not a signatory to this Agreement, nor is it mentioned anywhere in the Agreement. (*Id.*).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

Throughout their meetings, Mr. Reuter assured NEO leadership, including Horanyi, that NEO would maintain its autonomy and protection of its intellectual property. (Horanyi Decl. ¶13; Grant Decl. ¶20). Luminate's assurances mirrored NEO's prior arrangement with Celebrity, which ensured that NEO's intellectual property remained independent and uncompromised. (Horanyi Decl. ¶14; Grant Decl. ¶21). Mr. Reuter also committed that Luminate would not interfere with NEO's assets without explicit agreement from NEO. (Horanyi Decl. ¶14; Grant Decl. ¶21)

## C.    Transition to Luminate and Operational Challenges

This independence was crucial to NEO and Horanyi and led them to partner with Luminate in December 2022. (Horanyi Decl. ¶¶15-16; Grant Decl. ¶¶23-24). While Luminate claims it fully rebranded NEO, in reality, NEO continued using its own branding and retained ownership of its trademark. (Horanyi Decl. ¶15). This transition involved hundreds of NEO employees and represented a comprehensive business-to-business partnership rather than a simple employer-employee relationship. (Horanyi Decl. ¶16). Indeed, Luminate even issued a press release heralding the relationship *with NEO*:

> Over the next few weeks, Luminate is excited to be welcoming NEO Home Loans and the company's 200+ employees to the team. Over the past three years, NEO has experienced tremendous growth, and even amidst today's challenging market, they are on track to fund over 1.5 billion by the end of the year. This is a remarkable feat and is attributed to their belief in helping build financial wealth and wellness for each of their clients and team members.

(Murtagh Decl. ¶10; Ex. 6).

As part of the transition, Horanyi and the NEO leadership insisted that any agreements with Luminate recognize NEO's independence by including the right for them to solicit NEO colleagues to leave and join them elsewhere. (Horanyi Decl. ¶17; Grant Decl. ¶22). This was consistent with Mr. Reuter's assurance that NEO could depart at any time without interference from Luminate. (Horanyi Decl.

¶17; Grant Decl. ¶22). Horanyi signed a "Non-Producing Division President Employment Agreement" with Luminate ("Horanyi Employment Agreement") with NEO's non-solicitation carve out reflected in section 5.8:

> Non-Solicitation of Employees. ***The prohibitions detailed in this Section do not apply to any individuals Employee recruited to join the Company to work at the Division***. However, Employee should not violate any restrictive covenants he/she may have to prior employers in recruiting any individuals to join the Company. It is the Company's requirement that any preexisting restrictive covenants are complied with, as detailed in Article VI.

(Horanyi Decl. ¶18; Compl. ¶39; Exhibit 3; ECF. 1-4). As a result, Luminate explicitly allowed Horanyi to solicit the very employees it now alleges he was contractually prohibited from soliciting. And while Luminate claims that Lee also solicited employees, it fails to provide or cite to any employment agreement that she might have signed, despite the fact that her counsel has repeatedly requested her personnel file.[4] (Murtagh Decl. ¶7).

NEO joined Luminate as an independent entity, with Luminate aiming to establish NEO as its mortgage arm. (Horanyi Decl. ¶16). Luminate had a small mortgage operation that was expected to struggle in worsening market conditions, while NEO was positioned to create a strong, competitive unit. (*Id.*) The initial plan involved NEO taking over Luminate's limited mortgage operations, including its production team, to become a fully independent unit. (*Id.*; Grant Decl. ¶19; Ledlie Decl. ¶11). But over the course of negotiations between Luminate and NEO, Luminate's offers either significantly undervalued NEO or imposed lending terms that were excessively burdensome, including high interest

---

[4] Luminate alleges that Lee is subject to restrictions in the Luminate Handbook. (Compl. at ¶¶ 46 and 52; ECF. No. 1). It is obvious from even a cursory glance at the Handbook (Compl. Ex. 4 and 5; ECF Nos. 5 and 7) that it does not contain equivalents to §§ 2.4, 5.3, 5.8, and 5.9 of Horanyi's Employment Agreement.

