JASON E. MURTAGH (SBN 294830)
jason.murtagh@bipc.com
BUCHANAN INGERSOLL & ROONEY LLP
600 West Broadway, Suite 1100
San Diego, CA 92101
Telephone: 619 239 8700
Fax:         619 702 3898

Attorney for Defendants
Daniel Horanyi, Jeanette Lee and Lauren Havins

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## SAN DIEGO

| | |
|---|---|
| LUMINATE HOME LOANS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BETTER MORTGAGE CO., DANIEL HORANYI, JEANETTE LEE, & LAUREN HAVINS, <br><br> Defendants. | Case No.: 3:24-cv-02251-BAS-MSB <br><br> **DECLARATION OF DANIEL HORANYI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** <br><br> Complaint Filed: December 2, 2024 |

I, Daniel Horanyi, hereby declare and state:

1.     I am over the age of 18 and competent to testify to the matters set forth herein. The statements contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.     I submit this declaration in support of Defendants' oppositions to Luminate Home Loans. Inc.'s ("Luminate") Motion for a temporary restraining order, preliminary injunction, and expedited discovery.

3.     I have over 20 years of experience in the mortgage industry, beginning my career in 2003 at CTX Mortgage. I subsequently held positions at Signature Funding,

Caliber Home Loans, Loan Depot. Since NEO was founded in or around 2021, I also have held positions associated with Celebrity Home Loans ("Celebrity") and Luminate starting in December 2022.

4.    On or about January 1, 2021, long before joining Luminate, I, Ryan Grant, Chris Ledlie, and others formed Neo Services LLC as an independent company ("NEO"). NEO was designed to address inefficiencies in retail mortgage operations. NEO developed proprietary financial models, workflows, and training programs that became the cornerstone of its operations. I am NEO's managing member and my home address is listed as the mailing address for the company. Attached as **Exhibit 1** is a true and correct copy of the Statement of Information for NEO filed with the California Secretary of State.

5.    NEO's intellectual property included—and to this day includes—its email domain (@neohomeloans.com), intranet ("NEONet"), and its "NEO Home Loans" trademark, for which the application was filed well before any involvement with Luminate or its affiliates. Attached as **Exhibit 2** is a true and correct copy of NEO's trademark issued by the United States Patent and Trademark Office under Registration No. 7184182 and the history of that mark.

6.    While operating as a separate unit under the umbrella of Celebrity, NEO maintained its independence, trademarks, and developed its own proprietary information and systems, such as "The NEO Way" workflow. NEO leveraged Celebrity's infrastructure mainly for compliance and administrative tasks, as well as warehouse funding.

7.    Importantly, NEO has never sold its assets to any entity, be it Celebrity, Luminate, or Better. Whenever NEO is associated with an entity, it tries to be a good partner and provide materials and information that the entity might find useful. But it has always retained ownership of its own assets. This is outlined in NEO's Limited Liability Company Agreement which provides that NEO owns "information that is proprietary to Company or any of its Subsidiaries, including, without limitation, prices,

costs, recipes, software, designs, formulas, code, applications, personnel, knowledge, customer information, supplier information, manufacturer information, distributor information, marketing plans, business plans, data and techniques, other non-public information concerning the business or finances of Company." Relevant portions of the LLC Agreement are attached as **Exhibit 3.** This consistent independence, whether under Celebrity or later, under Luminate, underscores NEO's unique identity and control over its own brand, operations, and intellectual property.

8.    I understand that Luminate has alleged that NEO "utilized Luminate's extensive trade secrets and the insight … acquired from Luminate." I do not believe this statement to be true. From the time of its formation, I and other managers of NEO developed proprietary financial models, workflows, and training programs that became and continued to be the cornerstone of NEO's operations, whether at Celebrity, Luminate, or Better.

9.    In its Motion, Luminate refers to an Asset Purchase Agreement between Celebrity and Luminate (Motion, at 4-10; Exhibit A). Luminate claims that pursuant to the APA, Celebrity owned NEO's assets (including its data, brand, and intellectual property) and that Luminate exclusively acquired NEO assets pursuant to that APA. (Motion, at p. 25). NEO never sold or otherwise transferred ownership of its assets to Celebrity. NEO was not a signatory to the APA and never consented to, or knew of, the alleged transfer of its assets by Celebrity to Luminate. No one at Celebrity or Luminate asked me, or upon information and belief, any of my NEO co-owners to sign the APA or to transfer any of NEO's assets.

10.    NEO and I first began exploring a partnership with Luminate in mid-2022, as Celebrity faced mounting financial challenges. NEO and I were looking for alternative partnerships to ensure the stability of NEO's operations. In the late spring or early summer of 2022, Luminate's CEO, Taryn Reuter, contacted me via text to discuss the potential transition of NEO and its leadership team to Luminate from Celebrity. Shortly thereafter, in early August 2022, Mr. Reuter and Luminate Co-

Founder Eric Lovins met with NEO leaders, including myself, Ryan Grant, Chris Ledlie and Mark Robinson to further explore the possibility of collaboration.

11. Prior to the meeting with Mr. Reuter, he presented me with a "Mutual Non-Disclosure Agreement" to sign. A true and correct copy of that Agreement, dated August 11, 2022, is attached as **Exhibit 4.** Mr. Reuter signed on behalf of Luminate, and I signed on behalf of Neo Home Loans. The address for any notices for Neo Home Loans is the same address that I use for Neo Services, LLC. In my view, the Agreement made clear that NEO owned its own trade secrets and proprietary information, because Celebrity did not sign the Agreement, and it was not mentioned anywhere in the Agreement.

