JASON E. MURTAGH (SBN 294830)
jason.murtagh@bipc.com
BUCHANAN, INGERSOLL & ROONEY, LLP
600 West Broadway, Suite 1100
San Diego, CA 92101-3387
Telephone:  619 346 7592
Facsimile:  619 702 3898

Attorney for Defendants
Daniel Horanyi, Jeanette Lee and Lauren Havins

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA
# SAN DIEGO

| | |
|---|---|
| LUMINATE HOME LOANS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BETTER MORTGAGE CO., DANIEL HORANYI, JEANETTE LEE, & LAUREN HAVINS, <br><br> Defendants. | Case No.:  24-cv-2251-BAS-MSB <br><br> **DECLARATION OF SYDNEY LYNN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY** <br><br> Complaint Filed:  December 2, 2024 |

I, Sydney Lynn, hereby declare and state:

1. My name is Sydney Lynn, and I am the Vice President, Distributed Retail – Finance at NEO, part of Better Mortgage Corporation ("Better").

2. I am over the age of 18 and competent to testify to the matters set forth herein. The statements contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

3. Where I know certain events or information secondhand, or where I believe them to be true based on information received from others, I have specified that these are "upon information and belief."

**My Employment at NEO**

4. I started working at NEO on or around June 14, 2021, when it was associated with a mortgage company called Celebrity Home Loans. I joined NEO as its Director of Finance, which was a role similar to a CFO. I was in charge of managing NEO's finances, including the finances related to its branches.

5. I joined NEO in its early days, when they had made few – if any – profits. My first job was to make sure that NEO had clear financial statements. I spent my first two months cleaning up and auditing NEO's P&L and other financial data. I prepared P&Ls for each individual NEO branch as well.

6. Upon arriving at NEO, I was tasked with developing financial models and reports that accurately reflected NEO's profits and losses. Although NEO was technically part of Celebrity, my understanding was that it functioned as a separate and independent entity. This was consistent with what I observed in managing NEO's finances, which were separate from Celebrity's. NEO had its own financial reporting, including its own profit & loss reports that I worked to develop from the outset of my employment.

7. In 2022, partially as a result of obtaining a better understanding of revenue allocation from the work I was doing, and partly because of Celebrity's own dim financial outlook, NEO leadership – including Danny Horanyi, Ryan Grant, and Chris Ledlie – started to look for a new business to partner with.

8. Among other things, we were interested in partnering with a bank that already had warehouse lines set up and would not require us to apply for substantial additional licensing.

**NEO's Transition to Luminate**

9. Luminate was one of the companies NEO was considering joining. During this process, while NEO was still affiliated with Celebrity, Luminate asked for extensive NEO financial data. Upon information and belief, this was for the purpose of modeling whether NEO could be profitable at Luminate. I modeled NEO's projected

finances for Luminate. Bekka Gustafson, who was CFO at Luminate, was not satisfied with the projected financials. She wanted to see the actual, underlying data, including hard numbers, and requested that we send NEO's historical financial data. I provided that data to Luminate.

10. I and others also met in person with Taryn Reuter – who is Luminate's CEO – and Ms. Gustafson. We kept these meetings secret from Celebrity, but they did happen during our working hours. No one on the Luminate team suggested that we should not meet with them during our working hours at Celebrity.

11. The NEO leadership team met with several banks, and ultimately decided to partner with Luminate Bank, and its mortgage subsidiary Luminate Home Loans. Upon information and belief, one of the main reasons NEO chose Luminate was that Mr. Reuter represented that NEO would retain its ability to function as an independent entity.

12. Based on our conversations with Mr. Reuter and the Luminate team, we decided to transfer the NEO team to Luminate. Our understanding when NEO joined Luminate was that it would continue to operate as its own brand and that it would retain its intellectual property. To the best of my recollection, no one ever told me that Luminate had acquired the assets or intellectual property of NEO.

13. NEO officially joined Luminate in or around early 2022. I stayed on as Director of Finance. When I first joined, I was a shared resource between Luminate and NEO, but after a couple of months I started working exclusively on NEO's finances. I believe that NEO always paid my entire salary out of its P&L, although it is possible that Luminate paid me for a very short period of time.

14. NEO and Luminate had entirely separate financial systems. They had different economic models, which meant that they needed to be managed separately. For NEO, I continued to use the financial models and the P&L reports I had developed while NEO was with Celebrity, which I brought with me when NEO transitioned to Luminate.

