JASON E. MURTAGH (SBN 294830)
jason.murtagh@bipc.com
BUCHANAN, INGERSOLL & ROONEY, LLP
600 West Broadway, Suite 1100
San Diego, CA 92101-3387
Telephone: 619 346 7592
Facsimile: 619 702 3898

Attorney For Defendants
Daniel Horanyi, Jeanette Lee And Lauren Havins

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA
# SAN DIEGO

| | |
|---|---|
| LUMINATE HOME LOANS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BETTER MORTGAGE CO., DANIEL HORANYI, JEANETTE LEE, & LAUREN HAVINS, <br><br> Defendants. | Case No.: 24-cv-2251-BAS-MSB <br><br> **DECLARATION OF RYAN GRANT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY** <br><br> Complaint Filed: December 2, 2024 |

I, Ryan Grant, hereby declare and state:

1. I am over the age of 18 and competent to testify to the matters set forth herein. The statements contained in this declaration are based on my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2. I submit this declaration in support of Defendants' oppositions to Luminate Home Loans. Inc.'s ("Luminate") Motion for a temporary restraining order, preliminary injunction, and expedited discovery.

3. I have nearly two decades of experience in the mortgage industry. I am a co-founder, member and manager of Neo Services LLC ("NEO"), a California limited

liability company.

4. Earlier in my career, I developed a platform called "The Art of Home Ownership." This platform walked mortgage advisors and branch leaders through the best ways to interact with a client from the beginning of the transaction through closing.

5. I began working with Daniel Horanyi in or around the Spring of 2020, when he became a partner in The Art of Home Ownership. This collective work was the seed of NEO.

6. In or around January of 2021, I and others then formed Neo Services LLC as an independent company ("NEO"), NEO was designed to address inefficiencies in retail mortgage operations. A true and correct copy of NEO's Articles of Organization are attached as **Exhibit 1.**

7. A true and correct copy of NEO's most recent California Statement of Information is attached as **Exhibit 2.**

8. Since its formation, NEO has continually owned its own intellectual property, and all other assets of its mortgage business, including its "Neo Home Loans" trademark, for which the application was filed on or about January 20, 2022, well before NEO had any involvement with Luminate or its affiliates. A true and correct copy of the history of NEO's current trademark is attached as **Exhibit 3.**

9. NEO developed and owns its own e-mail domain, @neohomeloans.com, which is stored on a Go Daddy account owned and controlled by me.

10. NEO developed and owns its own intranet ("NEONet"), which remained separate from Luminate's intranet during the time NEO was associated with Luminate.

11. In or around January 2022, Neo Services LLC entered into a Limited Liability Company Agreement ("LLC Agreement"), providing for the management of NEO, the allocation of profits and losses, the distribution of cash, the rights, obligations and interests of the LLC members to each other and to Company.

12. The Agreement provided that NEO would own "information that is proprietary to Company or any of its Subsidiaries, including, without limitation, prices,

costs, recipes, software, designs, formulas, code, applications, personnel, knowledge, customer information, supplier information, manufacturer information, distributor information, marketing plans, business plans, data and techniques, other non-public information concerning the business or finances of Company". A true and correct copy of the relevant portion of the Agreement is attached as **Exhibit 4.**

13. While operating as a separate unit under the umbrella of Celebrity, NEO maintained its independence, trademarks, and proprietary information, leveraging Celebrity's infrastructure solely for compliance and administrative tasks. NEO developed its proprietary "The NEO Way" workflow and continued operating autonomously, despite using certain shared services.

14. I understand that Luminate alleges that it "acquired" NEO's intellectual property from Celebrity. But Celebrity never held an ownership interest in NEO or its assets, including its intellectual property. In fact, to the best of my knowledge, NEO has never authorized the sale of any NEO intellectual property to any entity (including Celebrity, Luminate or Better) and I do not believe any NEO employee ever has done so.

15. Upon information and belief, it would be impossible for NEO's intellectual property to be sold without my knowledge because I am one of its managing members under the LLC Agreement.

16. I understand that Luminate has alleged that NEO "utilized Luminate's extensive trade secrets and the insight … acquired from Luminate." This is not true. From the time of its formation, Danny Horanyi, I, and the other managers of NEO developed proprietary financial models, workflows, and training programs that became and continued to be the cornerstone of NEO's operations, whether at Celebrity, Luminate, or Better.

17. Whenever NEO is associated with an entity, it tries to be a good partner and provide materials and information that the entity might find useful. But it has always, to the best of my knowledge, retained ownership of its own assets.

