Adrienne L. Conrad (SBN 318776)
Kevin B. Hambly (SBN 312426)
JACKSON LEWIS P.C.
225 Broadway, Suite 1800
San Diego, California 92101
Telephone:  (619) 573-4900
Facsimile:   (619) 573-4901
Adrienne.Conrad@jacksonlewis.com
Kevin.Hambly@jacksonlewis.com

Lucas Markowitz (*pro hac vice forthcoming*)
lmarkowitz@mitchellsandler.com
Ari Karen (*pro hac vice forthcoming*)
akaren@mitchellsandler.com
Alexander Rogosa (*pro hac vice forthcoming*)
arogosa@mitchellsandler.com
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, DC 20036
Office: (202) 886-5265

Attorneys for Plaintiff
LUMINATE HOME LOANS, INC.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUMINATE HOME LOANS, INC., | Case No.: 3:24-cv-2251-BAS-MSB |
| Plaintiff, | **LUMINATE HOME LOANS, INC.'S REPLY BRIEF IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINIG ORDER AND A PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY** |
| v. | |
| BETTER MORTGAGE CO., DANIEL HORANYI, JEANETTE LEE, & LAUREN HAVINS, | |
| Defendants. | Hearing Date: Friday, January 24, 2025 |

**PLAINTIFF LUMINATE HOME LOANS, INC.'S REPLY BRIEF IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

Plaintiff Luminate hereby submits this Reply Brief in Support of its Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery (the "Motion").[1]

---

[1] All capitalized terms defined in the Motion are hereby incorporated into the Reply, unless otherwise noted.

1

## **Introduction**

Defendants' oppositions are much more notable for what is left out than what made it in. Defendants' primary argument is that they own the material at issue through an entity referred to as NEO Services LLC (the "LLC"). Aside from Defendants' self-serving declarations, all the evidence says otherwise. Noticeably absent from Defendants' submissions is any documentary evidence to support their claims of ownership over the materials at issue, or any legal relationship between the nebulous LLC and either Luminate or Celebrity. Their conclusory, unsupported references to supposed conversations with Luminate about the autonomy of the Company's NEO Division or its functioning as the LLC is starkly contradicted by the Asset Purchase Agreement ("APA") and the written employment contracts of the Division Presidents, like Defendant Horanyi.

Defendants provide no explanation for why, if NEO was an independent "partner" of Luminate's, they spent months working to transform the division into a wholly owned subsidiary. There is no explanation for why, if the LLC had rights to all data at issue, Defendants felt compelled to share it clandestinely through personal email accounts, shared cloud folders, WhatsApp messages, flash drives, and screen shares. Contrary to their representations, they never disclosed the coordination between Better and the NEO Division managers. On the contrary, they repeatedly denied, when confronted by Luminate, that they were engaged in even exploratory talks about moving to any other lender. If Defendants' claims were true, all this cloak and dagger nonsense would have been unnecessary.

The Oppositions also fail to meaningfully address key issues. They avoid the months-long continued employment at Luminate of these bad actors while they absconded with Luminate's materials and met regularly to establish Better's retail loan operations. Also left unaddressed is the NEO Division managers' exploitation of their privileged positions at Luminate to use those materials to solicit scores of Luminate employees and expense those efforts to Luminate. They ignore that their

continued solicitation of Luminate's employees all spring from those original sins.

Instead, the Oppositions attempt to muddle the central issues of the case and create a veneer of conflicting facts when there are none. Defendants' generalized denials, without factual support, do not create a conflict of evidence or otherwise justify denial of a TRO. Moreover, Defendants' suggestion that Luminate did not sufficiently articulate its trade secrets is betrayed by a review of the Complaint or Motion. Not only did Luminate give extensive descriptions of its various trade secrets which were misappropriated, the Company went a step further than is commonly available at this stage by providing numerous documented examples of the trade secrets, demonstrating when and how they were misappropriated.

To claim that Defendants' self-supervised "segregation" of the trade secrets dispenses with the need for injunctive relief ignores that Defendants have been unwilling to say they are not using materials *generated* from the stolen information. For these reasons and the reasons set forth in Luminate's moving papers, and considering Defendants' failure to support their "well, actually" declarations with documentary evidence, the Court should grant Luminate's application and allow expedited discovery to understand the scope of the problem before it's too late.