rates and additional fees, rendering the deal unfeasible. (Horanyi Decl. ¶21). Accordingly, in mid-2024, NEO leadership began to explore a partnership with Better, in case negotiations with Luminate failed. (Horanyi Decl. ¶23; Grant Decl. ¶31). During NEO's discussions with Better, Horanyi and Lee ensured they did not share Luminate's confidential information. They only provided NEO-owned data, such as NEO's workflows and financial models, but withheld the underlying hard data which NEO considered proprietary to NEO. (Horanyi Decl. ¶24; Lynn Decl. ¶¶22-23). Better requested certain financial information from NEO—which was similar to, but actually less detailed than, what Luminate had sought when it was assessing the NEO partnership to assess NEO's potential profitability at Better. (Lynn Decl. ¶¶22-23). Better did not ask for any Luminate's confidential information, and NEO did not intentionally send any such information. (Lynn Decl. ¶23). Luminate was aware and did not object to NEO providing documents to Better for evaluating a potential partnership (Horanyi Decl. ¶23).

### D.    Termination of the Individual Defendants

By October 2024, it was becoming increasingly clear to Horanyi and the NEO leadership team that Luminate was unwilling or unable to partner with NEO on mutually-agreeable terms (Horanyi Decl. ¶25¶). The NEO executives scheduled a meeting with Mr. Reuter for October 25 to discuss the status of negotiations and whether NEO should move to Better or stay with Luminate. (Horanyi Decl. ¶26; Grant Decl. ¶33).

During the video meeting on October 25, as Horanyi began to speak, Mr. Reuter abruptly said, "I'm going to cut you off. This is your last day; a decision has been made." (Horanyi Decl. ¶27; Grant Decl. ¶33¶). Mr. Reuter then expressed his view that Horanyi had taken proprietary information, at which point Horanyi objected that the information belonged to NEO. (Horanyi Decl. ¶28). When asked if legal action was necessary, Mr. Rueter said, "we aren't going to sue you guys," and told Horanyi that Luminate would work with NEO on

1   transitioning operations to Better. (*Id.*). At that point, the NEO team had not

2   committed to joining Better or finalized any transition plans. (Horanyi Decl. ¶29).

3   However, after the abrupt termination of Horanyi and Lee, they decided to join

4   Better. To be clear, through the Individual Defendants' very last day with

5   Luminate, NEO acted in good faith. Horanyi Decl. ¶29).

6   ### E.    NEO's Transition to Better

7    Far from being the victim of "poaching" or the "theft" of a division (as

8   Luminate fulminates in its Motion), Luminate *actively cooperated and*

9   *coordinated* with both NEO and Better to facilitate the transition of NEO's team

10  and assets. (Horanyi Decl. ¶28; Grant Decl. ¶34; Ledlie Decl. ¶¶17, 19-22, 26-29,

11  32, 34-40). Certain employees, including Sydney Lynn were specifically and

12  explicitly tasked by Taryn Reuter and others with assisting and facilitating NEO's

13  transition to Better. (Lynn Decl. ¶42; Ledlie Decl. ¶¶17, 19-21, 32). A few

14  examples of this facilitation—which occurred mostly in November and early

15  December, include:

16  - Luminate's Chief of Staff, Courtney Nuness, drafted and sent to Mr. Ledlie

17    a list of items that NEO employees should leave at Luminate during their

18    transition to Better, and gave approval for employees to send Marketing

19    Services Agreement, leases, and desk rentals to Better (Ledlie Decl. ¶32);

20  - Ms. Nuness told NEO that employee loans at Luminate Home should be

21    terminated or moved by December 1, 2024, because "they can start at Better"

22    (Ledlie Decl. ¶24);

23  - Within Luminate, rosters of NEO employees who Luminate wanted to move

24    to Better were circulating as early as November 12, 2024, and at one point

25    Ms. Nuness suggested NEO employees be offboarded in early December

26    (Ledlie Decl. ¶¶26-28); and

27

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

- Luminate received and approved Better "offboarding plans," "transition roadmaps" and wind-down action items in late November and early December (Ledlie Decl. 31-33).

This cooperation presumably aligned with Luminate's business decision to shutter NEO, as well as its own interests, as Luminate would have had no need to continue supporting the salaries and office leases for NEO's team (which had been accounted for on NEO's P&L statements) without its producers and employees.