12. These initial discussions set the stage for key meetings that followed. In late August 2022, I, and other members of NEO's leadership visited Luminate's corporate office to discuss the potential partnership in greater detail. During this meeting, the NEO team and Luminate addressed a range of topics, including stock grants, warrants, profit-and-loss structures, and the possibility of NEO taking over the Luminate's Home Loans brand.

13. A follow-up meeting occurred in September 2022, where NEO and Luminate continued refining the terms of our partnership. On November 25, 2022, Mr. Reuter asked me to send NEO's pro-formas for review to Mr. Reuter's personal Gmail account. Throughout these discussions, Mr. Reuter and the Luminate leadership explicitly assured me and NEO's team that NEO would maintain its autonomy, intellectual property, and the ability to move on and transition to partner with another entity if necessary.

14. These assurances mirrored the NEO's arrangement with Celebrity, where its intellectual property, brand identity, and proprietary information remained independent and uncompromised. Mr. Reuter was unequivocal in his commitment that Luminate would not appropriate or interfere with NEO's assets unless explicitly agreed otherwise.

15.     Luminate's assurances were pivotal in my and NEO's decision to partner with Luminate, as they provided confidence that NEO's business model, intellectual property, and autonomy would remain intact under the partnership. NEO continued using its own branding, marketing materials, and operational models, and continued to own its own trademark.

16.     NEO's leadership, including me, joined Luminate in December 2022. Because of this, hundreds of employees that had been working for NEO also transitioned to Luminate, including Ms. Lee. This was not a simple employer-employee relationship; it was a full-blown business-to-business partnership *with NEO* and its founders (including myself).

17.     As part of that transition, the NEO leadership and I insisted that any agreements we signed explicitly include the right to solicit our NEO colleagues to leave and join us elsewhere. This demand was based on the commitment we received from Mr. Reuter, assuring us that NEO could depart at any time without interference from Luminate.

18.     To that end, I signed a "Non-Producing Division President Employment Agreement" with Luminate (my "Employment Agreement"). A true and correct copy my Employment Agreement is annexed as Exhibit 3 to Luminate's Complaint. (Compl. ¶39; Exhibit 3; ECF. 1-4). My Employment Agreement and NEO's non-solicitation carve out demands resulted in section 5.8 which provides:

> Non-Solicitation of Employees. The prohibitions detailed in this Section ***do not apply to any individuals Employee recruited to join the Company to work at the Division***. However, Employee should not violate any restrictive covenants he/she may have to prior employers in recruiting any individuals to join the Company. It is the Company's requirement that any preexisting restrictive covenants are complied with, as detailed in Article VI.

19.     While NEO joined Luminate as an independently owned and operated entity, Luminate's stated goal was to collaborate with NEO to establish it as the mortgage arm of Luminate. Luminate had a small mortgage arm that, upon information and belief, it believed would have trouble weathering the market headwinds that were expected to get worse. By contrast, NEO would create a strong and competitive mortgage unit. The initial plan, as I understood it, was for NEO to take over the small portion of Luminate, including its production team, so that NEO could "stand up" as a full and separate unit.

20.     Luminate apparently changed its mind about how to structure the relationship after I and several hundred employees joined.  In or about May 2023, Mr. Reuter and Eric Lovins told me and the NEO leadership that Luminate was no longer interested in NEO taking over Luminate's production team. Instead, they proposed selling the Luminate subsidiary to NEO. As good faith discussions and negotiations between NEO and Luminate continued, both parties agreed to a mutual "do no harm" principle.

21.     In early 2024, negotiations resumed between NEO and Luminate regarding their corporate relationship. When Luminate finally presented its proposal to NEO in or around March 2024, NEO had no choice but to reject the offer, because it significantly undervalued the assets owned by NEO. Nevertheless, I, and the NEO's leadership continued to negotiate with Luminate to effort to find a mutually beneficial integration.

22.     In late spring and into the summer and fall of 2024 negotiations shifted again with Luminate now proposing returning to its earlier integration proposal where NEO would purchase a Luminate mortgage operation and Luminate would, in turn, lend NEO money to fund its mortgage business. However, Luminate's lending terms were excessively burdensome for NEO Luminate sought interest lending rates (including "rental fee" and "risk premium") at an extremely high rate, making any deal under this new proposed structure unfeasible.

DECLARATION OF DANIEL HORANYI
CASE NO.: 24-CV-2251-BAS-MSB

23.    Throughout 2024, I and the NEO leadership were transparent with Luminate regarding NEO's discussions with Better. I also informed Luminate that a partnership with Better was a longshot. Luminate raised no objections and remained uncertain about solidifying its relationship with NEO. Given this uncertain partnership, in mid-2024, I and the NEO leadership began discussions with Better about the possibility of transitioning its operations if negotiations with Luminate fell through.

24.    During these discussions, I and the other Individual Defendants took pains not to share any confidential information from Luminate; instead, we only shared non-confidential information and materials that belonged solely to NEO. This included NEO's "broker flow," (which is not a Luminate "trade secret," or even a secret, as broker flows are commonly understood in the mortgage industry) as well as workflows, financial models, and limited operational data that NEO developed independently of Luminate. The financial information provided to Better was solely NEO's financial information and was the same kind of information that I recall Luminate requesting when it was assessing whether to partner with NEO.