15. When NEO first joined Luminate, we negotiated financial terms that stipulated that NEO would pay Luminate a specific amount for each loan it originated. Our agreement was that that payment entitled NEO to certain shared services from Luminate.

16. Luminate quickly started renegotiating the economic terms of its relationship with NEO. Specifically, every few months, Luminate asked for additional basis points on each loan that NEO wrote. We had no option but to agree to their requests, and the cost of doing business with Luminate became too burdensome for NEO.

17. I also learned that the NEO leadership continued to negotiate with Luminate to purchase the Luminate Home Loans corporate shell. My understanding was that each time that NEO and Luminate leadership came close to finalizing a deal, Luminate would change the terms, and a final agreement was very slow to materialize.

**NEO's Potential Partnership with Better**

18. Sometime in June of 2024, Better and NEO began communicating about the possibility of NEO coming over to Better. Mr. Horanyi asked for my help vetting the potential partnership. My role was primarily to create financial models to determine if it was a prudent financial move for NEO.

19. In July 2024 I traveled to Better's New York officer with Jeanette Lee, Mr. Horanyi, Mr. Grant, and Mr. Ledlie. This was my first official introduction to Better.

20. To the best of my recollection, the proposed economics of the partnership with Better were the same as our original economics with Luminate: NEO would pay Better a certain amount per loan that NEO originated. I created a 12-month pro forma of what NEO's finances would look like under Better's economic model.

21. In or around August 2024 Hana Khosla asked us for certain NEO financial information and data. The information she sought was, to the best of my recollection,

very similar to the data Luminate had sought when NEO was still at Celebrity. My understanding was that the purpose of such data was to determine whether NEO would potentially be profitable at Better.

22. I decided which financial information to send Ms. Khosla based on what I believed to be proprietary. I provided Ms. Khosla with the forecasting model I had created, but not with the underlying hard numbers. I did so because, in my view, the hard data was proprietary information that belonged either to NEO or, in some instances, the individual NEO branches (which, upon information and belief, own their own P&L). I also sent Ms. Khosla a breakdown of NEO's corporate – non-branch – employees, including their salaries

23. This was less data than I had provided Luminate with in advance of our move from Celebrity. At Luminate's request I had provided P&L data, and 18 months of NEO's financials. I never provided that sort of information to Better, and Better did not insist on receiving it.

24. At that time, I did not believe that NEO should enter a partnership with Better. Still, our team stayed open to Better as an alternative to staying put at Luminate, and Mr. Horanyi asked me to continue with my due diligence.

25. At this point, conversations halted. I was convinced that NEO should not partner with Better, and should not pursue the opportunity further, and I know others at NEO felt similarly.

26. Things changed however in late August or early September. Upon information and belief, Mr. Horanyi, Mr. Grant, and Mr. Ledlie became frustrated upon learning about a new complication with NEO's potential acquisition of the Luminate Home Loans shell. Our team began to speak with Better again, and in or around October 17, 2024 the NEO core leadership traveled to New York with some of the top producing branch leaders to explore a NEO/Better partnership further.

27. On or around August 18, 2024, I sent Ms. Khosla branch margins, and created a cost center breakdown that I sent to Ms. Khosla as well. To be clear this was

not hard financial data, and I did not consider it to be proprietary.

28. In or around October 21, 2024, NEO had a strategy meeting in Texas focused on discussing opportunities for 2025 and the future. At that meeting, NEO leadership met with many of the NEO branch leaders to discuss the potential partnership with Better, and to get their feedback and see how they would feel about making changes. The feedback was overwhelmingly positive.

29. Next, NEO leadership flew to Portland and met with Pacific Northwest branch leaders. They too reacted positively to a potential partnership with Better. After those meetings, we were leaning strongly towards moving to Better, but had not made a final decision.

**NEO's Luminate Partnership Breaks Down**

30. On or around October 25, 2024, I suddenly began receiving emails and calls from my NEO coworkers telling me that Mr. Horanyi, Ms. Lee, and 10 others had been abruptly fired by Luminate. The explanation given by Luminate was that they were fired because Luminate did not think Mr. Grant and Mr. Horanyi were being straightforward about NEO's potential deal with Better. I was confused because I knew that Mr. Reuter had been aware of the potential Better partnership for months, since Mr. Horanyi and Mr. Grant told him in July.