18. On or about August 8, 2022, Luminate CEO Taryn Reuter and Luminate Co-Founder Eric Lovins met with NEO leaders, including myself, Danny Horanyi, Chris Ledlie and Mark Robinson to explore the possibility of collaboration.

19. These initial discussions set the stage for key meetings that followed. On or about August 29, 2022, I and other members of NEO's leadership visited Luminate's corporate office to discuss a potential partnership in greater detail. During this meeting, my NEO team and Mr. Reuter's Luminate team addressed a range of topics, including stock grants, warrants, profit-and-loss structures, and the possibility of NEO acquiring Luminate's existing retail mortgage arm and production team.

20. A follow-up meeting occurred on September 15, 2022, where NEO and Luminate continued refining the terms of their partnership. Throughout these discussions, Mr. Reuter and the Luminate leadership explicitly assured our team that NEO would maintain its autonomy, intellectual property, and the ability to transition to another entity if necessary.

21. These assurances mirrored the arrangement NEO had previously had with Celebrity, where its intellectual property and proprietary information remained independent and uncompromised. Mr. Reuter was unequivocal in his commitment that Luminate would not appropriate or interfere with NEO's assets unless explicitly agreed otherwise.

22. As part of that transition, I and the rest of the NEO leadership insisted that any agreements that we signed include the explicit right for us to solicit our NEO colleagues to leave and join us elsewhere. This reflected the commitment we had received from Mr. Reuter, that NEO could leave at any time without interference from Luminate.

23. Luminate's assurances were pivotal to my and NEO's decision to join Luminate as an independent partner in December 2022, as they provided confidence that NEO's business model, intellectual property, and autonomy would remain intact under the partnership.

24. NEO's leadership, including myself, joined Luminate in December 2022. Because of this move, hundreds of NEO employees that had been working at Celebrity also transitioned to Luminate.

25. At the time we joined Luminate, its retail mortgage section was relatively small and inactive, with less than half of the annual production of NEO.

26. NEO had a fully independent profit and loss sheet at Luminate, and we were responsible for our own business. Early during our association with Luminate, Danny Horanyi and I cut our salaries simply to ensure that other NEO employees did not lose their jobs. Luminate did not pay for or reimburse any of the substantial loss of salary we took.

27. During our time at Luminate, NEO overwhelmingly utilized only materials it had developed itself, including its own proprietary financial models, workflows, and training programs.

28. In late 2023 and early 2024, Luminate informed us that it intended to refocus on its banking operations. It is also my recollection that in or around the end of 2023 Luminate began to change the terms of its financial arrangement with NEO, charging NEO more per loan originated and imposing a less favorable capital markets allocation.

29. Luminate suggested that NEO buy the Luminate Home Loans corporate shell and fully take over all retail mortgage operations. We negotiated with Luminate for several months, but the terms of Luminate's offer kept changing.

30. During this time, Luminate and NEO exchanged multiple letters of intent, and draft documents in an effort to stay and expand NEO. However, NEO also told Luminate that we were considering other offers.

31. For example, no later than the late Spring or early Summer of 2024, I and others told Mr. Reuter that NEO had spoken to Better about the possibility of affiliating with that company if we could not reach a deal with Luminate. We repeated that representation to Mr. Reuter in September 2024.

32. On October 23, 2024, I had a conversation with Mr. Reuter. I told him that we had not decided anything yet, but that we needed to choose between joining Better on the one hand, and reaching a deal to stay with Luminate on the other. I asked to schedule a meeting on October 25, 2024 to discuss the options.

33. On October 25, 2024, I and several others, including Daniel Horanyi, attended the meeting via video. As Mr. Horanyi began to speak, Mr. Reuter told him that he was being terminated. Mr. Reuter told me that I had not done anything wrong, but that I was "not revenue, just an expense," and so he terminated my employment too.

34. Mr. Reuter then said that Chris Ledlie would not be terminated, but instead would be kept on, to transition the rest of the NEO team to Better.

35. This development was a shock to me, as I believed that our discussions with Luminate were still active.

36. To be clear, as of October 25, 2024, we had not committed to leave and work for Better. We had no contracts with Better and had no commitments from any team members to leave and go to Better. Luminate fired us, and the same day they put out a press release saying that they were shutting down NEO.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of January 2025, in Kamas, Utah.