## **Argument**

I. <u>Luminate Submitted Mountains of Admissible Evidence.</u>

Luminate's first pleading was a Verified Complaint and authenticated exhibits. A verified complaint is treated as an affidavit, so it is competent evidence to support injunctive relief. *See* Fed. R. Civ. P. 65(B)(1)(A); *Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985); *Ross–Whitney Corp. v. Smith Kline & French Labs.,* 207 F.2d 190, 198 (9th Cir. 1953). Luminate's Verified Complaint was signed and notarized by the Company's CEO, Taryn Reuter, attesting to its contents, including all exhibits. The exhibits used by Luminate qualify for hearsay exceptions as statements by parties' opponents, self-authenticating business records, or qualify for a residual exception considering the totality of the circumstances. *See* Fed. R. Civ. P. 802; 803;

3

804; 902. Luminate submitted a declaration with its Motion by its counsel, Lucas Markowitz, that was based on his personal knowledge of various facts, given his review of materials and communications with opposing counsel, as well as communications with a terminated Luminate employee, Sydney Lynn. Defendants' effort to conceal the factual evidence from analysis betrays their knowledge that a fair review of the records tells a damningly different story than their self-serving and unsupported declarations. Luminate supplements its prior evidence with additional declarations in response to allegations made by Defendants in their Oppositions, and to address continuing malfeasance. *See* Exhibits A (Declaration of Taryn Reuter); B (Declaration of Mike Pelham); and C (Declaration of Lucas Markowitz).

    II.    <u>Luminate Established That Defendants Misappropriated Its Trade Secrets.</u>

        a.  *Luminate Sufficiently Articulated the Trade Secrets at Issue.*

Luminate adequately defined the trade secrets that are at issue and that it is seeking to protect through the injunction. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (preliminary injunctions are usually granted on "evidence that is less complete than in a trial on the merits"). The Complaint and supporting exhibits reveal a mountain of explicit examples of not just the trade secrets, but also stark examples of Defendants' misappropriating them using various covert methods like private email, cloud uploads, taking pictures, and screensharing of specific files. *Soc. Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, at *5 (N.D. Cal. June 14, 2012) (trade secret sufficiently identified "where plaintiff identified a specific file name"). Luminate's evidence shows the trade secrets include, among other things, organizational documents, operational procedures and training information, contracts, loan offerings, pricing information, performance and revenue data down to the branch level, individual employees compensation, employee rosters with contact information and salary lists, economic models, marketing information, branch and corporate cost allocations to profitably run the division, secondary market sales data, loan lead lists, leads, and breakdowns of hundreds of loan files constituting NPI.

For example, Sydney Lynn claimed she created a flash drive filled with trade secrets and confidential and proprietary information supposedly out of fear the computer would be wiped upon return to Luminate, deleting the only record of substantial financial data of "NEO." *See* Dkt. No. 14-2 at ¶ 31. Later, in a message to a Better employee while transferring confidential information to her, she said, "I will put it in BOX so I don't send it." Pelham Declaration at ¶ 19. Said another way, Ms. Lynn confirms the data she tried to take was Luminate's, Luminate controlled access to it, and she avoided using normal channels to transmit it. There was no authority for it to exist anywhere other than confidentially protected within Luminate's secure servers and devices. Luminate provided a breakdown of the nearly 4,000 files downloaded to that device as part of its Motion. During its ongoing investigation, Luminate identified that one such file, Empire ProForma Model 7_15_HK v2, evidenced the sharing of extensive data with Better and the subsequent analysis by Hana Khosla at Better of Luminate's branch volume production history, future forecasts and projections (including for six Apex teams that were not part of the NEO Division), a Proforma detailing 136 line items of costs for the NEO Division and the Net Income to Luminate, and nonpublic information breakdown of over 250 loan files. *See* Pelham Declaration at ¶ 16.

Specific pieces of Luminate's trade secrets, such as broker flows or training methods may be used across the industry as Defendants allege, but different mortgage lenders use their own systems that provide different advantages. Lenders do not freely share them with each other. Rather, they closely guard their competitive advantages that make their loan processing run smoother for borrowers and employees alike. Why else would Defendants feel the need to secretly take it and use it at Better? Most importantly, before Luminate's entire computer system landed in Better's lap, Better had zero retail loan operations. Simply because the industry may have general knowledge on these subjects, does not mean it could be acquired freely by a new player without investing money or time to obtain it. Similarly, names of

Luminate's individual loan officers or branch locations may be publicly obtainable, but that does not extend to the numerous support staff positions necessary to operate the business. Indeed, Better could ask an individual job candidate their salary, but the individual could choose to tell them or not. Here Better did not merely obtain an individual's identity, they received from the Individual Defendants a complete roster list of all employees in Luminate's entire NEO Division, the amount of their compensation, their production data, and the profitability of entire branches to understand who to target, their expected profit margin for any hires, and how much to offer employees to entice them to leave Luminate. These are trade secrets. *See Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 473 (N.D. Cal. 2020).