## F.    Luminate's Allegations,  Defendants' Proactive Measures and Collaboration

On December 2, 2024, in the midst of this extensive cooperation and assistance, Luminate made a bewildering about-face and filed a lawsuit (ECF No. 1) alleging that Better had, in fact, "poached" NEO. Since Luminate filed this lawsuit, the Individual Defendants, along with non-party Sydney Lynn, have preserved and segregated the alleged "trade secrets." This data preservation took place under by data recovery vendors, who have access to these materials pending the resolution of this action. (Horanyi Decl. ¶32; Rosenberg Decl. ¶¶8-30; Lynn Decl. ¶36). Moreover, Ms. Lynn has provided a sworn declaration that her backup of her NEO laptop computer to a hard drive while she was still employed was undertaken to prevent the loss of NEO's data (Lynn Decl. ¶31), that she has not accessed that hard drive since she was terminated by Luminate (*id.* ¶35), that she has not provided any files from that hard drive to anyone, and that she does not have access to the hard drive because it is in the possession of the data recovery vendor. (Lynn Decl. ¶¶35-36)

Defendants have communicated all of this information to Plaintiff and have maintained transparency to address Luminate's concerns. (Murtagh Decl. ¶3; Ex. 1)

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY                    Case No.: 3:24-cv-02251-BAS-MSB

### III. Legal Standard

A preliminary injunction is "an extraordinary remedy" that may only be granted if Plaintiff demonstrates: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The same legal standard applies to a motion for a temporary restraining order and a motion for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *RMS, NA. Inc. v. RMS (Aus) Pty Ltd.*, No. 24-cv-01366-AJB-MMP, 2024 BL 368461, at *6 (S.D. Cal. Oct. 15, 2024). The moving party bears the burden of demonstrating the four *Winter* factors. *Winter*, 555 U.S. at 20. As discussed below, Plaintiff has failed to meet its burden.

Plaintiff also seeks early expedited discovery. Courts generally require movants to show "good cause" which "may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Grooms v. Legge*, CASE NO. 09cv489 - IEG - POR, 2009 BL 362879, at *12 (S.D. Cal. Mar. 17, 2009) (citing *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D.Cal.2002)). Plaintiff has not shown "good cause," particularly since it is not seeking expedited discovery to obtain evidence to preserve the status quo. Rather, it seeks to radically transform the status quo on an expedited basis. *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 7 (D. D.C. 2006).

### IV. Argument

#### A. Luminate Fails to Prove Ownership of Alleged Trade Secrets

In Counts III and IV of Luminate's Complaint, it alleges violations of the DTSA and the CUTSA. These claims are unlikely to succeed as an initial matter because Luminate cannot establish ownership of NEO's proprietary assets.

1  Proving ownership of the trade secrets in question is a prerequisite to any

2  misappropriation claim.

3      Luminate relies on Section 6.5 of the APA to assert its ownership of NEO's

4  confidential information (Mot., at 4-10). However, the APA's language does not

5  list or identify any of NEO's trade secrets that Luminate claims were taken as part

6  of the "Purchased Assets." The APA merely references broad categories of assets

7  allegedly purchased from Celebrity (and not from Neo Services LLC, which

8  owned the assets and was not a party to the Agreement) but **does not explicitly**

9  **list or describe any intellectual property, operational workflows, or**

10  **proprietary materials Luminate now claims as trade secrets**. (Motion, Ex. A;

11  ECF No. 4-2). Instead, these materials were and remain the property of NEO, an

12  independent LLC owned and operated by Defendant Horanyi before and after the

13  APA was executed. (Horanyi Decl. ¶¶8-11).[5] Without explicit language in the

14  APA transferring ownership of specific proprietary assets, Luminate's claims to

15  these materials lack any factual or legal foundation.

16      In any event, where there is conflicting evidence, injunctive relief must be

17  denied. *See SPS Techs., LLC v. Briles Aerospace, Inc.*, No. CV 18-9536-MWF

18  (ASx), 2019 at *9 (C.D. Cal. Mar. 11, 2019); *JDA Software, Inc. v. Bissett*, 282

19  Fed. App'x 532 , 535 (9th Cir. 2008) ("In light of conflicting evidence on the

20  question of whether Bissett obtained from JDA or Manugistics confidential

21  information useful to him in his new position, the District Court did not clearly

22  err in determining that JDA had not produced sufficient evidence to prevail on its

23

24  _____

  [5] Moreover, NEO Home Loans continued to operate independently after the APA,

25  further undercutting Luminate's claims of ownership. NEO retained its own

26  trademark, used distinct email domains, and maintained a separate business

27  identity. These factors confirm NEO's operational autonomy and proprietary

28  control over its intellectual property and processes. Trademark ownership and

  independent branding mean that NEO, not Luminate, retained control over its

  business tools, workflows, and data. Luminate's cannot assert rights over NEO's

  assets in the absence of clear contractual terms transferring ownership.