25.    By October 2024, it became clear to me and NEO leadership team that Luminate was unwilling or unable make a good faith effort to integrate NEO on terms that would be satisfactory to us, leaving the future of our partnership uncertain.

26.    As tensions escalated, I planned to inform Luminate that NEO was considering, but had not yet fully committed to, a separation from the company. I and others scheduled a meeting with Mr. Reuter for on or around October 25, 2024, and prepared an agenda outlining NEO's position. To be clear, this was not the first time I had told Mr. Reuter about NEO's discussions with Better. In or around late spring or early summer of 2024, I told Mr. Reuter that NEO was having conversations with Better about partnering. He did not raise any objections.

27.    On October 25, Mr. Reuter met with me and other NEO leaders and employees via video. As I began to speak, Mr. Reuter abruptly said, "I'm going to cut you off. This is your last day; a decision has been made."

28.    Mr. Reuter then claimed that I was being let go for taking Luminate's proprietary information. I was perplexed and reminded Mr. Reuter that the proprietary information belonged to NEO. Another NEO executive in the room asked Mr. Reuter whether we needed to hire attorneys; Mr. Reuter responded that "we aren't going to sue you guys." He also told us that Luminate would work with us to transition NEO to Better.  The conversation ended. I learned later that Luminate terminated the other individual defendants that same day for alleged misappropriation, and that Luminate had publicly announced that same day that it was shutting down the NEO division. Attached as **Exhibit 5** is a true and correct copy of that announcement.

29.    At that time, neither I nor the other individual defendants had committed to join Better, nor had we finalized any transition plan for doing so. I was shocked by Mr. Reuter's decision, as I believed that our discussions with Luminate were still active. However, following my abrupt termination, we firmly decided to join Better and did so on or about October 29, 2024. Until our very last day with Luminate, it is my belief that I and others at NEO acted in good faith.

30.    Luminate filed a lawsuit against me on December 2, 2024.

31.    I understand that Luminate claims that NEO provided Better with certain information, including training materials, employee information, processing procedures (presumably including broker process flow and team flow), branch margins, and the names of NEO's branches.  In addition to the fact that NEO created the information that Luminate now claims as a trade secret, based on my twenty years of experience in the industry, I believe that these categories of information are either publicly available or do not constitute trade secrets. Just by way of example, broker process flow and team flow are available through public sources. The names of NEO's branches and employees can be found through internet searches or LinkedIn, among other locations, and of course I knew the employees and branches because I and the NEO leadership brought them to Luminate. Finally, branch margins are relatively

DECLARATION OF DANIEL HORANYI

CASE NO.: 24-CV-2251-BAS-MSB

consistent across companies in specific territories based on market forces, and in fact change frequently.

32.    Since Luminate filed this lawsuit, and at the direction of my attorneys, I have preserved and segregated the alleged "trade secrets." This data preservation took place under my counsel's supervision and was done by their data recovery vendors.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 10th day of January 2025, in San Marcos, California.

Daniel Horanyi

DECLARATION OF DANIEL HORANYI

CASE NO.: 24-CV-2251-BAS-MSB

# EXHIBIT 1

BA20220608187

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION**
**LIMITED LIABILITY COMPANY**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: BA20220608187
Date Filed: 8/2/2022

B0976-4339 08/02/2022 2:28 PM Received by California Secretary of State

Entity Details

| | |
|---|---|
| Limited Liability Company Name | NEO SERVICES LLC |
| Entity No. | 202100111543 |
| Formed In | CALIFORNIA |

Street Address of Principal Office of LLC

| | |
|---|---|
| Principal Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |

Mailing Address of LLC

| | |
|---|---|
| Mailing Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |
| Attention | Daniel Horanyi |

Street Address of California Office of LLC

| | |
|---|---|
| Street Address of California Office | None |

Manager(s) or Member(s)

| Manager or Member Name | Manager or Member Address |
|---|---|
| + Daniel Horanyi | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |
| + Mark Robertson | 404 LA VETA AVE<br>ENCINITAS, CA 92024 |
| + Josh Mettle | 8235 SUNRISE LOOP<br>PARK CITY, UT 84098 |
| + Chris Ledlie | 56 BUCKSKIN LANE<br>ROLLING HILLS, CA 90274 |
| + Ryan Grant | 1852 SHADOW MOUNTAIN DRIVE<br>PARK CITY, UT 84098 |

Agent for Service of Process

| | |
|---|---|
| Agent Name | DANIEL HORANYI |
| Agent Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |

Type of Business

| | |
|---|---|
| Type of Business | Consulting Services |

Email Notifications

| | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

Chief Executive Officer (CEO)

| CEO Name | CEO Address |
|---|---|
| None Entered | |

Labor Judgment

No Manager or Member of this Limited Liability Company has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

Electronic Signature

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Daniel Horanyi*                                    *08/02/2022*
Signature                                          Date