31. I assumed I also would be fired, because I was part of the meetings with Better. I feared I would lose access to my Luminate laptop and systems and to the NEO historical financial data that I was able to access through those systems. To ensure NEO would not lose its historical data, I backed up everything on my laptop's desktop, and some documents from the FP&A drive on SharePoint onto a hard drive. Upon information and belief, my NEO colleagues and I created all of the documents I copied. I believed this was NEO's proprietary data. Notably, much of that data I backed up came from prior to NEO joining Luminate, and dated back to NEO's partnership with Celebrity.

32. Before I transferred the NEO files, my external hard drive already had other data saved to it. This included work records from before I joined NEO (including my time in the hospitality industry); it also included thousands of personal photos. I did not delete any of that data when I backed up my NEO files.

33. To be clear, I never plugged any other hard drive into the laptop.

34. I did not select particular files to transfer, but rather tried to back up the machine to avoid the risk of loss of NEO's data if the machine were wiped.

35. I put the hard drive into a drawer and have never looked at it. To this date, I have not accessed that drive, shared the data or any files copied to that drive with anyone, or allowed anyone other than my attorney's third-party data analyst to have access to the drive.

36. I no longer have possession of the hard drive, because I provided it to my attorney's third-party data analyst, who retains possession of it to this day.

37. Shortly after backing up my data, I reached out to Jordyn Costello—who is Luminate's Controller of Accounting— on Teams and said that I was trying to log into Luminate's reimbursement system because I had thousands of dollars of expenses that I had not yet put in for reimbursement, and I could not afford to eat that expense. I did not hear back from Jordyn.

38. I think Jordyn must have told Mr. Reuter about my message, because at around 10:30 AM Mr. Reuter sent me a Teams message saying that I was not being terminated and that he would reach out shortly to discuss.

39. Mr. Reuter called me and confirmed that I was not being terminated from Luminate. He told me that he did not want to terminate anyone from NEO, but that he was done waiting for Mr. Horanyi and Mr. Grant to decide if they were going to transition to Better, so he decided to make the decision for them by terminating their employment with Luminate.

40. Mr. Reuter told me he was not going to fire me because I was an integral part of the company, and because he respected my integrity. He told me that I had not

done anything inappropriate related to the potential NEO/Better transition. He told me he wanted me to stay on with Luminate to help transition the NEO branches to Better. He alluded to me continuing to have a job with Luminate post-NEO transition if I did not want to move to Better.

41. Although I was very surprised that Taryn terminated members of the NEO leadership team so suddenly, this sort of impulsive behavior was not abnormal for him.

42. Mr. Reuter told me he wanted me to facilitate NEO's transition. For me, as NEO's Director of Finance, that meant preparing for a financial transition to Better. At the time, I was grateful for what appeared to be Luminate's support with NEO's transition to Better.

**Luminate Initiates Legal Action**

43. Unfortunately, things quickly changed. On or around November 25, 2024, I received an email from Luminate's outside counsel, Lucas Markowitz, and another attorney from his law firm named Alexander Rogosa. They told me they needed to meet with me immediately, and no later than the next day. They said I was legally required to meet with them because of the terms of my employment contract. I have never been involved in a legal proceeding and, given the recent firings, their email made me very anxious.

44. Later the same day a Luminate employee named Courtney Nuness messaged me and told me Luminate's lawyers wanted to schedule time to meet with me.

45. Shortly thereafter, I reached out to Mr. Markowitz over email to schedule the meeting. I asked what the meeting was going to be about, and if I needed legal representation. Mr. Markowitz would not tell me what the meeting was going to be about. He also told me I could have legal representation if I so wished.

46. This was right before Thanksgiving, and Mr. Markowitz told me I was required to meet with him immediately before the holiday. He was extremely

aggressive about this. I did want my own attorney but, having never been involved in a legal proceeding before I did not know how to find one, especially with such tight time constraints.

47. I attended a meeting with Mr. Markowitz and another lawyer who I believe to be Mr. Alexander Rogosa on or around November 27 over Teams. I do not remember most of it. What I do remember is feeling like they were trying to entrap me. I did not understand their questions. It felt like they did not understand anything about NEO's independence, its relationship with Luminate, its ownership of its IP or its partnership with Better. It also seemed as if they had no idea that Mr. Reuter had asked me to help facilitate NEO's transition to Better.