Ryan Grant

# EXHIBIT 1

# California Secretary of State
## Electronic Filing



# LLC Registration – Articles of Organization

| | |
|---|---|
| Entity Name: | Neo Services LLC |
| Entity (File) Number: | 202100111543 |
| File Date: | 01/01/2021 |
| Entity Type: | Domestic LLC |
| Jurisdiction: | California |

Detailed Filing Information

1. Entity Name: Neo Services LLC

2. Business Addresses:
   a. Initial Street Address of Designated Office in California:
      1119 Vega Way
      San Marcos, California 92078
      United States
   b. Initial Mailing Address:
      1119 Vega Way
      San Marcos, California 92078
      United States

3. Agent for Service of Process:
   Daniel Horanyi
   1119 Vega Way
   San Marcos California 92078
   United States

4. Management Structure: More than One Manager

5. Purpose Statement: The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

Future File Date Of: January 01, 2021

Electronic Signature:
The organizer affirms the information contained herein is true and correct.
Organizer: Daniel Horanyi

Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.

# EXHIBIT 2

| | |
|---|---|
| **STATE OF CALIFORNIA**<br>*Office of the Secretary of State*<br>**STATEMENT OF INFORMATION**<br>**LIMITED LIABILITY COMPANY**<br>California Secretary of State<br>1500 11th Street<br>Sacramento, California 95814<br>(916) 653-3516 | **For Office Use Only**<br>**-FILED-**<br>File No.: BA20220608187<br>Date Filed: 8/2/2022 |

| Entity Details | |
|---|---|
| Limited Liability Company Name | NEO SERVICES LLC |
| Entity No. | 202100111543 |
| Formed In | CALIFORNIA |

| Street Address of Principal Office of LLC | |
|---|---|
| Principal Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |

| Mailing Address of LLC | |
|---|---|
| Mailing Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |
| Attention | Daniel Horanyi |

| Street Address of California Office of LLC | |
|---|---|
| Street Address of California Office | None |

**Manager(s) or Member(s)**

| Manager or Member Name | Manager or Member Address |
|---|---|
| Daniel Horanyi | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |
| Mark Robertson | 404 LA VETA AVE<br>ENCINITAS, CA 92024 |
| Josh Mettle | 8235 SUNRISE LOOP<br>PARK CITY, UT 84098 |
| Chris Ledlie | 56 BUCKSKIN LANE<br>ROLLING HILLS, CA 90274 |
| Ryan Grant | 1852 SHADOW MOUNTAIN DRIVE<br>PARK CITY, UT 84098 |

| Agent for Service of Process | |
|---|---|
| Agent Name | DANIEL HORANYI |
| Agent Address | 1119 VEGA WAY<br>SAN MARCOS, CA 92078 |

| Type of Business | |
|---|---|
| Type of Business | Consulting Services |

| Email Notifications | |
|---|---|
| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |

**Chief Executive Officer (CEO)**

| CEO Name | CEO Address |
|---|---|
| None Entered ||

| Labor Judgment |
|---|
| No Manager or Member of this Limited Liability Company has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code. |

Electronic Signature

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Daniel Horanyi*

Signature

*08/02/2022*

Date

B0976-4340 08/02/2022 2:28 PM Received by California Secretary of State

# EXHIBIT 3

| | |
|---|---|
| **Generated on:** | This page was generated by TSDR on 2024-12-11 14:19:35 EST |
| **Mark:** | NEO HOME LOANS |



| | | | |
|---|---|---|---|
| **US Serial Number:** | 97223469 | **Application Filing Date:** | Jan. 17, 2022 |
| **US Registration Number:** | 7184182 | **Registration Date:** | Oct. 03, 2023 |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |
| **TM5 Common Status Descriptor:** |  | LIVE/REGISTRATION/Issued and Active  The trademark application has been registered with the Office. | |
| **Status:** | Registered. The registration date is used to determine when post-registration maintenance documents are due. | | |
| **Status Date:** | Oct. 03, 2023 | | |