      b. *There Is No Genuine Dispute Over Who Owns This Material or Who Was Authorized to Share it with Better.*

Self-serving unsupported denials like Defendants' are appropriately treated with skepticism. *See Armstrong v. Sutter Cty. Superintendent of Sch.*, 2017 WL 6448000, at *6 (E.D. Cal. Dec. 18, 2017) ("A blanket 'I didn't do it' declaration can rarely create a material factual dispute, and that is particularly true here where Armstrong intersperses her denials with concessions that each incident did in fact happen but instead justifies why she did it."). *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact).

Better's President, Chad Smith,[2] described this process as an "acqui-hire" – "a transaction in which a company hires human capital (i.e. the employees) from another company rather than acquiring that company's assets or products." Dkt. No. 16 at ¶ 6. If that were true and Better merely hired away Defendant Horanyi or whoever else they wanted, without using reams of Luminate data and employees to solicit one another, we would not be here. But that is not what they did. They took the easy,

---

[2] Defendants objected to notices sent directly to Mr. Smith and Ms. Khosla, however, the gravity of their misconduct reasonably suggested Better may disclaim their intentional illegal actions as outside the scope of their employment rendering them not represented by Better's in house counsel.

Case 3:24-cv-02251-BAS-MSB    Document 23    Filed 01/17/25    PageID.690    Page 7 of 12

greedy way out. They pumped Defendant Horanyi and many others for troves of Luminate's information necessary for Better to start up retail loan operations. Despite describing this as an acqui-hire, Defendants admit Better had no prior experience with or infrastructure for retail loan operations until utilizing the information they wrongfully obtained from Luminate. Mr. Smith even admits, contrary to his self-described acqui-hire, that he "asked . . . Hana Khosla, who is Better's Vice President of Finance and Investor Relations, to analyze NEO's business model and economic structure to determine if Better should partner with NEO and what the terms of a profitable arrangement might look like." *Id.* at ¶ 10. This was not analysis of the LLC Defendant Horanyi and others owned. This was the mortgage operations, owned, controlled, and operated by Luminate using its mortgage license and featuring its proprietary business methods for organizing retail branches in a profitable structure. The evidence shows Better could not even understand and utilize this information without months of active involvement and analyses by Luminate "double agents."

If Better believed the subject material to be "NEO's" rather than Luminate's, why when acquiring it did Mr. Smith need to expressly direct that Luminate's information be removed from various documents before they were passed on for further use by other Better departments? If training materials and broker process flow documents did not have independent economic value, why did Better need to request that Luminate's employees send them Luminate's documents on these matters?

Defendants consistently try to recontextualize and muddy this matter by referring to things as NEO employees, NEO financial data, and NEO loans, when in fact NEO as they describe (NEO Services LLC) has none of these. The employees and branches whose data were sent to Better were all Luminate employees and offices. LLC has no actual role in this dispute. It is a consulting company[3] Defendant Horanyi created that had no relation with any mortgage lender, was not licensed for mortgage lending, and had no employees. Defendants' claims that the extensive

---

[3] *See* Dkt. No. 14-1, Exhibit 1 identifying NEO Home Services LLC as a Consulting Business, not a mortgage lender.

information about Luminate's lending operations, or Celebrity's beforehand, somehow belonged to LLC, are laughable. The only asset LLC controls is a trademark for a design insignia, which is the *only* documentary evidence Defendants provided to support their false claims of ownership.[4] NEO Home Loans is a registered Doing Business As tradename of Luminate's, and before that Celebrity's.

Defendant Horanyi, and the other Division Presidents for Luminate's NEO division such as Ryan Grant and Chris Ledlie, all signed employment agreements and initialed the corresponding Addendum Bs to those contracts specifying that neither they, <u>nor any company they controlled</u>, brought to Luminate or otherwise retained rights to any information or materials when leaving Luminate's employ. *See, e.g., Dkt*. No. 1-4 (Complaint Exhibit 3 § 5.2; Addendum B). Those contain airtight merger clauses. *See id. §* IX(B; D). In other words, Defendants' self-serving, conclusory evidence is contradicted by signed writings between the parties. They cannot overcome this fact and try to simply ignore it. Defendants are no less able than Luminate, and in many cases are *more capable*, of presenting supporting evidence of these supposed conversations and they did not. *See Maaso v. Signer*, 203 Cal. App. 4th 362, 371, (2012) ("An inference may be drawn from a party's failure to produce available evidence or to explain evidence or facts in the case against him."). The Individual Defendants' fantasies about autonomy are shattered by the many written restrictions on the operation of the NEO Division in their employment agreements, such as: (1) the prohibition on the NEO Division or its Presidents from entering into any binding contracts without Luminate's approval; (2) any changes to fixed operating expenses of the Division must be submitted to Luminate for approval beforehand; (3) employee terminations must be approved by Luminate; and (4) no