1    factual claims for purposes of a preliminary injunction."); *Marina Vape, LLC v.*

2    *Nashick*, No. 16-cv-1028-JAK (JEMx), 2016 U.S. Dist. LEXIS 189500, 2016 WL

3    9086939, at *11-12 (C.D. Cal. May 6, 2016) (denying motion for preliminary

4    injunction where "competing evidence [was] presented by the parties"); *Waste*

5    *and Compliance Mgmt, Inc. v. Stericycle, Inc.*, No. 17-cv-967-DSM, 2017 U.S.

6    Dist. LEXIS 162889, 2017 WL 4358145 , at *6 (S.D. Cal. Oct. 2, 2017) (denying

7    motion for preliminary injunction, "declin[ing] to resolve these factual disputes

8    on such a limited record," and "find[ing] Plaintiff has not demonstrated a

9    likelihood of success on the merits").

10    **B.    Luminate Identifies No Legally Cognizable Trade Secrets**

11        Luminate also cannot succeed on claims for trade secret misappropriation

12    because it has not identified the alleged trade secret with reasonable particularity.

13    Luminate "must identify the trade secrets and carry the burden of showing they

14    exist." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir.

15    2020); *Probo Med., LLC v. Heart Med., LLC*, No. 24-cv-0433-BAS-VET, 2024

16    BL 257235, at *4 (S.D. Cal. July 26, 2024) (this court denied a preliminary

17    injunction, in part, because plaintiff failed to "clearly refer to tangible trade secret

18    material rather than referring to information which potentially qualifies for trade

19    secret protection.") (internal quotations omitted). To do so, Luminate "should

20    describe the subject matter of the trade secret with sufficient particularity to

21    separate it from matters of general knowledge in the trade or of special knowledge

22    of those persons . . . skilled in the trade." (*Id.*) (citations omitted). This is

23    particularly true when seeking an injunction. *Agency Solutions.Com, LLC v.*

24    *TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011) (holding that

25    "a party seeking injunctive relief must describe the subject matter of the trade

26    secret with sufficient particularity […]") (citations omitted). As a result, Luminate

27    must clearly (1) "identify what the thing is that is alleged to be a trade secret[;]"

28    and (2) "articulate why that thing belongs in the legal category of a trade secret."

1    *Agency Solutions.Com*, 819 F. Supp. 2d at 1015 (citations omitted). Plaintiff fails
2    to do either.

3         In its filings, Luminate improperly relies on overly broad and vague
4    categories of information that do not qualify as trade secrets under the law, which
5    requires such information to derive independent economic value from not being
6    generally known and to be subject to reasonable efforts to maintain secrecy. *See*
7    Cal. Civ. Code § 3426.1(d); 18 U.S.C. § 1839(3). For example, facility leases,
8    certain employee data, and branch-specific financial reports are either publicly
9    available, generic operational documents, or lack the requisite economic value to
10   qualify as trade secrets. Similarly, "proprietary" or "confidential" information is
11   neither synonymous with, nor equivalent to, a trade secret. *TriNet Grp., Inc. v.*
12   *Krantz*, 2017 WL 10702187, at *3 (C.D. Cal. Aug. 4, 2017) ("'confidential and
13   proprietary information' . . . and 'trade secrets'…are neither synonyms nor
14   coextensive . . . [plaintiff] use[s] them interchangeably, thereby rendering the []
15   claim unintelligible"). Therefore, even if Plaintiff demonstrates that some of the
16   materials described in its Motion are proprietary or confidential, that alone does
17   not satisfy the legal requirements to establish that they qualify as trade secrets.