B0976-4340  08/02/2022  2:28 PM Received by California Secretary of State

# EXHIBIT 2

**Generated on:** This page was generated by TSDR on 2024-12-11 14:19:35 EST

**Mark:** NEO HOME LOANS



**US Serial Number:** 97223469

**US Registration Number:** 7184182

**Register:** Principal

**Mark Type:** Service Mark

**TM5 Common Status Descriptor:**



**Application Filing Date:** Jan. 17, 2022

**Registration Date:** Oct. 03, 2023

LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Oct. 03, 2023

**Publication Date:** Dec. 13, 2022 **Notice of Allowance Date:** Feb. 07, 2023

# Mark Information

**Mark Literal Elements:** NEO HOME LOANS

**Standard Character Claim:** No

**Mark Drawing Type:** 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S) /NUMBER(S)

**Description of Mark:** The mark consists of a slightly horizontally stretched black hexagon with rounded corners having a light blue bowtie outline design centered inside the hexagon with the word "NEO" in light blue to the right of the hexagon and the words "HOME LOANS" in black and in smaller font below "NEO".

**Color Drawing:** Yes

**Color(s) Claimed:** The color(s) light blue and black is/are claimed as a feature of the mark.

**Disclaimer:** "HOME LOANS"

**Design Search Code(s):** 09.03.15 - Bow ties; Neckties; Ties, neckties or bow ties
26.15.21 - Polygons that are completely or partially shaded

# Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** home mortgage lending; home mortgage lending consulting services for home buyers

**International Class(es):** 036 - Primary Class

**U.S Class(es):** 100, 101, 102

**Class Status:** ACTIVE

**First Use:** Dec. 31, 2020

**Use in Commerce:** Dec. 31, 2020

# Basis Information (Case Level)

**Filed Use:** No

**Filed ITU:** Yes

**Filed 44D:** No

**Filed 44E:** No

**Currently Use:** Yes

**Currently ITU:** No

**Currently 44D:** No

**Currently 44E:** No

| | | | |
|---|---|---|---|
| **Filed 66A:** No | | **Currently 66A:** No | |
| **Filed No Basis:** No | | **Currently No Basis:** No | |

## Current Owner(s) Information

**Owner Name:** Neo Services LLC

**Owner Address:** 100 Spectrum Center Drive #750
Irvine, CALIFORNIA UNITED STATES 92618

**Legal Entity Type:** LIMITED LIABILITY COMPANY    **State or Country** CALIFORNIA
**Where Organized:**

## Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** Daniel Barry    **Docket Number:** NEM-00210T

**Attorney Primary** dan@barryiplaw.com    **Attorney Email** Yes
**Email Address:**    **Authorized:**

**Correspondent**

**Correspondent** Daniel Barry
**Name/Address:** BARRY IP LAW, P.C.
27201 PUERTA REAL, SUITE 300
MISSION VIEJO, CALIFORNIA UNITED STATES 92691

**Phone:** 949-943-2704

**Correspondent e-** dan@barryiplaw.com    **Correspondent e-** Yes
**mail:**    **mail Authorized:**

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Oct. 03, 2023 | NOTICE OF REGISTRATION CONFIRMATION EMAILED | |
| Oct. 03, 2023 | REGISTERED-PRINCIPAL REGISTER | |
| Aug. 29, 2023 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Aug. 28, 2023 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Aug. 04, 2023 | STATEMENT OF USE PROCESSING COMPLETE | |
| Jul. 17, 2023 | USE AMENDMENT FILED | |
| Aug. 02, 2023 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |
| Jul. 17, 2023 | TEAS STATEMENT OF USE RECEIVED | |
| Feb. 07, 2023 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Dec. 13, 2022 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Dec. 13, 2022 | PUBLISHED FOR OPPOSITION | |
| Nov. 23, 2022 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Nov. 04, 2022 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Oct. 26, 2022 | EXAMINER'S AMENDMENT ENTERED | |
| Oct. 26, 2022 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| Oct. 26, 2022 | EXAMINERS AMENDMENT E-MAILED | |
| Oct. 26, 2022 | EXAMINERS AMENDMENT -WRITTEN | |
| Oct. 25, 2022 | ASSIGNED TO EXAMINER | |
| Jan. 25, 2022 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Jan. 24, 2022 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Jan. 20, 2022 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

**Current Location:** PUBLICATION AND ISSUE SECTION    **Date in Location:** Aug. 28, 2023

# EXHIBIT 3

**THE MEMBERSHIP INTERESTS AND UNITS DESCRIBED IN AND/OR REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER SECURITIES LAW OF ANY JURISDICTION. SUCH MEMBERSHIP INTERESTS AND UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED OR DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN. THE MEMBERSHIP INTERESTS AND UNITS DESCRIBED BY THIS LIMITED LIABILITY COMPANY AGREEMENT ARE SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THIS AGREEMENT.**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**NEO SERVICES LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

dated as of
January 1, 2022

effective date; (ii) an annual interest rate equal to the Prime Rate per each year of the Note, with the Prime Rate established on an annual basis starting on the effective date of such Note; and (iii) amortized monthly payments of principal and interest beginning on the first (1ˢᵗ) day of the next month that occurs at least ninety (90) days from the effective date of such note; <u>provided</u>, that the balance of each Note may be prepaid at any time without penalty.

9.3    <u>Offset</u>. Company shall have the right to offset all damages caused by a Member who dissociates, withdraws or resigns, against amounts, if any, distributable or owed to such Member. No dissociation, withdrawal or resignation, whether in accordance with this Article IX or otherwise shall relieve a Member from any obligation or liability it may have in connection with Company, unless otherwise agreed by Company in writing.