48. It was only after that meeting that I learned that Luminate had sued Better and some of the NEO executives.

49. On or around December 5, 2025, a Luminate employee named Courtney Hoefener asked me to join a brief Teams meeting. When I joined, Mr. Markowitz and Mr. Rogosa were on the call. Ms. Hoefener went on mute and Mr. Markowitz fired me. Mr. Markowitz told me I was in violation of my employment agreement because I had allegedly shared Luminate's trade secrets and proprietary information. He then told me that Luminate would be pursuing legal action against me.

50. After my employment was terminated, Luminate sent me a prepaid shipping label to send back my Luminate laptop.

51. I was out of town and unable to return my company laptop immediately. While I was still out of town on December 12, 2024, Mr. Rogosa emailed me to ask why I had not returned the laptop yet. *See* **Exhibit 1**. He also told me I needed to immediately return the hard drive with my computer backup. *Id.* He told me I risked criminal penalty if I did not follow his directions. *Id.* Mr. Markowitz was copied on the email. This email scared me greatly. I was also confused because I did not think I had done anything wrong by backing up my computer. I thought I was just saving NEO's financials, which were essential to its ongoing survival.

52. I emailed back and told Mr. Markowitz and Mr. Rogosa that I would return the laptop when I returned home. I was hesitant to return the hard drive because I knew it had a significant amount of personal data – including records from previous jobs and private photos – saved on it.

53. On December 16, 2024, I told Mr. Markowitz and Mr. Rogosa that I was returning the laptop, but shared my concerns about sending my hard drive full of personal information. *Id.* I told him I was going to seek legal counsel who could help me understand my rights regarding my personal data. *Id.* I also offered to work with Luminate's third-party vendor to identify which documents contained my personal data that I needed to retain, and did not want Luminate to be in possession of. *Id.*

54. After some back and forth over email, Mr. Markowitz emailed me on December 17, 2024 "This is not a negotiation. We tried to work with you. Either confirm you will ship the drive to the forensic analyst or we will take all actions available to us to get it back. You have two hours." *Id.* I still had not managed to find my own lawyer, and I felt that Mr. Markowitz was trying to intimidate me into sending Luminate a hard drive full of my personal information. This was less than two weeks after Mr. Markowitz himself had fired me, and only a few days after his colleague had threatened criminal liability if I failed to comply with his requests. For someone who had never been part of any legal proceeding, this was absolutely terrifying.

55. I responded on December 17, 2024 with my confirmation that I would ship the hard drive to the third-party forensic analyst, and stated my expectations that all personal data, and all data from before my start date at Luminate would be returned to me.

56. On December 17, 2024, Mr. Markowitz emailed me that he "can't and won't give [me] legal advice." In the same email told me that "any data you took from Celebrity is not yours and never was… Everything that belonged to Celebrity now belongs to Luminate." *Id.* I am not a lawyer, and at the time I did not have one. But my understanding was that my NEO colleagues and I moved from Celebrity to Luminate,

but that Luminate did not purchase or own any of NEO's data from when we worked at Celebrity. Mr. Markowitz finished that same email telling me that Luminate would "be instituting legal action against you at a time and place of our choosing."

57. On December 23, 2024, Luminate filed a complaint against me in the United States District Court, District of Nevada. Mr. Markowitz and Mr. Rogosa are Luminate's counsel in that litigation.

58. On or around December 16, 2024, I started working at Better. Until this matter is resolved, I do not intend to use or disclose any documents or materials from NEO's time at Luminate, even though I still believe that virtually all the materials I used while at NEO were actually NEO's property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of January 2025, in Las Vegas, Nevada.

*Sydney Lynn* (signature)

Sydney Lynn

# EXHIBIT 1

| | |
|---|---|
| **From:** | Lucas Markowitz |
| **To:** | Sydney Lynn |
| **Cc:** | Alexander Rogosa |
| **Subject:** | Re: LHL Separation Letter |
| **Date:** | Tuesday, December 17, 2024 6:41:28 PM |

You're free to seek legal advice. I can't and won't give you legal advice. What I can tell you is that any data you took from Celebrity is not yours and never was. You were always an employee, you never owned anything. Everything that belonged to Celebrity now belongs to Luminate. Whether you misappropriated this data from Celebrity or not, it is not now and never was your data. We take your last communication as an affirmation that you plan on keeping this data, which is Luminate's. As a result, we are done communicating with you about it. As a result, Luminate has no choice but to sue you for, among other things, return of the flash drive. We will be instituting legal action against you at a time and place of our choosing.