**Publication Date:** Dec. 13, 2022  **Notice of Allowance Date:** Feb. 07, 2023

## Mark Information

| | |
|---|---|
| **Mark Literal Elements:** | NEO HOME LOANS |
| **Standard Character Claim:** | No |
| **Mark Drawing Type:** | 3 - AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S) /NUMBER(S) |
| **Description of Mark:** | The mark consists of a slightly horizontally stretched black hexagon with rounded corners having a light blue bowtie outline design centered inside the hexagon with the word "NEO" in light blue to the right of the hexagon and the words "HOME LOANS" in black and in smaller font below "NEO". |
| **Color Drawing:** | Yes |
| **Color(s) Claimed:** | The color(s) light blue and black is/are claimed as a feature of the mark. |
| **Disclaimer:** | "HOME LOANS" |
| **Design Search Code(s):** | 09.03.15 - Bow ties; Neckties; Ties, neckties or bow ties  26.15.21 - Polygons that are completely or partially shaded |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | | | |
|---|---|---|---|
| **For:** | home mortgage lending; home mortgage lending consulting services for home buyers | | |
| **International Class(es):** | 036 - Primary Class | **U.S Class(es):** | 100, 101, 102 |
| **Class Status:** | ACTIVE | | |
| **First Use:** | Dec. 31, 2020 | **Use in Commerce:** | Dec. 31, 2020 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |

| | | | |
|---|---|---|---|
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | Neo Services LLC |
| **Owner Address:** | 100 Spectrum Center Drive #750<br>Irvine, CALIFORNIA UNITED STATES 92618 |
| **Legal Entity Type:** | LIMITED LIABILITY COMPANY |
| **State or Country Where Organized:** | CALIFORNIA |

## Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | Daniel Barry | **Docket Number:** | NEM-00210T |
| **Attorney Primary Email Address:** | dan@barryiplaw.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Daniel Barry<br>BARRY IP LAW, P.C.<br>27201 PUERTA REAL, SUITE 300<br>MISSION VIEJO, CALIFORNIA UNITED STATES 92691 |
| **Phone:** | 949-943-2704 |
| **Correspondent e-mail:** | dan@barryiplaw.com |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Oct. 03, 2023 | NOTICE OF REGISTRATION CONFIRMATION EMAILED | |
| Oct. 03, 2023 | REGISTERED-PRINCIPAL REGISTER | |
| Aug. 29, 2023 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Aug. 28, 2023 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Aug. 04, 2023 | STATEMENT OF USE PROCESSING COMPLETE | |
| Jul. 17, 2023 | USE AMENDMENT FILED | |
| Aug. 02, 2023 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |
| Jul. 17, 2023 | TEAS STATEMENT OF USE RECEIVED | |
| Feb. 07, 2023 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Dec. 13, 2022 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Dec. 13, 2022 | PUBLISHED FOR OPPOSITION | |
| Nov. 23, 2022 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Nov. 04, 2022 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Oct. 26, 2022 | EXAMINER'S AMENDMENT ENTERED | |
| Oct. 26, 2022 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| Oct. 26, 2022 | EXAMINERS AMENDMENT E-MAILED | |
| Oct. 26, 2022 | EXAMINERS AMENDMENT -WRITTEN | |
| Oct. 25, 2022 | ASSIGNED TO EXAMINER | |
| Jan. 25, 2022 | NOTICE OF DESIGN SEARCH CODE E-MAILED | |
| Jan. 24, 2022 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Jan. 20, 2022 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information - None**

**File Location**

| | | | |
|---|---|---|---|
| **Current Location:** | PUBLICATION AND ISSUE SECTION | **Date in Location:** | Aug. 28, 2023 |

# EXHIBIT 4

**THE MEMBERSHIP INTERESTS AND UNITS DESCRIBED IN AND/OR REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER SECURITIES LAW OF ANY JURISDICTION. SUCH MEMBERSHIP INTERESTS AND UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED OR DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN. THE MEMBERSHIP INTERESTS AND UNITS DESCRIBED BY THIS LIMITED LIABILITY COMPANY AGREEMENT ARE SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THIS AGREEMENT.**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**NEO SERVICES LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

dated as of
January 1, 2022

effective date; (ii) an annual interest rate equal to the Prime Rate per each year of the Note, with the Prime Rate established on an annual basis starting on the effective date of such Note; and (iii) amortized monthly payments of principal and interest beginning on the first (1ˢᵗ) day of the next month that occurs at least ninety (90) days from the effective date of such note; provided, that the balance of each Note may be prepaid at any time without penalty.

9.3     Offset. Company shall have the right to offset all damages caused by a Member who dissociates, withdraws or resigns, against amounts, if any, distributable or owed to such Member. No dissociation, withdrawal or resignation, whether in accordance with this Article IX or otherwise shall relieve a Member from any obligation or liability it may have in connection with Company, unless otherwise agreed by Company in writing.