---

[4] Defendants contend "NEO's intellectual property includes its email domain (@neohomeloans.com), intranet ("NEONet"), and its trademark," none of which are even at issue in this suit, which is about the proprietary information related to retail loan operations engaged in by Luminate's NEO division and Celebrity beforehand, as well as Luminate's contracts which it drew up to create a wholly owned subsidiary. However, to further demonstrate the hollowness of Defendants' claims, all domains related to NEO have actually been paid for by Luminate because the Division Presidents, such as Ryan Grant expensed all payments for those to the NEO Division and the reimbursements were approved by Luminate decreasing the profits to the Company. *See* Exhibit A at ¶ 19.

loans be brokered to another lender without Luminate's agreement. *See id.* at §2; 4.

Defendants concealed their months of work together, contrary to their claims that Luminate was informed of this consideration of Better or somehow authorized the transmission of its material. *See* Exhibits A at ¶¶ 31-35; B at ¶¶ 14; 15; 17-20. When confronted by Luminate executives, NEO managers consistently denied any affiliation with Better, consideration of leaving for another mortgage lender, or any dissatisfaction with Luminate. Exhibit A at ¶ 32; 33. They took extensive steps to try to conceal their transmission of information. Moreover, their claim that the transition was still up in the air until the terminations by Luminate on October 25, 2024, is false. Defendants worked closely together for months to set up Better's retail loan operations, Better already conveyed offers to the Individual Defendants and many others, they sent them Better work computers and provided logins for their systems, and Defendant Lee and Defendant Havins even engaged in calls on Better's behalf with vendors. Exhibit B at ¶¶ 10; 11.

The "press releases" Defendants desperately cling to following the firing of these malicious NEO managers, merely described that Luminate was reorganizing its employees to other areas of its business and intended to cease using the division name NEO Home Loans. To suggest that Luminate consented to the prior theft of its information related to Luminate's NEO division, the hijacking of its employees, branches, offices, or other property is too absurd to require further comment. Setting all that aside, it was merely an article in Housing Wire, not a Luminate press release.

III. <u>Luminate Continues To Face Irreparable Harm.</u>

a. *Defendants' Mitigation Efforts Are Insufficient.*

Defendants claim they are sequestering the materials at issue, yet they refuse to provide any records confirming what specifically is sequestered and have constantly objected to any enforcement provisions if they fail to do so. They also refuse to provide records on how the mountain of material arrived with Better in the first instance or provide any assurance that Better will not use any supposedly

sequestered information again.[5] Instead, during direct discussions between the Parties, Better brazenly reserved its right to cease all sequestering and continue using the material in dispute at its sole discretion on only three business days' notice. *See* Dkt. No. 14-2 at ¶ 10. And it was not until the filing of the Opposition that Ms. Lynn and her counsel provided any verifiable details about the segregation of stolen files on Ms. Lynn's flash drive. *See* Exhibit C at ¶ 8. They still withhold basic facts on that subject, such as the identity of the discovery vendor purportedly reviewing the flash drive or identification of all the specific files on it. *Id.*

The circumstances here still present a grave threat of imminent irreparable harm even on the issues Defendants' claim to mitigate. Courts have found that where proposed mitigation measures are inadequate, then a temporary restraining order is certainly appropriate. *Nat. Res. Def. Council, Inc. v. Winter*, 645 F. Supp. 2d 841, 850–51 (C.D. Cal. 2007). This is particularly necessary where mitigation efforts are only temporary and thus there is an ongoing threat that such efforts will cease absent a restraining order. *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 (2018) ("A party cannot automatically moot a case simply by ending its unlawful conduct once sued," else it "could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends") (*citing Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

### b. *Defendants Continue To Build Off Their Improper Foundation To Establish Retail Loan Operations and Solicit Luminate's Employees.*

If the Court does not grant an injunction, Better will continue to profit from their misdeeds even if they maintained their current segregation efforts until the conclusion of this case. Defendants freely admit Better had no background in retail