18        Luminate's reliance on the APA is also insufficient. Section 1.1 of the APA
19   defines "Intellectual Property" as patents, copyrights, trademarks, trade secrets,
20   and other confidential business information. (Motion, Ex. A; ECF No. 4-2).
21   However, the materials Luminate alleges were misappropriated, such as facility
22   leases (Compl. ¶77), training materials (Compl. ¶109), third-party contracts
23   (Compl. ¶109), loan processing procedures (*id.*), economic models (*id.*), and
24   employee data (Compl. ¶77) are not patents, copyrights, or trademarks, even if
25   they had been owned by Celebrity and transferred to Luminate. Nor were any of
26   those restrictions referenced or incorporated into agreements signed by the
27   Individual Defendants. Luminate attempts to circumvent the statutory limitations
28   imposed by CUTSA and DTSA by redefining the terms of an agreement that it

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

signed with a non-party. Luminate's failure to identify specific, legally qualifying trade secrets renders its request for injunctive relief legally untenable.[6]

### C.    Luminate Will Not Succeed on Contract-Based Claims.

Luminate will not prevail on Counts I, II, or V for breaches of contract, fiduciary duty, and tortious interference. First, with respect to the contract clam and the tortious interference claim, Luminate does not cite any contract signed by Lee that she allegedly violated or with what she allegedly interfered. Moreover, as set forth earlier, the cited contract with Horanyi explicitly allows him to solicit all of the NEO employees (Compl. ¶17) that joined Luminate from Celebrity. (Compl. Exhibit 3; ECF. No 1-4 at section 5.8). Luminate's injunctive relief application, based on its allegation that Horanyi and Lee "expressly violated Defendant Horanyi's non-solicitation provision" by "us[ing] their positions of trust and power at Luminate to solicit all the key branch leaders, high producers, and other individuals…." (Mot. at pp. 26-27) is, if true, exactly what Luminate intended when NEO joined, and what Horanyi's Employment Agreement allows him to do.

With respect to the fiduciary duty claim, Luminate concedes that California specifically permits employees to "prepare to compete prior to resigning" (Mot. at 33), but notes that the employee should not "solicit customers" or do "other acts in direct competition." But Luminate then simply hurls invective, perhaps because there is zero evidence that Horanyi or Lee solicited any customers or did anything other than what Horanyi's contract expressly permitted. Moreover, Luminate

---

[6] Luminate's claims also fail because much of the information (within the broad categories they cite) are either publicly available or not a trade secret. *See* Horanyi Decl. ¶31 (explaining that "broker process flow and team flow are available through public sources," the "names of NEO's branches and employees can be found through internet searches or LinkedIn," that he "knew the employees and branches because [he] and the NEO leadership brought them to Luminate," and that "branch margins are relatively  consistent across companies in specific territories based on market forces, and in fact change frequently.").

1   itself announced to the world on October 25 that it was shuttering the "Neo
2   Division" (Horanyi Decl. ¶18); from that point forward, there was nothing with
3   which to compete.

4       **D.    Luminate's Contract-Based Claims Violate California Law.**

5       California law prohibits restrictions on an employee's ability to compete
6   unless those restrictions fall within narrow statutory exceptions, none of which
7   apply here. Under California Business and Professions Code § 16600, "every
8   contract by which anyone is restrained from engaging in a lawful profession,
9   trade, or business of any kind" is void. The limitation on such agreements date
10  back to the 1800s, and in modern days the California Supreme Court has
11  reinforced this absolute prohibition since at least *Edwards v. Arthur Andersen*
12  *LLP*, 44 Cal. 4th 937, 945-46 (2008) (holding that holding that even narrowly
13  drawn non-compete provisions are unenforceable unless they meet specific
14  statutory exceptions).

15      First, the provisions that purport to restrain the Individual Defendants from
16  competing with Luminate and soliciting its employees after leaving Luminate
17  violate § 16600 because they prevent them from pursuing lawful employment and
18  enterprise. *See AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App.
19  5th 923 (2018) (invalidating an employee non-solicitation clause, reasoning that
20  such provisions impermissibly interfere with employee mobility).

21      Second, Luminate's reliance on overly broad confidentiality agreements
22  operate as *de facto* non-compete provisions that violate section 16600. *See Brown*
23  *v. TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 316-18 (2020) (invalidating an
24  overly broad confidentiality agreement that required confidentiality of all
25  "information, in whatever form, used or usable in, or originated, developed or
26  acquired for use in, or about or relating to, the Business" of "analyzing, executing,
27  trading and/or hedging in securities and financial instruments and derivatives
28  thereon, securities-related research, and trade processing and related

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND EXPEDITED DISCOVERY          Case No.: 3:24-cv-02251-BAS-MSB

1   administration" after their employment."); *see also Dowell v. Biosense Webster,*

2   *Inc.*, 179 Cal. App. 4th 564 (2009) (invalidated a provision restricting a former

3   employee from using customer information.)