9.4    <u>Company Decisions</u>. All powers of Company in connection with this Article IX must be made through a vote or written consent of a simple majority of the members of the Board of Managers unaffiliated with the Member (whether a VWM, Willful Misconduct or otherwise) to whom such actions relate.

<div align="center">

**ARTICLE X**
**DISSOLUTION AND WINDING UP**

</div>

10.1    <u>Mandatory Dissolution</u>. Company shall be dissolved immediately upon the first to occur of the following events:

    (a)    the sale of all or substantially all of Company's assets and conversion of the purchase price for such assets into cash when the provisions of Section 10.2 have been met;

    (b)    the entry of a decree of judicial dissolution pursuant to the Act, as amended from time to time, and any succeeding law; or

    (c)    the approval of the Board of Managers and a Class A Majority.

10.2    <u>Discretionary Dissolution</u>. Company may be dissolved, at the sole discretion of the Board of Managers, at any time after the sale of all or substantially all of Company's assets; <u>provided</u> that in the absence of approval by the Board of Managers prior to such date, Company shall be dissolved thirty-six (36) months following the date of such sale.

10.3    <u>Winding Up</u>. Upon the dissolution of Company, Company shall engage in no further business other than that necessary to wind up the business and affairs of Company. The Board of Managers shall select a Person, who may or may not be a Member or Manager, to wind up the affairs of Company in an orderly manner (such selected Person shall be the "**Designee**"). The Designee shall give Notice of the commencement of winding up by mail to all known creditors and claimants against Company whose addresses appear in the records of Company. After paying or adequately providing for the payment of all known debts and liabilities of Company (including all costs of dissolution) and the establishment of reasonable reserves that the Designee may deem reasonably necessary for contingent or unforeseen liabilities or obligations of Company, the remaining assets of Company shall be distributed or applied to the Members in the same order and manner as distributions under Section 4.5.

10.4    <u>Distributions -in -Kind</u>. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profits or Net Losses that would have resulted if such asset were sold for such value. Such Net Profits or Net Losses shall then be allocated among the Members pursuant to Article IV, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such

11.10    Survival of Indemnification. In the event Company merges with another entity and Company is not the surviving entity, or transfers all of its assets, proper provisions shall be made so that successors of Company assume Company's obligations with respect to indemnification of Managers and officers.

## ARTICLE XII
## CONFIDENTIALITY

12.1    Proprietary Information. Each Member and Manager acknowledges and agrees that it will receive and become aware of certain information that is proprietary to Company or any of its Subsidiaries, including, without limitation, prices, costs, recipes, software, designs, formulas, code, applications, personnel, knowledge, customer information, supplier information, manufacturer information, distributor information, marketing plans, business plans, data and techniques, other non-public information concerning the business or finances of Company, and other information the disclosure of which might harm or destroy the competitive advantage of Company (all of the foregoing shall hereinafter be referred to as the "**Proprietary Information**"). Notwithstanding the foregoing, the Proprietary Information shall not include any information that: (i) a Member or Manager has or obtains other than as a result of being a Member or Manager, as applicable; (ii) is generally known or becomes part of the public domain through no fault of a Member or Manager; or (iii) is required to be disclosed in the context of any administrative or judicial proceeding.

12.2    Confidentiality. Each Member and Manager agrees that it shall not, directly or indirectly, disclose any Proprietary Information to third parties other than such Member's or such Manager's (as applicable) attorneys, accountants, and financial advisors, copy or use any Proprietary Information, or publish any Proprietary Information, except for the purpose of fulfilling its obligations to Company or as otherwise required by applicable law.

12.3    Equitable Relief. Each Member and Manager hereby acknowledges and agrees that the breach by such Member or Manager of its covenants and obligations under this Article XII may cause irreparable harm and significant injury to Company that could be difficult to limit or quantify. Accordingly, each Member and Manager agrees that Company shall have the right to seek an immediate injunction, specific performance or other equitable relief due to any such breach, without posting any bond therefor, in addition to any other remedies that may be available to Company or the other Members and Managers at law or in equity.

## ARTICLE XIII
## POWER OF ATTORNEY

13.1    Appointment of the Board of Managers as Attorney-in-Fact.

(a)    Each party to this Agreement, by the execution of this Agreement, irrevocably constitutes and appoints the Board of Managers as such party's true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the following actions:

(i)    All fictitious name certificates and all certificates and other instruments (including the Articles of Organization and counterparts of this Agreement), and any amendment or restatement thereof, that the Board of Managers deems appropriate to form, qualify or continue Company as a limited liability company in the jurisdictions in which Company may conduct business or in which such formation, qualification or continuation is, in the opinion of the Board of Managers, necessary or desirable to protect the limited liability of the Members;

40

# EXHIBIT 4



# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (the "Agreement") is made and entered into as of the Effective Date set forth below by and between Luminate Capital Corp, a Delaware limited liability company (together with its affiliates and subsidiaries, collectively "**Luminate**"), and the entity and/or individual whose name and address are set forth below (the "Company"). Luminate and the Company may be discussing or evaluating possible business transactions (the "Business Transactions"). For purposes of this Agreement, each of Luminate or Company/Individual may be referred to individually as a "**Party**" or collectively as the "**Parties**." In connection with these discussions, each Party may disclose or has disclosed, certain Proprietary Information (as hereinafter defined) which it desires to be used only for the limited purpose for which disclosed. The Party receiving Proprietary Information is referred to herein as "Recipient" and the Party disclosing Proprietary Information is referred to herein as "Discloser."