If at any time you retain legal counsel, they should contact me immediately.

Get Outlook for iOS

---

**From:** Sydney Lynn <sydincolo1@gmail.com>
**Sent:** Tuesday, December 17, 2024 6:32:21 PM
**To:** Lucas Markowitz <lmarkowitz@mitchellsandler.com>
**Subject:** Re: LHL Separation Letter

Lucas:

I will confirm that I will ship the drive to the third party forensic analyst. I want to make my intention clear that I will only share this drive with the third party forensic analyst and no personal data can or will be shared with Luminate from this third party. It is clear that you are bullying me and not allowing me time to consult legal advice to understand my rights to my own data. How exactly have you tried to work with me? Based on your actions, I want to state my expectation on the data that will be returned to me. All personal data and anything created prior to starting with Luminate will be returned to me. All data that was owned by me prior to onboarding but was updated by me after onboarding will still be returned to me. Please confirm that this is accurate and I will send the device.

Sydney

On Tue, Dec 17, 2024 at 2:20 PM Lucas Markowitz <lmarkowitz@mitchellsandler.com> wrote:

> Sydney:
>
> This is not a negotiation. We tried to work with you. Either confirm you will ship the drive to the forensic analyst or we will take all actions available to us to get it back. You have two hours.
>
> Get Outlook for iOS
>
> ---
>
> **From:** Sydney Lynn <sydincolo1@gmail.com>
> **Sent:** Tuesday, December 17, 2024 4:48:20 PM
> **To:** Lucas Markowitz <lmarkowitz@mitchellsandler.com>

**Subject:** Re: LHL Separation Letter

Lucas:

Thank you for your proposed option.  Will I have line of sight into what they decide to remove?  For example, I had kept all my Celebrity Home Loans data on my Luminate computer for easy access and those docs were part of what I had backed up.  That is my data from our previous company, so would want to ensure that items that may have been backed up from LHL computer, are still documents that would be considered my own and would remain on my drive. Please confirm, thank you.

Sydney

On Tue, Dec 17, 2024 at 9:11 AM Lucas Markowitz <lmarkowitz@mitchellsandler.com> wrote:

> Sydney:
>
> Unfortunately, you made the decision to comingle highly sensitive information, trade secrets and potentially consumer protected information with your personal information. We simply cannot allow that information to be in your hands. We propose that you send the flash drive to a third-party forensic discovery vendor. That vendor will hold your flash drive in trust and segregate the Company's information from yours and then return the flash drive to you. Please confirm if you will agree to that. We need a response by the end of the day today.
>
> ### LUCAS MARKOWITZ
>
> Partner*
>
> lmarkowitz@mitchellsandler.com
>
> (o)  202-240-7142
>
> (m) 973-886-3080
>
> 
>
> 2020 K Street, Suite 760
> Washington, DC 20006
>
> 202-886-5260
> Info@mitchellsandler.com

*Licensed to practice in New York and New Jersey*

**Not licensed to practice in Washington, D.C.; working under the supervision of Ari Karen, Esq. pursuant to D.C. Bar Rule 49(c)(8).*

*The content of this email is confidential and intended for the recipient specified in this message only. It is strictly forbidden to share any part of this message with any third party without written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion.*

---

**From:** Sydney Lynn <sydincolo1@gmail.com>
**Sent:** Monday, December 16, 2024 3:36 PM
**To:** Lucas Markowitz <lmarkowitz@mitchellsandler.com>
**Cc:** Alexander Rogosa <arogosa@mitchellsandler.com>
**Subject:** Re: LHL Separation Letter

Hello,

I am writing to confirm that the computer will be shipped back today, as previously discussed.

As a follow-up to our prior conversation before Thanksgiving, I would like to reiterate that I had inquired about the necessity of legal representation, to which you had responded that I could engage legal counsel if I so wished.