9.4     Company Decisions. All powers of Company in connection with this Article IX must be made through a vote or written consent of a simple majority of the members of the Board of Managers unaffiliated with the Member (whether a VWM, Willful Misconduct or otherwise) to whom such actions relate.

## ARTICLE X
## DISSOLUTION AND WINDING UP

10.1     Mandatory Dissolution. Company shall be dissolved immediately upon the first to occur of the following events:

(a)     the sale of all or substantially all of Company's assets and conversion of the purchase price for such assets into cash when the provisions of Section 10.2 have been met;

(b)     the entry of a decree of judicial dissolution pursuant to the Act, as amended from time to time, and any succeeding law; or

(c)     the approval of the Board of Managers and a Class A Majority.

10.2     Discretionary Dissolution. Company may be dissolved, at the sole discretion of the Board of Managers, at any time after the sale of all or substantially all of Company's assets; provided that in the absence of approval by the Board of Managers prior to such date, Company shall be dissolved thirty-six (36) months following the date of such sale.

10.3     Winding Up. Upon the dissolution of Company, Company shall engage in no further business other than that necessary to wind up the business and affairs of Company. The Board of Managers shall select a Person, who may or may not be a Member or Manager, to wind up the affairs of Company in an orderly manner (such selected Person shall be the "**Designee**"). The Designee shall give Notice of the commencement of winding up by mail to all known creditors and claimants against Company whose addresses appear in the records of Company. After paying or adequately providing for the payment of all known debts and liabilities of Company (including all costs of dissolution) and the establishment of reasonable reserves that the Designee may deem reasonably necessary for contingent or unforeseen liabilities or obligations of Company, the remaining assets of Company shall be distributed or applied to the Members in the same order and manner as distributions under Section 4.5.

10.4     Distributions -in -Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profits or Net Losses that would have resulted if such asset were sold for such value. Such Net Profits or Net Losses shall then be allocated among the Members pursuant to Article IV, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such

11.10    Survival of Indemnification. In the event Company merges with another entity and Company is not the surviving entity, or transfers all of its assets, proper provisions shall be made so that successors of Company assume Company's obligations with respect to indemnification of Managers and officers.

## ARTICLE XII
## CONFIDENTIALITY

12.1    Proprietary Information. Each Member and Manager acknowledges and agrees that it will receive and become aware of certain information that is proprietary to Company or any of its Subsidiaries, including, without limitation, prices, costs, recipes, software, designs, formulas, code, applications, personnel, knowledge, customer information, supplier information, manufacturer information, distributor information, marketing plans, business plans, data and techniques, other non-public information concerning the business or finances of Company, and other information the disclosure of which might harm or destroy the competitive advantage of Company (all of the foregoing shall hereinafter be referred to as the "**Proprietary Information**"). Notwithstanding the foregoing, the Proprietary Information shall not include any information that: (i) a Member or Manager has or obtains other than as a result of being a Member or Manager, as applicable; (ii) is generally known or becomes part of the public domain through no fault of a Member or Manager; or (iii) is required to be disclosed in the context of any administrative or judicial proceeding.

12.2    Confidentiality. Each Member and Manager agrees that it shall not, directly or indirectly, disclose any Proprietary Information to third parties other than such Member's or such Manager's (as applicable) attorneys, accountants, and financial advisors, copy or use any Proprietary Information, or publish any Proprietary Information, except for the purpose of fulfilling its obligations to Company or as otherwise required by applicable law.

12.3    Equitable Relief. Each Member and Manager hereby acknowledges and agrees that the breach by such Member or Manager of its covenants and obligations under this Article XII may cause irreparable harm and significant injury to Company that could be difficult to limit or quantify. Accordingly, each Member and Manager agrees that Company shall have the right to seek an immediate injunction, specific performance or other equitable relief due to any such breach, without posting any bond therefor, in addition to any other remedies that may be available to Company or the other Members and Managers at law or in equity.

## ARTICLE XIII
## POWER OF ATTORNEY

13.1    Appointment of the Board of Managers as Attorney-in-Fact.

(a)    Each party to this Agreement, by the execution of this Agreement, irrevocably constitutes and appoints the Board of Managers as such party's true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the following actions:

(i)    All fictitious name certificates and all certificates and other instruments (including the Articles of Organization and counterparts of this Agreement), and any amendment or restatement thereof, that the Board of Managers deems appropriate to form, qualify or continue Company as a limited liability company in the jurisdictions in which Company may conduct business or in which such formation, qualification or continuation is, in the opinion of the Board of Managers, necessary or desirable to protect the limited liability of the Members;