---

[5] This is a primary example of how Luminate demonstrated that good cause supports expedited discovery. Plaintiff's Verified Complaint and Motion are replete with examples of Defendants misappropriating trade secrets via clandestine means and trying to obfuscate the extent to which they used them to establish retail loan operations. The longer Luminate is forced to wait for this information, the better positions Defendants become to reap the benefits of their misconduct, successfully steal Luminate's employees, and divert loans. Luminate urgently needs to know what next steps are necessary to safeguard its trade secrets from Defendants. Ensuring compliance with any preliminary injunction order and that irreparable harm to Luminate is actually prevented depends on such expedited discovery.

loan operations before working together and utilizing what they claim is "NEO" data, which belonged to Luminate. While they may now be segregating the Luminate data they originally received, they are continuing with the launch of the retail loan division built entirely with this stolen information to compete with Luminate for its customer base. Better has no plans to segregate that. Moreover, they continue gathering Luminate's trade secrets through video conferences with departing employees to review Luminate's data via screen shares that avoid formal transmission records and segregation. *See* Exhibit B at ¶¶ 17-20.

Similarly, Better's ongoing solicitations of Luminate's employees are built off an improper head start by using Luminate managers to lead the solicitations months ahead of their resignations. Moreover, their offers to employees and knowledge of who to target is based off the trade secrets they misappropriated that gave complete breakdowns of compensation and performance for Luminate's employees known only to high-level insides of the Company. They continue to reap these benefits to recruit employees to fill out the retail loan division they tailored for Luminate's people rather than fair competition for employees across the marketplace.

Luminate's continuing investigation confirms Better has now set its sights on Luminate's customer base. They are directly soliciting borrowers to move loans over to Better through a variety of avenues. They have told borrowers that a merger is taking place so their loan should proceed with Better rather than Luminate, they claim Luminate consents to the transfers, they have disparaged Luminate to prospective borrowers, departing employees have forwarded leads to Better before resigning from Luminate, and at least one employee has forwarded borrower information to her Better email address before resigning. *See* Exhibits A at ¶ 41; B at ¶¶ 21-23. Only an injunction from the Court will stop this madness.

## **CONCLUSION**

**WHEREFORE** Plaintiff Luminate Home Loans, Inc., respectfully requests that an Order be entered awarding the relief detailed in Plaintiff's Motion.

Respectfully submitted this 17th day of January, 2025.

| | |
|---|---|
| */s/ Lucas Markowitz* | */s/ Adrienne L. Conrad* |
| Lucas Markowitz (*phv forthcoming*) | Adrienne L. Conrad (SBN 318776) |
| Ari Karen (*phv forthcoming*) | Kevin B. Hambly (SBN 312426) |
| Alexander Rogosa (*phv forthcoming*) | JACKSON LEWIS P.C. |
| MITCHELL SANDLER PLLC | 225 Broadway, Suite 1800 |
| 2020 K Street NW, Suite 760 | San Diego, California 92101 |
| Washington, DC 20006 | Telephone: (619) 573-4900 |
| Office: (202) 886-5265 | Facsimile: (619) 573-4901 |
| E-mail: lmarkowitz@mitchellsandler.com | Adrienne.Conrad@jacksonlewis.com |
| akaren@mitchellsandler.com | Kevin.Hambly@jacksonlewis.com |
| arogosa@mitchellsandler.com | |

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court and served on all Counsel of Record via the Court's electronic filing system this 17th day of January, 2025.

| | |
|---|---|
| */s/ Lucas Markowitz* | */s/ Adrienne L. Conrad* |
| Lucas Markowitz (*phv forthcoming*) | Adrienne L. Conrad (SBN 318776) |
| Ari Karen (*phv forthcoming*) | Kevin B. Hambly (SBN 312426) |
| Alexander Rogosa (*phv forthcoming*) | JACKSON LEWIS P.C. |
| MITCHELL SANDLER PLLC | 225 Broadway, Suite 1800 |
| 2020 K Street NW, Suite 760 | San Diego, California 92101 |
| Washington, DC 20006 | Telephone: (619) 573-4900 |
| Office: (202) 886-5265 | Facsimile: (619) 573-4901 |
| E-mail: lmarkowitz@mitchellsandler.com | Adrienne.Conrad@jacksonlewis.com |
| akaren@mitchellsandler.com | Kevin.Hambly@jacksonlewis.com |
| arogosa@mitchellsandler.com | |

**ATTORNEYS FOR PLAINTIFF**