4       Similarly, Luminate relies on §§ 2.4, 5.3, 5.8, and 5.9 of Horanyi's

5   Agreement (ECF No. 1-4), but these provisions also fail in California. They

6   purport to unlawfully restrict Horanyi from using skills and knowledge acquired

7   during his employment under the guise of protecting "confidential information"

8   and "trade secrets." For instance, Section 2.4 prohibits him from providing

9   services to other entities without prior written consent, in violation of California

10  Labor Code Section 96. Section 5.3 broadly defines "confidential information" to

11  include non-proprietary data, attempting to convert ordinary knowledge into

12  restricted material and claiming ownership over all employee-created documents

13  and data, which unlawfully interferes with the Individual Defendants' industry

14  skills. Additionally, while not cited by Luminate, section 5.6 purports to imposes

15  a one-year post-employment non-solicitation clause preventing the solicitation of

16  any customers, which California courts have consistently deemed a violation of

17  16600 and unenforceable as a restraint on employee mobility.

18      Under California law,[7] Luminate could not lawfully require Horanyi to sign

19  the Agreement on which it relies (Business & Professions Code 16600.5(c)). The

20  Agreement is therefore void, and, by seeking to enforce the Agreement now,

21  Luminate (a) has committed a civil violation (*Id.* subsection (d)); and (b) Horanyi

22  is entitled to his reasonable attorney's fees and costs (*id.* at subsection (e)).

23      **E.    Luminate's Delay Undermines Its Claims of Irreparable Harm**

24      Despite terminating the Individual Defendants on October 25, 2024 and

25  alleging misconduct and misappropriation of confidential information, Luminate

26

27  _____

    [7]     Despite the fact that much of the paperwork upon which Plaintiff relies is

28  based in Minnesota, its home state, California law applies to any employment
    issues involving the Individual Defendants, pursuant to Labor Code Section 925.

1    waited over two months—until December 26, 2024—to file its Motion, and then

2    sought a hearing another month away. This unexplained and unjustified delay is

3    inconsistent with Luminate's claimed "imminent harm" and suggests that

4    Luminate itself never perceived a threat requiring urgent judicial intervention.

5        Courts in the Ninth Circuit have repeatedly held that delays in pursuing

6    injunctive relief weigh heavily against claims of irreparable harm. In *Oakland*

7    *Tribune, Inc. v. Chronicle Publishing Co., Inc.*, the Court affirmed the denial of

8    injunctive relief, noting that "Plaintiff's long delay before seeking a preliminary

9    injunction implies a lack of urgency and irreparable harm." 762 F.2d 1374, 1377

10   (9th Cir. 1985). Courts have found even relatively short delays sufficient to

11   undermine such claims. *See Dahl v. Swift Distribution, Inc.*, No. CV 10-00551

12   SJO (RZx), 2010 WL 1458957, at *4 (C.D. Cal. Apr. 1, 2010) (18-day delay

13   "implies a lack of urgency and irreparable harm.") (citations omitted); *Sanchez v.*

14   *Sanchez*, No. 10-CV-1628 JLS RBB, 2010 WL 4790179, at *5 (S.D. Cal. Nov.

15   17, 2010) (plaintiff failed to "demonstrate immediate threatened injury as a

16   prerequisite to preliminary injunctive relief" after a 26-day delay in seeking

17   injunctive relief) (*citing Carribean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d

18   668, 674 (9th Cir. 1988)). Luminate's two-month delay far exceeds these

19   timeframes, making its claims of irreparable harm even less credible.

20        Furthermore, Luminate's actions during this period of delay contradict its

21   assertions of urgency. Rather than promptly seeking relief, Luminate continued

22   helping NEO to facilitate the transition of employees, assets, and operations. Even

23   after filing its complaint on December 2, 2024, Luminate continued some of these

24   cooperative efforts, demonstrating that it did not view the situation as an

25   emergency requiring immediate intervention. This conduct is wholly inconsistent

26   with the behavior of a party facing an urgent and irreparable threat and further

27   undermines the credibility of its claims. Accordingly, the Court should deny

28   Luminate's motion for a TRO and preliminary injunction.

1      **F.    Luminate's   Speculative   Claims   of   Harm   Cannot   Justify**

2           **Injunctive Relief and are Compensable by Monetary Damages**

3          Luminate's claims of harm are speculative and, even if proven, fully

4    compensable by monetary damages, making injunctive relief inappropriate

5    Luminate claims it seeks emergency relief because "it [is] impossible to currently

6    calculate the extensive revenue that will be lost from Defendants' unlawfully built

7    NEO division, the illicit recruitment of Luminate's employees, and from the future

8    business   that   Luminate   would   have   derived   without   the   intervening

9    competition."[8] (ECF No. 4-1, p. 35). However, the Complaint does not seek

10   equitable remedies, claiming, instead, that Defendants' actions are worth $10

11   million in actual damages and $50 million in punitive damages. Thus, while

12   Luminate argues in the Motion that its losses are incalculable, its Complaint

13   calculates the alleged harm at $10 million, confirming that monetary remedies are

14   adequate.