1. *Proprietary Information*. For purposes of this Agreement, "Proprietary **Information**" of a Party shall mean: (i) information disclosed by such Party relating to product development strategy and activity, product concepts and features, marketing strategies, corporate assessments and strategic plans, pricing, financial and statistical information, accounting information, identity of suppliers and vendors, software development, algorithms, models, development efforts, software, systems, processes, formulae, inventions, discoveries, policies, guidelines, procedures, practices, disputes or litigation, (ii) confidential, proprietary or trade secret information orally disclosed by such Party, (iii) confidential, proprietary or trade secret information disclosed by such Party that is clearly and conspicuously identified in writing as such at the time of its first disclosure, (iv) confidential, proprietary or trade secret information disclosed by such Party, which a reasonable person employed in the technology, mortgage or real estate industries or Recipient's industry would recognize as such,
(v) information disclosed by such Party relating to employees, contractors or customers which, if released, would cause an unlawful invasion of privacy, or (vi) any compilation or summary of information or data that contains or is based on Proprietary Information. For purposes of this Agreement, and without limiting the generality of the foregoing, the Parties acknowledge and agree that (A) all Proprietary Information disclosed by a Party shall be deemed to be the Proprietary Information of such Party, including, but not limited to, third-Party confidential, proprietary or trade secret information that such Party is obligated to protect, and (B) Proprietary Information shall be deemed to be disclosed by a Party if such Proprietary Information is disclosed by any of its partners, affiliates, officers, employees, directors, contractors, agents or representatives or is otherwise disclosed on behalf of such Party (collectively, "**Representatives**").

2. *Protection*. Recipient agrees to (i) receive Proprietary Information disclosed hereunder in confidence, (ii) implement appropriate measures to maintain the confidentiality, security, and integrity of such Proprietary Information and not disclose such Proprietary Information to third parties (except for (a) Recipient's Representatives acting for the sole benefit of Recipient, who have a need to know, are under a duty of non- disclosure with respect to such information, and are under a duty to implement appropriate measures to maintain the confidentiality, security and integrity of such information, and (b) Recipient's regulator, upon request by such regulator and subject to Recipient's formal request that such information be treated in confidence and Recipient only discloses that portion of the Proprietary Information that is legally required to be furnished pursuant to the opinion of its legal counsel), which efforts shall accord such Proprietary Information at least the same level of protection against unauthorized use and disclosure that Recipient customarily accords to its own information of a similar nature but no less than a commercially reasonable degree of protection, (iii) use or permit the use of such Proprietary Information solely in accordance with the terms of this Agreement for the

discussion and/or evaluation of the Business Transactions, (iv) promptly notify Discloser in writing of any actual or suspected loss or unauthorized use, disclosure or access of Discloser's Proprietary Information of which it becomes aware, and take all steps reasonably requested by Discloser to limit, stop or otherwise prevent such loss or unauthorized use, disclosure or access, and (v) be responsible for any violation of this Agreement by its Representatives.

3.    _Compliance with Gramm-Leach-Bliley Act_.    Notwithstanding anything to the contrary contained in this Agreement, each Party agrees that it may receive nonpublic personal information as such term is defined in the Gramm-Leach-Bliley Act (the "GLB") in connection with the Business Transactions, and that with respect to such information (1) it shall act in accordance with all applicable laws and regulations, including without limitation the applicable security and privacy provisions of the GLB with respect to its use of nonpublic personal information, (2) it shall maintain, and shall require all third parties permitted hereunder to maintain, effective information security measures to protect nonpublic personal information from unauthorized disclosure or use, and (3) it shall provide the other Party with information regarding such security measures upon the reasonable request of such other Party and promptly provide such other Party with information regarding any failure of such security measures or any security breach related to nonpublic personal information.  The obligations set forth in this paragraph shall survive the termination of the Agreement.

4.    _Nonuse_.  Neither Party will copy, transmit, reproduce, summarize, or quote any Proprietary Information, and each Party will use the Proprietary Information only in connection with the Business Transactions.  Each Party and its affiliates shall at all times use the Proprietary Information in accordance with applicable laws, including without limitation, all securities laws.  In addition, neither Party will use the Proprietary Information to make any contact with any of the obligors of the mortgage loans.

5.    _Compliance with Securities Laws_.  Each Party (i) acknowledges that neither it nor its employees will use any Proprietary Information in contravention of the United States securities laws, (ii) has implemented reasonable policies and procedures, taking into account the nature of its business, to ensure that individuals making investment decisions will not violate laws prohibiting trading on the basis of material non-public information and (iii) represents that informational barriers exist between individuals who are involved in purchasing and/or selling securities and individuals who will receive the Proprietary Information.

6.    _Exclusions_.  The restrictions on use and disclosure set forth above shall not apply when and to the extent that the Proprietary Information:  (i) is or becomes generally available to the public or widely known in the mortgage industry through no fault of Recipient (or anyone acting on its behalf), (ii) was previously rightfully known to Recipient free of any obligation to keep it confidential, (iii) is subsequently disclosed to Recipient by a third party who may rightfully transfer and disclose such information without restriction and free of any obligation to keep it confidential, (iv) is independently developed by Recipient without reference or access to Discloser's Proprietary Information, or (v) is required to be disclosed by Recipient by applicable law, provided that Recipient uses all reasonable efforts to provide Discloser with at least ten (10) days' prior notice of such disclosure and Recipient discloses only that portion of the Proprietary Information that is legally required to be furnished pursuant to the opinion of legal counsel of Recipient.