I can also confirm that none of the information stored on the flash drive has been disseminated or shared with any third party or external entity. However, I must express concern regarding the contents of the flash drive, which contains 15 years' worth of personal data. I am not comfortable with any of this information being shared, and as such, I intend to seek legal counsel to explore my options for safeguarding my personal data. This may include working with your third-party service to selectively remove the files that were downloaded, or considering other legal avenues to ensure my personal data is adequately protected.

Given the time constraints and my ongoing efforts to secure legal representation, I am still in the process of obtaining counsel. Therefore, I will refrain from shipping the flash drive until we collectively have determined the most appropriate course of action to ensure the protection of my personal data.

Thank you for your understanding and cooperation.

Sydney

On Mon, Dec 16, 2024 at 8:23 AM Lucas Markowitz <lmarkowitz@mitchellsandler.com> wrote:

Sydney:

We will be expecting you to confirm when you have shipped the computer back. However, we need you to confirm our questions (below) about the flash drive and we need you to do that within in the next few hours. If we don't hear from you, we will take any and all actions necessary to protect our property with no further attempts to communicate with you about it.

### LUCAS MARKOWITZ

Partner*

lmarkowitz@mitchellsandler.com

(o)  202-240-7142

(m) 973-886-3080



2020 K Street, Suite 760
Washington, DC 20006

202-886-5260
Info@mitchellsandler.com

---

*Licensed to practice in New York and New Jersey

**Not licensed to practice in Washington, D.C.; working under the supervision of Ari Karen, Esq. pursuant to D.C. Bar Rule 49(c)(8).

The content of this email is confidential and intended for the recipient specified in this message only. It is strictly forbidden to share any part of this message with any third party without written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion.

**From:** Lucas Markowitz
**Sent:** Friday, December 13, 2024 12:11 PM
**To:** 'Sydney Lynn' <sydincolo1@gmail.com>; Alexander Rogosa <arogosa@mitchellsandler.com>
**Subject:** RE: LHL Separation Letter

Sydney:

Thank you for your cooperation. However, it is not just the computer that must be returned. It is the flash drive as well. Can you confirm you will be sending the flash drive back as well?

Separately, can you confirm that none of the information on the flash drive was disseminated to any other person or entity?

We will monitor the shipping notifications to confirm on Monday.

### LUCAS MARKOWITZ

Partner*

lmarkowitz@mitchellsandler.com

(o)  202-240-7142

(m) 973-886-3080



2020 K Street, Suite 760
Washington, DC 20006

202-886-5260

Info@mitchellsandler.com

---

*Licensed to practice in New York and New Jersey

**Not licensed to practice in Washington, D.C.; working under the supervision of Ari Karen, Esq. pursuant to D.C. Bar Rule 49(c)(8).

---

The content of this email is confidential and intended for the recipient specified in this message only. It is strictly forbidden to share any part of this message with any third party without written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion.

---

**From:** Sydney Lynn <sydincolo1@gmail.com>
**Sent:** Friday, December 13, 2024 12:07 PM
**To:** Alexander Rogosa <arogosa@mitchellsandler.com>
**Cc:** Lucas Markowitz <lmarkowitz@mitchellsandler.com>
**Subject:** Re: LHL Separation Letter

Good morning,

I have been out of town and unavailable to return my company laptop but will be returning home tomorrow. I will get it shipped out by Monday, December 16th.

Thank you,

Sydney

On Thu, Dec 12, 2024 at 5:37 PM Alexander Rogosa <arogosa@mitchellsandler.com> wrote:

> Hello Ms. Lynn,
>
> We are reaching out because the prepaid shipping information Luminate provided for

you to send back the company's material shows you have not yet done so. Be advised you must immediately return the flash drive you illegally downloaded Luminate's confidential information onto, as well as the work laptop Luminate provided for you during your employment. This must be done within the next 24 hours to avoid legal process as we are aware of the serious and sensitive nature of the material you are withholding. Your continued illegal possession of this information risks not only civil liability for you personally but criminal penalties as well.

Please confirm your receipt of this message and that you are taking the necessary responsive action.

### Alexander Rogosa

Counsel
arogosa@mitchellsandler.com
(o) (202) 886-5294
2020 K Street, NW, Suite 760
Washington, DC 20006
202-886-5260
info@mitchellsandler.com

***WE HAVE MOVED.*** *Please note our new address:  2020 K Street NW, Suite 760, Washington, DC 20006.*

*The content of this email is confidential and intended only for the recipient specified in the message. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.*