15         Luminate's allegations of reputational harm and goodwill are similarly

16   deficient. It cites *Stuhlbarg International Sales Co. v. John D. Brush & Co.*, 240

17   F.3d 832, 841 (9th Cir. 2001), to support its claim that "threatened loss of

18   prospective customers or goodwill certainly supports a finding of the possibility

19   of irreparable harm" (Mot. at 36). However, injunctive relief is inappropriate

20   when claims are based on "pronouncements grounded in platitudes rather than

21   evidence." *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239,

---

22   [8] On September 10, 2024, while NEO and Luminate were discussing the future of

23   their partnership, Luminate filed an updated Statement of Information with the

24   California Secretary of State. In this filing, Luminate made two notable

25   representations. First, it stated that it had no offices in the State of California.

26   Second, it declared that its "Type of Business" was "dealing in gold and silver

27   bullion," unlike its 2023 Statement of Information that listed its business as a

28   "Mortgage Lender." Luminate provided no explanation for this significant shift in

its business classification. These representations to the Secretary of State appear

to be either false or inconsistent with its claims in this action that it intended to

function as a mortgage lender. *See* Murtagh Decl. ¶ 8; Exs. 4 and 5)

1250 (9th Cir. 2013) (citing *Winter*, 555 U.S. at 22). This is even more true because Luminate announced the shuttering of NEO and substantially withdrew from the market.

And Luminate provides no actual evidence of likely irreparable harm. The Individual Defendants operated under the NEO brand with minimal public association with Luminate, making any alleged reputational harm speculative. Luminate fails to cite tangible harm, such as lost clients, market share decline, or measurable negative industry impact. Its imminent harm assertions are inherently speculative. Luminate's claim of competitive harm is also unsupported by specific facts and its sole support is the conclusory declaration of outside counsel, who lacks personal knowledge the unsupported conclusions alleged therein. It alleges that the Individual Defendants' actions may harm its competitive position, but fails to provide evidence that confidential information was used to secure clients or disrupt operations. Even if Luminate's claims were substantiated, any harm would be quantifiable and compensable through monetary damages, as the alleged loss of clients or revenue can be calculated using historical data and projected future losses. Claims related to trade secret misappropriation fall under the DTSA and CUTSA, which allow for damages based on actual losses and unjust enrichment. Costs incurred to address alleged harms, such as implementing data security measures or pursuing legal remedies, are also calculable and compensable. Thus, any potential harm Luminate alleges is compensable through monetary damages, and its failure to demonstrate immediate or irreparable harm further undermines the extraordinary remedy it seeks.

## G.    The Balance of Equities Strongly Favors Defendants

The balance of equities strongly weighs against granting Luminate's proposed injunction because Luminate faces no credible threat of irreparable harm. All Defendants have implemented robust data sequestration protocols, preserving allegedly sensitive information and eliminating the need for further

21

1  emergency measures. Despite these efforts, Luminate abandoned negotiations in

2  favor of this Motion, seeking relief it could have obtained through stipulations or

3  ordinary discovery.

4      In contrast, the proposed injunction would impose severe burdens on the

5  Individual Defendants, demanding the turnover of personal devices and email

6  accounts, including privileged communications and third-party confidential

7  information. It fails to adequately safeguard these sensitive categories, allowing a

8  forensic examiner undue discretion to determine relevance—functions that should

9  remain with the Court.

10      Luminate's injunction is also overly broad and lacks adequate protections

11  for the Individual Defendants' privacy and privilege. It demands access to all

12  personal and professional devices, cloud storage, and email accounts used over

13  the past 12 months without safeguards for irrelevant or sensitive data. The

14  proposal imposes unreasonable timelines, requiring responses to expansive

15  discovery requests within 14 days and depositions within 30 days, while placing

16  the compliance costs on Defendants. This request improperly delegates judicial

17  functions to a forensic examiner, risking the collection of privileged or irrelevant

18  data. Given the Defendants' existing data protocols, these invasive measures are

19  redundant and unjustified.