7.    _Rights; Term_.  All Proprietary Information shall be deemed to be the property of Discloser or the appropriate third-party owner, as the case may be.  Except as Recipient reasonably requires to accomplish the purposes provided herein, Recipient shall not reproduce such Proprietary Information, in whole or in part, without written authorization of Discloser.  At the conclusion of the discussions between the Parties or within

five (5) business days of Discloser's earlier request, Recipient shall cease use of all Proprietary Information received hereunder and shall return it to Discloser or, at Recipient's option, destroy all tangible or retrievable materials embodying such Proprietary Information. If Recipient elects to destroy rather than return Proprietary Information, Recipient will provide Discloser, at Discloser's request, with an affidavit affirming that such Proprietary Information has been permanently and completely destroyed. However, machine- readable archival copies of Proprietary Information need only be destroyed in due course and Recipient's auditors or legal counsel may each retain one (1) copy of Proprietary Information for the purpose of establishing what Proprietary Information has been received or for the purpose of complying with any orders, subpoenas or legal requirements. Except as expressly provided herein, Discloser grants no license under any copyright, patent, trademark, trade secret or other intellectual property right by disclosure of Proprietary Information. Except for express provisions that survive termination or expiration of this Agreement, unless earlier terminated by the Parties, this Agreement shall terminate one (1) year from the date hereof.

8.  _Legends._  Each Party agrees that it shall abide by and reproduce and include any restrictive legend or proprietary rights notice that appears in or on any Proprietary Information of the other Party (or any third-Party owner) that it is authorized to reproduce. Each Party also agrees that it shall not remove, alter, cover or distort any trademark, trade name, copyright or other proprietary rights notices, legends, symbols or labels appearing on or in any Proprietary Information of the other Party (or any third-party owner).

9.  _Records._  Recipient shall at all times maintain appropriate measures to protect the security and integrity of any Discloser's records Recipient obtains or accesses pursuant to this Agreement, including, but not limited to, measures designed to protect against the unauthorized use, access, destruction, loss, or alteration of such records. Recipient shall also ensure that all of its Representatives who obtain or access Discloser's records maintain appropriate measures to protect security and integrity of these records.

10.  _General Terms._

(a)  No Warranties.  DISCLOSER PROVIDES INFORMATION SOLELY ON AN "AS IS" BASIS, WITHOUT WARRANTIES OF ANY KIND or duty to update or correct. Each Party understands that portions of Proprietary Information may relate to products or services that are under development or planned for development by Discloser or a third party. Discloser does not warrant or represent that it will or will not introduce any product or service to which Proprietary Information disclosed herein is related.

(b)  Limited Obligations.  Other than the obligations set forth herein, neither Party shall have any further obligations to the other unless and until a definitive written agreement is executed. Either Party may negotiate with others and may withdraw from negotiations at any time, for any reason, without obligation to the other. To the extent either Party incurs costs or changes position as a result of any discussions between the Parties, it does so entirely at its own risk. This Agreement does not create any agency or partnership relationship.

(c)  Public Statements; Use of Name.  Neither party shall make, deliver or publish any public statements or descriptions of the Business Transactions (including statements that a Business Transaction is being discussed) without the prior written consent of the other Party. Neither Party shall use the name or marks of the other for advertising or any other purposes without the prior written approval of the other Party.

(d)    No Assignment.  Neither this Agreement nor any rights or obligations hereunder shall be assignable, delegable or otherwise transferable in whole or in part, except in the event of a change of control of Luminate or Luminate's assignment of this Agreement to any of its affiliates.

(e)    Governing Law; Severability.  This Agreement shall be governed by the laws of the State of Texas, exclusive of its conflict of laws principles.  If any provision of this Agreement is held to be void or unenforceable, in whole or in part, the other provisions of this Agreement shall continue to be valid and the Parties shall replace the void or unenforceable provision with one that is valid and enforceable and most nearly approximates their original intentions.

(f)    Notices.  All notices, requests, demands, and other communications (other than routine operational communications) required or permitted hereunder shall be in writing and shall be deemed to have been received by a Party (i) when actually received in the case of hand delivery against a signed receipt, (ii) two (2) business days after being given to a reputable overnight courier, or (iii) upon receipt, when mailed by first class mail, postage prepaid, and addressed to such Party at its address set forth herein (or to such other address as such Party may designate in writing). All notices to Luminate shall be sent to: Luminate Capital Corp, 2523 Wayzata Blvd, Suite 200, Minneapolis, MN 55405, Attention: Taryn Reuter – CEO & Chairman. All notices to the Company shall be sent to the address set forth on the signature page hereto.

(g)    Injunctive Relief.  The Parties each acknowledge and agree that the unauthorized use or disclosure of the Discloser's Proprietary Information would cause Discloser to incur irreparable harm and significant damages, the degree of which may be difficult to ascertain.  Accordingly, each Party agrees that the Discloser will have the right to seek immediate equitable relief to enjoin any unauthorized use or disclosure of its Proprietary Information, in addition to any and all other rights and remedies it may have at law or otherwise.