20      Additionally, the proposed injunction violates Rule 65(d) by lacking the

21  specificity and clarity required. It ambiguously prohibits and mandates actions

22  regarding "confidential, proprietary, and/or trade secret information" without

23  clear definitions, creating a substantial risk of inadvertent noncompliance.

24      Luminate's speculative claims do not justify the extraordinary relief sought.

25  The vague terms, overreach, and disproportionate burdens of the proposed

26  injunction far outweigh any potential risks to Luminate, strongly supporting the

27  denial of the Motion.

28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

## H.   Expedited Discovery is Unwarranted

Luminate seeks expedited discovery, all at Defendants' expense (Complaint ¶¶47-49, 68-71, 86-87). While Luminate's brief does not address the standard or provide any argument regarding this request, its requests are premature, baseless, and not supported by good cause.

As an initial matter, the Complaint's failure "to satisfy the threshold requirement to identify the secrets with specificity" alone makes its claims ripe for dismissal, which would preclude discovery altogether. *P2i Ltd. v. Favored Tech USA Corp.*, No. 23-CV-01690-AMO, 2024 WL 4294652, at *3 (N.D. Cal. Sept. 24, 2024) (dismissing trade secret misappropriation claim where plaintiff "fails to identify its purported trade secrets with sufficient specificity…'"). But even if the claims were valid, courts regularly deny invasive and overly broad discovery requests when good cause is lacking. *Henry Schein Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078-79 (N.D. Cal. 2016) (denying plaintiff's motion for expedited discovery, which included forensic imaging of the defendant's personal email accounts, devices, and storage drives, for lack of good cause and significant intrusion into personal data). Similarly, in this case, there is no justification for expedited access to Defendants' private data, privileged communications, or third-party confidential information, especially since Defendants have agreed to preserve relevant evidence.

Furthermore, Plaintiff is not seeking expedited discovery to maintain the status quo. As discussed herein, there is no imminent harm, and Defendants have already secured the allegedly misappropriated materials and agreed not to access them. Instead, Plaintiff's true aim is to collect evidence to support its claims, and it is improperly requesting the Court's assistance to expedite this process. Any legitimate issues of discovery can and should be resolved in the ordinary course by the Court, and the Court should deny Luminate's motion for expedited discovery.

## I.    Luminate Has Produced No Competent or Admissible Evidence

The evidence that Luminate submitted in support of its motion consists solely of a declaration from Lucas Markowitz, its out-of-state counsel who has not been granted admission *pro hac vice* by this Court. More importantly, Mr. Markowitz has no personal knowledge of the facts and exhibits annexed to his declaration. His declaration lacks foundational facts to establish his personal knowledge of the issues underlying the Motion, including Luminate's internal decisions, procedures, and communications. Therefore, both the declaration and the referenced exhibits are inadmissible. *See Citcon USA, LLC v. MaplePay Inc.*, No. 19-cv-02112-NC, 2021at *9 (N.D. Cal. Apr. 2, 2021) (denying motion because an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") As a result, Luminate's evidence, consisting solely of Mr. Markowitz's inadmissible declaration, fails to establish the necessary personal knowledge required to support its motion and injunctive relief must be denied as a result.

## V.    Conclusion

For the foregoing reasons, Luminate has failed to meet the legal and factual standards required for injunctive relief. Defendants respectfully request that the Court deny Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction in its entirety.[9]

---

[9]    If the Court grants Plaintiff's Motion, it should impose a sufficient bond under Fed. R. Civ. P. 65(d) "to pay the costs and damages sustained" by defendants if they are wrongfully enjoined. Because Plaintiff's Complaint pleads that the value of what it now seeks to enjoin defendants from doing is $10,000,000, that is the minimum amount of bond that the Court should impose. Individual Defendants request an additional 25% to cover the likely costs and fees that would be incurred after such an injunction, for a total of $12,500,000.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY    Case No.: 3:24-cv-02251-BAS-MSB

DATED:  January 10, 2025          Respectfully submitted,

BUCHANAN, INGERSOLL & ROONEY LLP

By:   */s/ Jason E. Murtagh*
          JASON E. MURTAGH

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND EXPEDITED DISCOVERY          Case No.: 3:24-cv-02251-BAS-MSB