(h)    Entire Agreement; Signatures.  This Agreement expresses the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior oral or written agreements, commitments and understandings.  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be an original and all of which together shall constitute one and the same instrument.  Facsimile signatures are deemed to be equivalent to original signatures for purposes of this Agreement.  No modification, amendment or waiver of any term or condition of this Agreement shall be binding upon a Party unless it is in writing and is executed by the duly authorized representative of the Party against whom such modification, amendment or waiver is sought to be enforced.

(i)    Survival.  The Parties hereto agree that provisions which expressly or by their nature continue to apply after the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement. For avoidance of doubt, Sections 3, 5, 10(f) and 10(i) shall survive the termination or expiration of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the latest of the two dates listed below (the "Effective Date").

**LUMINATE CAPITAL CORP**

By: _____

Name: Taryn Reuter

Title: Chairman and CEO

Date: 8/11/2022

_____

*Neo Home Loans*

By: _____

Name: Danny Horanyi

Title: CSO

Date: 8/11/2022

Address for Notices:
1119 Vega Way

San Marcos, CA 92078

Attention:

Facsimile:

# EXHIBIT 5

Varun Krishna shares Rocket's plan to "become the Apple of homeownership"

**Listen Now**

✕

☰ **HOUSINGWIRE**                                    SUBSCRIBE

INVENTORY  ⓘ  **635,432**  **−15,560**      30-YR FIXED  ⓘ  **7.12%**  **0.00**

Mortgage    Origination

# Luminate Home Loans to close NEO division

## The division is expected to close by the end of February 2025

*October 25, 2024, 3:05 pm  By Flávia Furlan Nunes*

Minneapolis-based mortgage lender **Luminate Home Loans** has decided to shutter its **NEO Home Loans** division, which transitioned to the firm two years ago, the company announced on Friday. The expectation is that NEO will close by the end of February 2025.

According to Luminate, the decision reflects, among other things, its "focus on integrating mortgage lending into its core banking services to better serve clients and build long-term financial relationships." The mortgage firm, which has been in business since 1998, is a subsidiary of **Luminate Bank**.

The company said it's working with affected employees and will provide opportunities to transition to other roles within the organization.

Luminate announced in December 2022 that it would transition the Neo Home Loans team, which had more than 200 members, to its structure. The team was previously part of **Celebrity Home Loans**.

"We made the decision to close the NEO Division to align with our long-term business strategy," Taryn Reuter, CEO and chairman of Luminate, said in a statement. "Our focus now is on ensuring a smooth transition while continuing to provide outstanding service and expanding our platform."

The lender says it has 84 branches and more than 500 loan originators nationwide, providing financial solutions in 49 states.

**Inside Mortgage Finance** shows Luminate Bank originated $1.26 billion in mortgages in the first half of 2024, up 4% year over year. Meanwhile, data from



POWER HOUSE

Hosted By Diego Sanchez

Listen Now

**Featured Events**


Hosted By    Demo Day
**February Virtual Demo Day**


Hosted By    HousingWire
**Housing Economic Summit**


Hosted By    HousingWire
**The Gathering 2025**

mortgage tech platform **Modex** shows that most of the company's origination this year has been conventional (71%) and purchase (76%) loans.

"The partnership between Luminate Home Loans and Luminate Bank is the spark that ignites our nationwide <u>expansion</u>, accelerating our growth across the United States," Reuter added.

More:    | Minneapolis |   | Retail Lending |

## – Featured White Papers

**Personal Insurance Marketplace Outlook 2025: Strategies for value creation**

Published by HUB International

**Elevating mortgage servicing through strategic outsourcing: A path to efficiency and growth**

Published by AIS

**How investing in a variety of servicing technologies streamlines operational efficiencies**

Published by ServiceLink

<u>**Become a member**</u> to



## – Most Popular



## – Latest Article



As LA fires burn, reverse

How 7% mortgage rates will change housing for a decade

We haven't had this many homeowners with mortgage rates over 6% since 2016.

---

LA fires upend rental market as residents scramble for housing

---

Varun Krishna shares Rocket's plan to "become the Apple of homeownership"

---

Housing resources and help for victims of the LA fires

---

As LA fires burn, reverse mortgage industry emphasizes need for servicer, insurer contacts

mortgage industry emphasizes need for servicer, insurer contacts

Los Angeles County has the highest concentration of HECM borrowers in the country, and the industry is moving to respond.

---

Redfin lays off 46 employees

---

Rep. Maxine Waters pushes for serious investigation with proposed wildfire bill 🔒

---

Housing resources and help for victims of the LA fires

---

Ally Financial
closes mortgage
origination
business

Jobs week data
is keeping
mortgage rates
above 7% 🔒

HUD secretary
nominee Scott
Turner to have
Senate
confirmation
hearing next
week

## HW Media

Altos Research

HousingWire

RealTrends

Reverse Mortgage Daily

## Advertise With HW

Digital Advertising

HW Content Studio

## Community

Events

The Gathering

## Company

About HousingWire

Enterprise Subscription



Download Rate Card

Contact Us

Licensing & Reprints

Jobs

© 2006–2025 HW Media, LLC. All rights reserved. Site by Trew Knowledge. Powered by WordPress VIP

Privacy Policy